**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

ALVIN L. BRAGG, JR., in his official capacity as
District Attorney for New York County,

*Plaintiff*,

    v.

JIM JORDAN, in his official capacity as Chairman of the
Committee on the Judiciary; COMMITTEE ON THE
JUDICIARY OF THE UNITED STATES HOUSE OF
REPRESENTATIVES; and MARK F. POMERANTZ,

*Defendants*.

**Case No.**   23-cv-3032

---

## INTRODUCTION

1.    Plaintiff District Attorney Alvin L. Bragg, Jr. brings this action in response to an unprecedently brazen and unconstitutional attack by members of Congress on an ongoing New York State criminal prosecution and investigation of former President Donald J. Trump. Beginning on March 20, 2023, Representative Jim Jordan, Chairman of the House Committee on the Judiciary (the "Committee"), began a transparent campaign to intimidate and attack District Attorney Bragg, making demands for confidential documents and testimony from the District Attorney himself as well as his current and former employees and officials. Two days after Mr. Trump was arraigned on 34 felony counts in New York State Supreme Court, Chairman Jordan and the Committee served a subpoena on Mark Pomerantz, a former Special Assistant District Attorney who participated in an investigation of Mr. Trump and his businesses. The subpoena seeks to compel Mr. Pomerantz to testify in a deposition on April 20, 2023. Chairman Jordan's demands, including his subpoena to Mr. Pomerantz, seek highly sensitive and confidential local prosecutorial information that belongs to the Office of the District Attorney and the People of New

1

York.   Basic principles of federalism and common sense, as well as binding Supreme Court precedent, forbid Congress from demanding it.

2.     Congress has no power to supervise state criminal prosecutions.   Nor does Congress have the power to serve subpoenas "for the personal aggrandizement of the investigators or to punish those investigated."  *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (2020) (quoting *Watkins v. United States*, 354 U.S. 178, 187 (1957)) (internal quotation marks omitted).   Yet that is precisely what Chairman Jordan is trying to do.   He and his allies have stated they want the District Attorney to come to Capitol Hill to "explain" himself and to provide "a good argument" to Congress in support of his decision to investigate and prosecute Mr. Trump.   And they have threatened that the House of Representatives will "hold Alvin Bragg . . . to account" for indicting Mr. Trump.   Now, Chairman Jordan has subpoenaed one of the District Attorney's former Special Assistants to interrogate him about his official prosecutorial activities.   But subpoenaing a former line prosecutor to talk about an ongoing criminal prosecution and investigation is no less of an affront to state sovereignty than subpoenaing the District Attorney himself.   Chairman Jordan claims he is seeking to conduct "oversight."   But he has no power under the Constitution to oversee state and local criminal matters.   By definition, then, he has no legitimate legislative purpose for issuing this subpoena.   The subpoena threatens the sovereign powers of the States, confidence in the secrecy of grand jury proceedings, and the integrity of an ongoing criminal prosecution.   This Court should enjoin its enforcement.

3.     The Constitution "with[held] from Congress a plenary police power," *United States v. Lopez*, 514 U.S. 549, 566 (1995), which "is controlled by 50 different States instead of one national sovereign," *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012); *accord United States v. Morrison*, 529 U.S. 598, 618 (2000).   "[P]rimary authority" "for defining and enforcing

the criminal law" is vested in the States. *Lopez*, 514 U.S. at 561 n.3.  That division of authority requires that "[o]rdinarily" there should "be no interference with [state] officers," who are "charged with the duty of prosecuting offenders against the laws of the State and must decide when and how this is to be done." *Younger v. Harris*, 401 U.S. 37, 45 (1971).  "Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Engle v. Isaac*, 456 U.S. 107, 128 (1982).

4.      The charges the District Attorney filed against Mr. Trump were approved by citizens of New York.  They did their civic duty as members of a grand jury pursuant to the federal Constitution and laws of the State of New York.  Like any other defendant, Mr. Trump is entitled to challenge these charges in court.  He can avail himself of all the processes and protections that New York State's robust criminal procedure affords.

5.      But rather than allowing the criminal process to proceed in the ordinary course, Chairman Jordan and the Committee are participating in a campaign of intimidation, retaliation, and obstruction.  Mr. Trump in particular has threatened New York officials with violent and racist vitriol.  At a March 25, 2023 rally, for instance, Mr. Trump stated that "the thugs and criminals who are corrupting our justice system will be defeated, discredited, and totally disgraced."[1]  On social media, he threatened "death & destruction" and to wage "war" if he was indicted.  Mr. Trump also called District Attorney Bragg a "SOROS BACKED ANIMAL"—a dog whistle Chairman Jordan repeated on television on March 23, 2023, calling District Attorney Bragg "the Soros-backed, new DA, left-wing DA Alvin Bragg."[2]  Mr. Trump even shared a social media post

---

[1]    Julia Shapero, *Trump vows to remove 'thugs and criminals' from justice system at rally, amid legal woes*, The Hill (Mar. 25, 2023), https://thehill.com/homenews/campaign/3918390-trump-vows-to-remove-thugs-and-criminals-from-justice-system-at-rally-amid-legal-woes/.

[2]    *The Art of Not Being Indicted with Rep. Jim Jordan*, The Charlie Kirk Show (Mar. 23, 2023), https://omny.fm/shows/the-charlie-kirk-show/the-art-of-not-being-indicted-with-rep-jim-jordan.

that appeared to be a picture of himself threateningly wielding a baseball bat to District Attorney

Bragg's head.



6.      These statements have had a powerful effect.  District Attorney Bragg has received

multiple death threats.  In one instance, he received a package containing suspicious white powder

with a note making a specific death threat against him.  Since Mr. Trump falsely predicted he

would be arrested on March 18, 2023, in fact, the District Attorney's Office has received more

than 1,000 calls and emails from Mr. Trump's supporters, many of which are threatening and

racially charged.  But rather than denounce efforts to vilify and denigrate the District Attorney and

the grand jury process, House Republicans are participating in those efforts.[3]

7.      Chairman Jordan, along with other congressmen, have made no secret that the

purpose of the Committee's inquiry is to "conduct oversight" and undertake an "examination of

the facts" supporting the indictment—the same facts already evaluated by an independent grand

---

[3]      Annie Grayer et al., *Inside the Backchannel Communications Keeping Donald Trump in the Loop on Republican Investigations*, CNN (Mar. 28, 2003), https://www.cnn.com/2023/03/28/politics/trump-gop-investigations-backchannel/index.html.

jury of New Yorkers—and to hold the District Attorney "to account."  Chairman Jordan and the Committee have, in essence, appointed Congress as a super grand jury that can flex its subpoena power to second guess the judgment of New York citizens and interfere with the state criminal justice process.   In his letters and public statements, however, Chairman Jordan and his congressional allies have changed their story multiple times, creating as it suits them a scattershot hodgepodge of new purported legislative interests and purposes that supposedly justify the Committee's unwarranted "incursion" into a state criminal case.  *Printz v. United States*, 521 U.S. 898, 920 (1997).  Each of these is a baseless pretext for hauling Mr. Pomerantz to Washington for a retaliatory political circus designed to undermine the rule of law and New York's police power. And in cases like this one implicating "substantial" federalism or separation of powers concerns, the Supreme Court's decision in *Mazars* requires the federal courts to probe Congress's asserted purposes for pretext and evidence.  140 S. Ct. at 2036.  The Chairman has also admitted that subpoenaing Mr. Pomerantz is only the first step of his subpoena strategy.  As Chairman James Comer of the House Committee on Oversight and Accountability put it, Mr. Trump's allies in the House "fully expect to see Alvin Bragg answering questions in front of Congress as soon as [they] can make it happen."[4]

8.     Members of Congress are not free to invade New York's sovereign authority for their or Mr. Trump's political aims.  Congress has no authority to "conduct oversight" into District Attorney Bragg's exercise of his duties under New York law in a single case involving a single defendant.  Nor can Congress force a former prosecutor to make extrajudicial statements during a criminal prosecution about that prosecution or related criminal investigations—statements that the

---

[4]   Luke Broadwater and Jonathan Swan, *Republicans Vowed to Grill Bragg About Trump, but It's Not So Simple*, N.Y. Times (Apr. 5, 2023), https://www.nytimes.com/2023/04/05/us/politics/house-republicans-bragg-subpoena-trump.html#:~:text=%E2%80%9CWe%20do%20want%20Mr.%20Bragg,not%20going%20to%20 back%20down.%E2%80%9D.

New York Rules of Professional Conduct forbid, in part, because they could prejudice Mr. Trump's right to a fair trial and prompt due process concerns. *See* N.Y.R. Prof. Cond. Rule 3.6; *see also Powers v. Coe,* 728 F.2d 97, 105 (2d Cir. 1984). Compelling Mr. Pomerantz to provide this type of testimony is unprecedented. As one former counsel for the House and legal scholar explained in testimony provided to Congress itself:

> [T]here hasn't been a subpoena enforcement against a state attorney general in 200 years . . . and there's an excellent reason. State Attorneys General have their own state sovereign authority. They are frequently elected. They have their own base, their own electoral base, their own mission, and their mission is to pursue things that Congress can't.[5]

9. Mr. Trump is free to avail himself of any and all criminal procedure processes available to him. Indeed, his motions in his criminal case are due in August. If he wishes to argue that his prosecution is "politically motivated," he is free to raise that concern to the New York state criminal court. Chairman Jordan is not, however, free to unconstitutionally deploy Congress's limited subpoena power for raw political retaliation, intimidation, or obstruction.

10. District Attorney Bragg therefore brings this action in response to the Committee's plainly unconstitutional subpoena. He brings two causes of action.

11. *First*, the subpoena served on Mr. Pomerantz is invalid, unenforceable, unconstitutional, and *ultra vires* because it has no legitimate legislative purpose, *Watkins*, 354 U.S. at 187, and manifestly fails each of the four factors the Supreme Court established in *Mazars* to evaluate the enforceability of a congressional subpoena directed to another branch of government. 140 S. Ct. at 2035–36. Namely, Congress has no power under Article I of the Constitution to oversee, let alone disrupt, ongoing state law criminal matters, and the shifting array of legislative

---

5   *Affirming Congress' Constitutional Oversight Responsibilities: Subpoena Authority and Recourse for Failure to Comply with Lawfully Issued Subpoenas*: *Hearing Before H. Comm. On Science, Space, and Technology*, 114th Cong. (2016) (statement of Charles Tiefer, Former Acting General Counsel, U.S. House of Representatives).

purposes the Chairman has invoked in favor of his demands do not "warrant[] the significant step" of seeking information from the District Attorney. *Id.* at 2035. The subpoena also is vastly "broader than reasonably necessary to support" the Chairman's purported "legislative objective"— an objective the Chairman has provided not a whit of "evidence" to support. *Id.* at 2036. And finally, the subpoena is unduly burdensome, particularly in light of the ongoing criminal prosecution and investigation of Mr. Trump.

12.     *Second*, even if Chairman Jordan and the Committee were able to demonstrate a valid legislative purpose and withstand the *Mazars* test (they cannot), the subpoena still would not be enforceable because it could allow the Committee to seek secret grand jury material, confidential investigative material, and information clearly protected by the attorney-client, work product, deliberative process, law enforcement, informant's, and public interest privileges. These privileges exist to protect precisely the type of information Chairman Jordan and the Committee are seeking—confidential law enforcement and legal materials compiled during investigations and in the lead-up to a prosecution. The privileges are designed to prevent the type of obstruction and interference with ongoing criminal investigations and prosecutions that Chairman Jordan and the Committee's actions represent.

13.     In sum, Congress lacks any valid legislative purpose to engage in a free-ranging campaign of harassment in retaliation for the District Attorney's investigation and prosecution of Mr. Trump under the laws of New York. That campaign is a direct threat to federalism and the sovereign interests of the State of New York. This Court should enjoin the subpoena and put an end to this constitutionally destructive fishing expedition. It should protect New York's lawful pursuit of criminal justice and permit this State's criminal justice system to function under the

careful supervision of the New York Supreme Court free from unconstitutional congressional interference.  This Court should grant judgment to District Attorney Alvin L. Bragg, Jr.

## PARTIES

14.    Plaintiff Alvin L. Bragg, Jr. is the District Attorney for Manhattan.  District Attorney Bragg brings this suit in his official capacity.

15.    Defendant Jim Jordan is a Republican member of the U.S. House of Representatives and Chairman of the Committee on the Judiciary.  He is sued in his official capacity.

16.    Defendant Committee on the Judiciary is a standing committee of the United States House of Representatives.

17.    Defendant Mark F. Pomerantz was a Special Assistant District Attorney in the Manhattan District Attorney's Office from 2021 to 2022.  In that role, Mr. Pomerantz assisted with the Office's investigation into Mr. Trump's personal and business finances.  On February 23, 2022, Mr. Pomerantz resigned his appointment.

18.    The District Attorney sues Mr. Pomerantz to protect the District Attorney's Office's interests and privileges and in light of the District Attorney's Office's instruction to Mr. Pomerantz not to provide any information or materials relating to his work in the District Attorney's Office in response to the subpoena.  As the Supreme Court has made clear, the important structural constitutional interests at stake "are no less palpable here simply because the subpoena[] w[as] issued to [a] third part[y]."  *Mazars*, 140 S. Ct. at 2035.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this case arises under the Constitution and laws of the United States.

20.     This Court has authority to issue a declaratory judgment and order other relief that is just and proper pursuant to 28 U.S.C. §§ 2201 and 2202.

21.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and (e)(1) because a substantial part of the events giving rise to this action occurred in the Southern District of New York.  Chairman Jordan served Mr. Pomerantz with a subpoena in New York, where he resides.  That subpoena seeks testimony relating to law enforcement investigations and an active prosecution the District Attorney is conducting in Manhattan and related grand jury proceedings.

22.     This Court has personal jurisdiction over Chairman Jordan and the Committee under CPLR § 302 because they "engage[d] in [a] persistent course of conduct" and "expect[ed] or should reasonably expect the act to have consequences in the state."  The Chairman and the Committee have reached into New York State to serve a subpoena on Mr. Pomerantz, a former Special Assistant in the Manhattan District Attorney's Office, as part of an ongoing effort to obstruct, impede, and delegitimize a local criminal prosecution in New York City.  They have also demanded documents and testimony from three other New Yorkers, including the District Attorney himself.  By his own reckoning, Chairman Jordan and the Committee are seeking to conduct "oversight" of an ongoing New York State criminal investigation and an ongoing New York State criminal prosecution pending in New York State court.  They are seeking highly sensitive and confidential prosecutorial information concerning an ongoing local prosecution and investigation the District Attorney's Office is properly conducting on behalf of the People of New York.  They have thereby purposefully availed themselves of this forum and subjected themselves to personal jurisdiction in the State of New York in connection with this controversy.

23.     The Chairman and the Judiciary Committee have also availed themselves of this forum by planning to hold a field hearing in New York City on April 17, 2023 regarding the District Attorney's prosecutorial policies.

24.     This Court has personal jurisdiction over Mr. Pomerantz because he is a resident of New York.

## FACTUAL ALLEGATIONS

**A.     District Attorney Bragg Takes Office And Reduces Crime In New York City.**

25.     The Manhattan District Attorney's Office investigates and prosecutes violations of New York State law.  New York State law confers on district attorneys the authority "to prosecute all crimes and offenses cognizable by the courts of the county for which he shall have been elected or appointed."  N.Y. County L. § 927; *see also id.* § 700.  Each case the Office brings is brought on behalf of "The People of the State of New York."

26.     Plaintiff Alvin L. Bragg, Jr. is the first Black person to serve as District Attorney of Manhattan.  District Attorney Bragg has spent two decades in public service, having previously served as Chief Deputy Attorney General in the New York Attorney General's office and as an Assistant United States Attorney in the Southern District of New York.  As a long-time white collar prosecutor, District Attorney Bragg believes in holding powerful people accountable for harming everyday New Yorkers.

27.     As of April 2, 2023, the year-to-date statistics for New York City, and Manhattan specifically, continue to trend downward:  homicides are down 14.3% and down further in Manhattan; shooting incidents are down 17.3%; rapes are down 33.3% and down further in Manhattan; robbery is down 7.6% and down further in Manhattan; and burglary is down 21% and down further in Manhattan.  Total index crimes are down 1.3% in Manhattan, despite being up slightly citywide.  The work of the District Attorney's Office in the last year is contributing to

these successes.  Gun prosecutions by the Office were up approximately 18% in the District Attorney's first year in office.  Last year, the District Attorney's Office secured indictments against gun traffickers, ghost gun manufacturers, and members of a violent criminal enterprise.  The Office is also making use of available tools to reduce recidivism:  with recent amendments to bail eligibility the Office has sought bail in 400 property crime cases that would not have been bail-eligible otherwise.  And in just the past week, the Office has required landlords to initiate civil eviction proceedings against seven unlicensed cannabis shops that are operating unlawfully in Manhattan.

**B.   District Attorney Bragg Continues His Predecessor's Investigations Into Mr. Trump.**

28.     When he assumed office on January 1, 2022, District Attorney Bragg inherited years-long investigations into the financial activities of Donald J. Trump and the Trump Organization.  District Attorney Bragg issued a public statement on April 7, 2022, confirming that his Office had continued the investigations through its staff of experienced career prosecutors.

29.     District Attorney Bragg also inherited an indictment of two Trump entities (Trump Corporation and Trump Payroll Corp.) and Allen Weisselberg, the former chief financial officer of the Trump Organization.  The charges against the Trump entities went to trial with opening statements beginning on Monday, October 31, 2022.  Donald Trump announced his candidacy for President the next month, while the trial and previously announced investigations by the District Attorney remained ongoing.

30.     District Attorney Bragg's Office secured the trial conviction of the two Trump entities and a guilty plea from Mr. Weisselberg for, among other crimes, defrauding New York State and New York City tax authorities.  Following the trial verdict in December of 2022, a New York State court fined the Trump Corporation and the Trump Payroll Corp. $1.6 million for

running the decade-long tax fraud scheme and sentenced Mr. Weisselberg to five months incarceration followed by five years' probation.

31.     Other investigations remained ongoing.  The New York State Constitution Bill of Rights establishes that all "capital or otherwise infamous crime[s]" must be brought through a grand jury indictment.  N.Y. Const. Art. I § 6; *see also* U.S. Const., amend. V.  A grand jury in New York consists of 23 New Yorkers who must decide whether documents, witness testimony, and other evidence presented by prosecutors supports returning an indictment for violations of New York law.  Grand jurors are selected at random from the general population of New York County without regard to their personal political affiliation.

32.     In early 2023, the news media reported on a grand jury investigation into allegations against Mr. Trump and the possibility that Mr. Trump might be criminally charged.  In response, Mr. Trump and his supporters in Congress launched efforts to attack the District Attorney's integrity, intimidate his Office, and mount "an aggressive response" to preempt potential criminal charges.[6]  House Republicans regularly kept Mr. Trump updated on these developments.  For example, Representative Marjorie Taylor Greene "keep[s] him up[dated] on everything that [they're] doing," and House Republican Conference Chair Elise Stefanik has "walked [Mr. Trump] through the GOP's plans for an aggressive response to Bragg."[7]  It has been reported that Mr. Trump has himself been preparing plans to exact revenge on District Attorney Bragg if Mr. Trump returns to the White House in 2024.  Some of his advisors have reportedly recommended that he

---

[6]     Grayer, *supra* note 3.

[7]     *Id.*

"unleash" the Department of Justice's "Civil Rights Division" to prosecute District Attorney Bragg

"for supposedly 'racist law enforcement practices.'"[8]

33.     The effort to obstruct the grand jury's investigation into Mr. Trump picked up steam

on March 10, 2023.  On that day, Mr. Trump's lawyer, Joseph Tacopina, sent Chairman Jordan a

letter describing District Attorney Bragg as a "rogue local district attorney."[9]  Mr. Tacopina urged

Chairman Jordan to deploy the powers of his office to investigate what he described as District

Attorney Bragg's "egregious abuse of power."[10]

34.     On March 18, 2023, Mr. Trump announced on Truth Social, his social media

platform, that he believed he would be arrested the following Tuesday.  Mr. Trump claimed to

have sourced this information—which was false—from "ILLEGAL LEAKS" in the "CORRUPT

& HIGHLY POLITICAL MANHATTAN DISTRICT ATTORNEYS OFFICE."   Mr. Trump

urged his supporters to "PROTEST, TAKE OUR NATION BACK!"



---

[8]     Asawin Suebsaeng, Adam Rawnsley, *Trump Already Has a Plan to Get Revenge on Alvin Bragg*, Rolling Stone (Mar. 23, 2023), https://www.rollingstone.com/politics/politics-features/trump-revenge-plan-alvin-bragg-1234702976/.

[9]     Annie Karni and Luke Broadwater, *House G.O.P., Defending Trump, Targets Bragg Ahead of Expected Indictment*, N.Y. Times (Mar. 20, 2023), https://www.nytimes.com/2023/03/20/us/politics/house-republicans-trump-indictment.html.

[10]    *Id.*

35.     Mr. Trump's post calling for "protest[s]" bears a striking resemblance to the December 19, 2020 tweet in which he urged his supporters to protest after he lost the 2020 Presidential election: "Big protest in D.C. on January 6th.  Be there, will be wild!"[11]  The House Select Committee to Investigate the January 6th Attack on the U.S. Capitol concluded that Mr. Trump's December 19, 2020 tweet served as "a call to arms" for "extremists and conspiracy theorists" that had the effect of "summoning a mob."[12]  "For the Proud Boys . . . President Trump's tweet set in motion a chain of events that led directly to the attack on the U.S. Capitol."[13]

36.     Mr. Trump was not arrested the following Tuesday, March 21, 2023, as he had predicted on social media.  Although his prediction was false, his call to "protest" and "take our nation back" prompted law enforcement agencies to deploy a significant security response, including around the New York State Supreme Court criminal courthouse in lower Manhattan and the District Attorney's Office.

37.     Meanwhile, on March 19, 2023, House Speaker Kevin McCarthy amplified Mr. Trump's incendiary rhetoric, accusing District Attorney Bragg of "abusing his office to target President Trump" and announced that Congress would "investigate any use of federal funds that are used to facilitate the perversion of justice by Soros-backed DA's across the country."  George Soros is a Jewish American businessman and philanthropist known for his support of liberal causes and candidates.  He is frequently cited as a boogeyman in rightwing, and often anti-Semitic, conspiracy theories and dog whistles.  District Attorney Bragg does not know Mr. Soros and has never communicated with him.

---

[11]   Maggie Haberman et al., *Trump Claims His Arrest Is Imminent and Calls for Protests, Echoing Jan. 6*, N.Y. Times (Mar. 18, 2023), https://www.nytimes.com/2023/03/18/us/politics/trump-indictment-arrest-protests.html.

[12]   Final Report of the House Select Committee to Investigate the January 6th Attack on the U.S. Capital, House Rep. 117-000, at Foreword & p. 6 (Dec. 22, 2022), available at https://tinyurl.com/mr364uyt.

[13]   *Id.*



38.     Other House Representatives have also expressed their support for Mr. Trump. House Republican Conference Chair Stefanik frequently speaks with Mr. Trump and has expressed that she believes District Attorney Bragg should testify before Congress to explain his decision to investigate the former president.  Representative Greene, a member of the Committee on Oversight and Accountability, also frequently speaks with Mr. Trump and has called for District Attorney Bragg's arrest.  On March 22, 2023, she falsely tweeted that District Attorney Bragg was "breaking the law" and "trying to incite civil unrest with his Soros funded political war."



**C.     Chairmen Of Three Congressional Committees Send A Letter Requesting Documents and Testimony from District Attorney Bragg, Mr. Pomerantz, and Carey Dunne.**

39.     After receiving the letter from Mr. Trump's counsel and in the wake of Speaker McCarthy's tweet vowing an investigation, on March 20, 2023, chairmen of three Congressional committees sent a letter to District Attorney Bragg purporting to launch an investigation into his "decision to pursue such a politically motivated prosecution."[14]  The signatories included Chairman Jordan, Chairman Comer, and Chairman Bryan Steil of the Committee on House Administration (together the "Chairmen" and the "Committees," respectively).

40.     The letter blithely accused District Attorney Bragg of "an unprecedented abuse of prosecutorial authority:  the indictment of a former President of the United States and current declared candidate for that office."  And it demanded that District Attorney Bragg give testimony and produce the following three categories of documents for the period January 1, 2017 to the present:

> "1. All documents and communications between or among the New York County District Attorney's Office and the U.S. Department of Justice, its component entities, or other federal law enforcement agencies referring or relating to your office's investigation of President Donald Trump;
>
> 2. All documents and communications sent or received by former employees Carey Dunne and Mark Pomerantz referring or relating to President Donald Trump; and
>
> 3. All documents and communications referring or relating to the New York County District Attorney Office's receipt and use of federal funds."

---

[14]   Previously, Chairman Jordan requested from the U.S. Department of Justice documents relating to the special counsel investigation into President Biden's handling of classified material.  The Department of Justice responded by stating that it would withhold such documents because "[d]isclosures to Congress about active investigations risk jeopardizing those investigations and creating the appearance that Congress may be exerting improper political pressure or attempting to influence Department decisions in certain cases. Judgments about whether and how to pursue a matter are, and must remain, the exclusive responsibility of the Department."  Zachary Cohen, *DOJ tells House Judiciary chair it will not hand over most Biden special counsel probe documents until investigation complete*, CNN (Jan. 30, 2023), https://www.cnn.com/2023/01/30/politics/doj-response-special-counsel-documents/index.html.

41.     The Chairmen stated that their requests were based on Rule X of the Rules of the House of Representatives and the need for (1) "congressional scrutiny about how public safety funds appropriated by Congress are implemented by local law-enforcement agencies," (2) "oversight to inform potential legislative reforms about the delineation of prosecutorial authority between federal and local officials," and (3) "consider[ation] [of] legislative reforms to the authorities of special counsels and their relationships with other prosecuting entities."

42.     Rule X of the Rules of the House of Representatives identifies the jurisdictions and functions of the standing committees in the House, including the Committee on the Judiciary, the Committee on House Administration, and the Committee on Oversight and Accountability.

43.     On March 22, 2023, Chairman Jordan sent letters to Mr. Pomerantz and Carey Dunne.  Mr. Dunne was the General Counsel to former Manhattan District Attorney Cyrus Vance Jr. from 2017 to 2021 and Special Assistant District Attorney to District Attorney Bragg from January 1, 2022 to February 24, 2022.   In those roles, Mr. Dunne helped lead the District Attorney's investigation into Mr. Trump's tax records and the Trump Organization's tax-fraud scheme.

44.     The letters to Mr. Pomerantz and Mr. Dunne both requested their "cooperation with [the Chairmen's] oversight of this politically motivated prosecutorial decision" and "overzealous" investigation.   Specifically, the letters requested the following documents and information for January 1, 2017 to the present from Mr. Pomerantz and Mr. Dunne, both of whom have not worked at the District Attorney's Office in about a year:

> "1. All documents and communications between or among the New York County District Attorney's Office and the U.S. Department of Justice, its component entities, or other federal law enforcement agencies referring or relating to New York County District Attorney's investigation of President Donald Trump;

2. All documents and communications between or among you and the New York County District Attorney's Office referring or relating to President Donald Trump; and

3. All documents and communications between or among you and representatives of the New York County District Attorney's Office referring or relating to your appointment and role as Special Assistant District Attorney for New York County."

45.     The letter to Mr. Pomerantz stated that he had previously "resign[ed] in protest" of a decision by District Attorney Bragg to "suspend[] the investigation" into Mr. Trump when District Attorney Bragg took office.  The letter went on to state that Mr. Pomerantz's actions "both as a special prosecutor and since leaving the District Attorney's office, cast serious doubt on the administration of fair and impartial justice in this matter," and alleged that Mr. Pomerantz had "unfairly disparaged" Mr. Trump, "an innocent and uncharged man, as a felon to millions of [*New York Times*] readers."   The letter further stated that Mr. Pomerantz's "book again unfairly disparaged President Trump, and now opens the door to examination about the District Attorney's office [sic] commitment to evenhanded justice."

**D.     District Attorney Bragg Responds.**

46.     District Attorney Bragg's Office timely responded to the demand on March 23, 2023.  Leslie Dubeck, General Counsel for the Manhattan District Attorney's Office, wrote in a letter to the Chairmen that the investigation into Mr. Trump "is one of thousands conducted by the Office of the District Attorney in its long history of pursuing justice and protecting New Yorkers" and "has been conducted consistently with the District Attorney's oath to faithfully execute the laws of the State of New York."  In the letter, Ms. Dubeck states that the request by the Chairmen "is an unprecedented inquiry into a pending local prosecution," which came only "after Donald Trump created a false expectation he would be arrested the next day and his lawyers reportedly urged [the Chairmen] to intervene."

18

47.     The letter states that compliance with the Chairmen's request "would interfere with law enforcement."  Specifically, the Chairmen's request "seeks non-public information about a pending criminal investigation, which is confidential under state law" because "[g]rand jury proceedings are secret."

48.     The letter also states that the requests "are an unlawful incursion into New York's sovereignty" because a "Congressional committee may not 'inquire into matters which are . . . reserved to the States,'" and "[p]erhaps the clearest example of traditional state authority is the punishment of local criminal activity."  It explained that the District Attorney's investigation is a "quintessential police power[] belonging to the State" and because the Chairmen's inquiry "treads into territory very clearly reserved to the states," it is "indefensible."  The letter further explained that the requests would "usurp[] executive powers" because "Congress [is not] a law enforcement or trial agency."  Ms. Dubeck also made clear that the District Attorney's Office was not "pursuing a prosecution for political purposes."

49.     Notwithstanding these objections, Ms. Dubeck stated that the District Attorney's Office would submit a letter describing its use of federal funds.  Ms. Dubeck further stated that "this Office will always treat a fellow government entity with due respect" and requested the opportunity to meet and confer regarding the Chairmen's inquiry.

**E.     Former President Donald Trump Launches Attacks on Social Media and Puts District Attorney Bragg And Other New Yorkers at Risk.**

50.     Following the parties' letter exchanges, Mr. Trump began to lob even more incendiary messages on Truth Social about District Attorney Bragg.  On March 23, 2023, he inveighed that "BRAGG REFUSES TO STOP DESPITE OVERWHELMING EVIDENCE TO THE CONTRARY" and described the District Attorney in dehumanizing terms, calling him a

"SOROS BACKED ANIMAL."  These attacks by Mr. Trump and others have been widely condemned as both racist and antisemitic.



51.     Minutes later, Mr. Trump accused District Attorney Bragg of "CARRYING OUT THE PLANS OF THE RADICAL LEFT LUNATICS."  He also stated that "OUR COUNTRY IS BEING DESTROYED, AS THEY TELL US TO BE PEACEFUL!"



52.     Also on that day, Mr. Trump shared a photograph on Truth Social of a side-by-side image of himself and District Attorney Bragg.  Mr. Trump was holding a baseball bat in the photograph, and their side-by-side juxtaposition suggested that Mr. Trump was winding up the bat to strike the District Attorney.



53.     In the early hours of March 24, 2023, Mr. Trump threatened that an indictment would unleash "death & destruction" that would be "catastrophic for our Country."  Mr. Trump queried: "What kind of person can charge another person, in this case a former President of the United States, . . . when it is known by all that NO Crime has been committed[?]"  He then supplied his followers with an answer, alluding to District Attorney Bragg:  "Only a degenerate psychopath that truely [sic] hates the USA."



54.     Later that day, a package containing suspicious white powder arrived at the District Attorney's Office along with a note making a specific death threat against the District Attorney.

The New York City Police Department and the Department of Environmental Protection responded and ultimately concluded the substance was not dangerous.

55.     In the aftermath, the District Attorney's Office received more than 1,000 calls and emails from individuals claiming to be Mr. Trump's supporters, many of which were threatening and racially charged.  District Attorney Bragg also received multiple death threats.

**F.     The Chairmen Continue to Insist on Document Production and Testimony.**

56.     On March 25, 2023, the Chairmen sent District Attorney Bragg's Office another letter.  They ignored Ms. Dubeck's request to meet and confer.

57.     The letter states that the Committees are "conducting oversight of [the Manhattan District Attorney's Office's] reported effort to indict a former President of the United States and current declared candidate for that office."  The Chairmen, for the first time, declared that they were considering whether Congress "should take legislative action to protect former and/or current Presidents from politically motivated prosecutions by state and local officials."

58.     The letter claimed that the inquiry is proper because (1) the Committees "are authorized to conduct such an inquiry," (2) "the inquiry is on a matter on which legislation could be had," and (3) "the requests are pertinent to the committees' inquiry."

59.     The letter further explains that the inquiry into the circumstances of a prosecutorial decision to indict a former President of the United States "on a novel and untested legal theory" falls within the scope of the Committee on the Judiciary's "oversight of criminal justice matters to inform potential legislation."  It also states that the inquiry could inform whether Congress drafts legislation to "insulate current and former presidents from such improper state and local prosecutions"—purported legislation the Chairmen did not even hint at in their March 20, 2023 letter.  The Chairmen speculated without any evidence that these prosecutions could create a

conflict "between the federal law-enforcement officials required to protect the former President and local law-enforcement officials required to enforce your indictment."  Despite the District Attorney's Office's commitment to provide a letter detailing the use of the Office's federal funds, the Chairmen reiterated their request for such information and insisted that a letter from the District Attorney's Office would not be enough.  The Chairmen requested a response by March 31, 2023.

60.     Subsequently, on an interview with CNN's Jake Tapper, Chairman Comer was asked about the Chairmen's letters to District Attorney Bragg.[15]  Chairman Comer candidly explained his view that the District Attorney should "come explain to us exactly what he's investigat[ing]."  He further stated, "if Mr. Bragg wants to come in and explain to us what he is doing and he makes a good explanation, . . . then we'll back off."  And when Mr. Tapper noted, "well, he's investigating as I understand it potential violations of state crimes," Chairman Comer responded: "even at that, . . . when you look at what we believe the role of the Manhattan DA should be is to fight crime.  I mean that's one of the biggest issues in New York."  He went on to state, "we believe our tax dollars would be better spent prosecuting local criminals—that's what a DA is supposed to do."  Mr. Tapper also asked: "if [District Attorney Bragg] refuses to come in willingly, will you subpoena him?"  Chairman Comer responded: "Well, that'll be up to Jim Jordan.  He's the lead investigator in this particular situation."  Mr. Tapper queried in response: "Jim Jordan who refused to comply with a congressional subpoena in the previous Congress?"

61.     Also on March 25, 2023, Ms. Dubeck sent a letter to Mr. Pomerantz and Mr. Dunne instructing them, as former employees of the District Attorney's Office, to not respond to Chairman Jordan's requests in light of the ongoing discussions and concerns over the inquiry.  In

---

[15]   *State of the Union with Jake Tapper & Dana Bash*, interview by Jake Tapper of James Comer, CNN (Mar. 26, 2013), https://www.cnn.com/videos/politics/2023/03/26/sotu-rep-comer-full.cnn.

that letter, the District Attorney's Office explained that the Chairmen's requests "raise significant concerns about federalism, state sovereignty, the limits on congressional power, and the purpose and legality of the [Judiciary Committee's] inquiry.  In addition, the documents and information requested are protected from disclosure for many reasons, including because they relate to an ongoing criminal investigation, and are subject to the attorney client privilege, work product doctrine, and other legal protections."

62.     The letter specifically instructed Mr. Pomerantz to "as a former employee and attorney of the DA's Office, [] not provide any information or materials relating to your work in the DA's Office in response to [the Judiciary Committee's] request.  In addition, please direct [the Judiciary Committee] to communicate with the DA's Office regarding the request."  The letter made clear the District Attorney's Office was writing "[t]o protect the DA's Office's interests and privileges" and had asked the Committee "to provide additional information regarding their inquiries."

**G.      Donald Trump Persists in His Attacks on Social Media.**

63.     On March 28, 2023, Mr. Trump re-posted to his Truth Social account an article by Wayne Allyn Root titled "Democrats Want to Indict & Arrest President Trump.  They Want a War?  Let's Give it to Them."  That same day, a supporter of Mr. Trump who was protesting District Attorney Bragg's investigation pulled a knife on a family—including two small children— outside the Manhattan Criminal Court.  Court officers arrested the protester, who was holding a sign that read:  "I support Trump, do you?"

64.     On March 29, 2023, following news reports that the grand jury had recessed for several weeks, Mr. Trump continued his attacks on Truth Social.  He stated that he had "GAINED

SUCH RESPECT FOR THIS GRAND JURY" for not being a "RUBBER STAMP" and described

District Attorney Bragg as "HIGHLY PARTISAN" and "HATEFUL."



65.     A day later, on March 30, 2023, Mr. Trump described District Attorney Bragg as a

"Radical Left, Soros Backed Lunatic[]" in a post on Truth Social.   He also implied that a New

York Times columnist wrote that Mr. Trump "should be prosecuted" "because [he is] WHITE."

He concluded "we are now a Nation in Decline being stupidly led into World War III."



**H.**     **Mr. Pomerantz and Mr. Dunne Respond.**

66.     On March 27, 2023, Mr. Pomerantz responded to Chairman Jordan's March 22, 2023 correspondence.  In the letter, Mr. Pomerantz states that he will "act in a manner consistent with the instructions [he has] received from DANY" and requested that Chairman Jordan relay any communication to the District Attorney's Office.

67.     That same day, Mr. Dunne also responded to Chairman Jordan's March 22, 2023 correspondence.  Like Mr. Pomerantz, Mr. Dunne declined to respond to the inquiry and referred any communication to the District Attorney's Office.  In the letter, Mr. Dunne also stated that the District Attorney's Office is the legal holder of various privileges, including the attorney-client privilege, implicated by Chairman Jordan's inquiry.  The letter further states that "[a]s the legal holder of such privileges," the Office's position that the inquiry was "constitutionally infirm" was "[their] prerogative."

**I.**     **New York State Supreme Court Unseals The Fact That Mr. Trump Has Been Indicted And The Chairmen (And Other Members Of Congress) React.**

68.     On March 30, 2023, the New York State Supreme Court issued an order unsealing the fact that a Manhattan grand jury had returned an indictment charging Mr. Trump with a certain number of undefined crimes.  Mr. Trump is the first American president, current or former, to be indicted.

69.     It did not take long for Mr. Trump to start casting doubt on the integrity of the District Attorney's Office, and on the judicial system as a whole.  On March 30, 2023, he claimed that the charges against him were "Fake, Corrupt, and Disgraceful."  And on the morning of March 31, 2023, he asserted on Truth Social: "The Judge 'assigned' to my Witch Hunt Case [] HATES ME."  He further stated that the judge's name "is Juan Manuel Marchan [sic], [he] was handpicked

by Bragg & the Prosecutors, & is the same person who 'railroaded' my 75 year old former CFO,

Allen Weisselberg, to take a 'plea' deal."



70.    Later that day, Mr. Trump posted again on Truth Social, specifically referencing

Mr. Pomerantz:



71.    Mr. Trump's followers have followed suit.   Hours after the indictment, District

Attorney Bragg and his Office received numerous overtly racist and antisemitic emails and

messages.[16]   One email stated: "Hay George Soros a** hole puppet If you want President Trump

---

[16]    Molly Crane-Newman, *Manhattan DA Alvin Bragg inundated with racist emails, death threats amid Trump indictment; 'We are everywhere and we have guns,'* N.Y. Daily News (Mar. 31, 2023),

come and get me to.  Remember we are everywhere and we have guns."  Other messages called the District Attorney "black trash [f----r]" and "Aids Infested."

72.     Mr. Trump's supporters in Congress have also followed his lead, although none of them articulated the legislative reform proposals the Chairman has invoked as the basis for this congressional subpoena and his other demands.  On March 30, 2023, Speaker McCarthy tweeted using language that indicated his goal was retribution against District Attorney Bragg, not legislation:



73.     The Speaker's caucus followed suit.  That same day, and after the news broke that Mr. Trump would be indicted, Chairman Jordan tweeted: "Outrageous."  Representative Ronny Jackson tweeted "When Trump wins, THESE PEOPLE WILL PAY!!"  Later, he stated that "it will ultimately be Alvin Bragg that pays the price for this abuse of office!"

74.     On March 31, 2023, Representative Dan Bishop, a member of defendant Committee on the Judiciary, tweeted that "The subpoenas should now fly."

_____

https://www.nydailynews.com/news/crime/ny-dany-bragg-trump-indictment-racist-emails-violent-threats-20230401-vimpdgvbrnfe5bq5d6wdw4g7ty-story.html.



Rep. Dan Bishop
@RepDanBishop

I saw to it in the January speaker negotiations that the Select Weaponization Subcommittee be fully empowered with compulsory process and broad investigative scope to expose every detail of actions like this to the American people. The subpoenas should now fly.

1:53 PM · Mar 31, 2023 · 1,183 Views

**J.      District Attorney Bragg Responds to the Chairmen.**

75.      District Attorney Bragg's Office responded to the Chairmen on March 31, 2023. In that response, Ms. Dubeck reiterated the Office's position: Congress cannot interfere with a state criminal investigation or usurp judicial and executive functions, and the Chairmen's "examination of the facts of a single criminal investigation, for the supposed purpose of determining whether any charges against Mr. Trump are warranted, is an improper and dangerous usurpation of the executive and judicial functions" and "an unprecedented and illegitimate incursion on New York's sovereign interests."

76.      The letter states that the Chairmen's alleged legislative purpose for the inquiry—potential legislation to "insulate current and former presidents"—is "baseless pretext to interfere with [the] Office's work."  The letter queried whether "Congress would [even] have authority to place a single private citizen—including a former president or candidate for president—above the law."  It further stated that "based on [the Chairmen's] reportedly close collaboration with Mr. Trump in attacking this Office and the grand jury process, it appears [the Chairmen] are acting more like a criminal defense counsel trying to gather evidence for a client than a legislative body seeking to achieve a legitimate legislative objective."

77.      As Ms. Dubeck indicated she would in her March 23, 2023 correspondence, she provided in the March 31, 2023 letter further detail and information about the Office's use of

federal funds.  Specifically, Ms. Dubeck clarified that "[n]o expenses incurred relating to this matter [including the investigation and prosecution of Mr. Trump] have been paid from funds that the Office received through federal grant programs."  She identified three federal grant programs that the District Attorney's Office participates in: (1) Stop Violence Against Women Act Program; (2) Victim and Witness Assistance Grant Program; and (3) Justice Assistance Grant.

78.   Ms. Dubeck also stated that the Office has "*contributed* to the federal fisc," in part by "help[ing] the Federal Government secure more than one billion dollars in asset forfeiture funds in the past 15 years."  Of that forfeiture money, the Office spent approximately $5,000 "on expenses incurred [between October 2019 and August 2021] relating to the investigation of Donald J. Trump or the Trump Organization."  The letter clarified that most of these expenses related to *Trump v. Vance*, 140 S. Ct. 2412 (2020), the Supreme Court case "in which the DA's Office prevailed and which led to the indictment and conviction of Trump Organization CFO Allen Weisselberg and two Trump organizations."

79.   In light of the death threats the District Attorney had received, Ms. Dubeck also urged the Chairmen to "denounce the[] attacks" and "refrain from inflammatory accusations" instead of continuing to "vilify and denigrate the integrity of elected state prosecutors and trial judges."  Ms. Dubeck further urged the Chairmen to "let the criminal justice process proceed without unlawful political interference."

80.   Ms. Dubeck again requested to meet and confer with the Chairmen.

81.   The Chairmen did not accept that request.  Instead, in the days following the District Attorney's March 31, 2023 letter, Chairman Jordan and the Committee focused on the $5,000 of forfeiture funds the District Attorney's Office had used in investigating Mr. Trump or the Trump

Organization between October 2019 and August 2021.  Specifically, defendant Committee on the

Judiciary tweeted that the $5,000 of forfeiture funds "BOLSTER[S] GOP INVESTIGATION":



82.     And in an interview conducted on *Fox News* with Maria Bartiromo, Chairman

Jordan stated, "they keep saying 'oh you're not supposed to be involved because, you know, this

is a local prosecution decision,' and we're saying well look you used federal funds, you conceded

that in your response to" the March 25, 2023 letter.[17]

83.     In other words, Chairman Jordan and the Committee argued the District Attorney's

use of $5,000 from federal forfeiture funds prior to 2021 on matters relating to Mr. Trump *other*

than his indictment was sufficient to confer authority on Congress to investigate the now-pending

criminal prosecution.  But they provided no explanation, and none exists, as to how mere federal

---

[17]     *Sunday Morning Futures*, interview by Maria Bartiromo with Jim Jordan (Fox News, Apr. 2, 2023),
https://www.foxnews.com/video/6323835580112.

funds (even if they had been used in preparing for the pending prosecution of Mr. Trump) could justify invading state sovereignty to conduct federal "oversight" of a single ongoing state criminal investigation or prosecution to begin with.

**K.    Donald Trump and His Supporters Continue to Interfere with an Ongoing State Criminal Proceeding.**

84.    On April 3, 2023, Mr. Trump falsely accused District Attorney Bragg of "illegally LEAK[ING] . . . the pathetic Indictment against [him]" on Truth Social.  He stated that as a result of this "illegal" leak, District Attorney Bragg "MUST BE IMMEDIATELY INDICTED."



85.    Eleven minutes later, he once again falsely accused the District Attorney of "ILLEGALLY LEAK[ING] THE 33 points of Indictment" and called for the District Attorney's resignation.

86.    On April 4, 2023—the very day of his scheduled arraignment—Mr. Trump stated on Truth Social that New York County was a "VERY UNFAIR VENUE" and "THE HIGHLY PARTISAN JUDGE & HIS FAMILY ARE WELL KNOWN TRUMP HATERS."



87.     Later that day, Mr. Trump's son, Donald Trump Jr., shared an article on Twitter that identified Judge Juan Merchan's daughter and included a picture of her.  He called into question Judge Merchan's impartiality and alleged that his daughter had worked on the Biden-Harris campaign, which he claimed was another "relevant" "connection in this hand picked democrat show trial."  Representative Greene shared a similar article.

88.     Also on April 4, 2023, Chairman Jordan and Chairman Comer issued a statement expressing "concern" over "reports [that] the New York District Attorney may seek an unconstitutional gag order" because "[t]o put any restrictions on the ability of President Trump to discuss his mistreatment at the hands of this politically motivated prosecutor would only further demonstrate the weaponization of the New York justice system."[18]

89.     That same day, Speaker McCarthy once again evoked the specter of punishment, reiterating that District Attorney Bragg would be "held accountable by Congress" for "attempting to interfere in our democratic process by invoking federal law to bring politicized charges against President Trump [and] admittedly using federal funds."

---

[18]   Jim Jordan (@Jim_Jordan), Twitter (Apr. 4, 2023),
        https://twitter.com/Jim_Jordan/status/1643251228246147074?cxt=HHwWhICwhaWSgM4tAAAA.



Kevin McCarthy ✔
@SpeakerMcCarthy

Alvin Bragg is attempting to interfere in our democratic process by
invoking federal law to bring politicized charges against President Trump,
admittedly using federal funds, while at the same time arguing that the
peoples' representatives in Congress lack jurisdiction to investigate this
farce.

Not so. Bragg's weaponization of the federal justice process will be held
accountable by Congress.

5:00 PM · Apr 4, 2023 · **6M** Views

90.     Later that night on April 4, Chairman Jordan and Mr. Comer did an interview on the *Fox News* program *Jesse Watters Primetime*.  During that interview, Chairman Jordan stated "Mr. Pomerantz . . . is someone we want to talk to as well.  He has left the DA's office.  He has written a book.  He's the guy who threw the fit and I think put the pressure on Mr. Bragg to go through with the ridiculous action that he took today."[19]  The book to which Chairman Jordan referred was Mr. Pomerantz's account of the District Attorney's Office's investigation into Mr. Trump and the Trump Organization, published on February 7, 2023.   Before the book was published, the District Attorney's Office wrote to Mr. Pomerantz and, referring to the existence of then-pending proceedings, expressly confirmed that Mr. Pomerantz did not have authority to make public any privileged or confidential information he acquired while serving as a Special Assistant. The Office requested to review a manuscript of the book before publication but was not provided that opportunity.  Mr. Pomerantz subsequently stated publicly that he was "confident that all of

---

[19]     *Jesse Watters Primetime*, interview by Jesse Watters with Jim Jordan and James Comer (Fox News, Apr. 4, 2023), https://www.foxnews.com/video/6323980648112.

my actions with respect to the Trump investigation, including the writing of my forthcoming book, are consistent with my legal and ethical obligations."[20]

91.     In response to Chairman Jordan's statement about the book, Mr. Watters stated: "Biden sent his goon into the DA's office, and that's what lit this fuse."  Chairman Comer shortly thereafter reiterated "we're serious about this . . .  I fully expect to see Alvin Bragg answering questions in front of Congress as soon as we can make it happen.  This is unacceptable, and we're not going to back down on this."  Chairman Comer therefore confirmed that the subpoena to Mr. Pomerantz was the first action of a subpoena strategy, with the ultimate goal of subpoenaing the District Attorney himself.

**L.     Mr. Trump Is Arraigned, And Chairman Jordan And The Committee Subpoena Mr. Pomerantz.**

92.     On April 4, 2023, Mr. Trump traveled from Florida to New York for his arraignment, arrest, and fingerprinting.  He was accompanied by the Secret Service, who had coordinated effectively with New York State Supreme Court security officers in advance of the arraignment.  On information and belief, Mr. Trump's transit to (and from) New York was safe. No security incidents or breaches were reported with respect to Mr. Trump's safety.

93.     Later that day, Mr. Trump was arraigned in New York State Supreme Court and his indictment and the District Attorney's statement of facts were unsealed.  The indictment accuses Mr. Trump of 34 felony counts of Falsifying Business Records in the First Degree in violation of New York Penal Law § 175.10.  Specifically, District Attorney Bragg alleged that Mr. Trump "repeatedly and fraudulently falsified New York business records to conceal criminal conduct that

---

[20]     Shayna Jacobs, *Ex-prosecutor's book could hurt Trump investigation, district attorney worries*, The Washington Post  (Jan.  18,  2023),  https://www.washingtonpost.com/national-security/2023/01/18/prosecutor-trump-book-manhattan/.

hid damaging information from the voting public during the 2016 presidential election."[21]   The criminal conduct involved, among other things, a scheme in which Mr. Trump and other participants "violated election laws," "made and caused false entries in the business records of various entities in New York," and "took steps that mischaracterized, for tax purposes, the true nature of the payments made in furtherance of the scheme."[22]

94.     Mr. Trump entered a plea of not guilty before Judge Merchan.

95.     The indictment vindicates a distinct state interest in the integrity of business records within New York State.   As District Attorney Bragg observed, "[t]rue and accurate business records are important everywhere," and "are all the more important in Manhattan, the financial center of the world."[23]   He further explained that "we have a history in the Manhattan DA's office of vigorously enforcing white collar law," and that the charge of falsifying business records is "the bread and butter of our white-collar work," which the Office has charged as a felony "hundreds" of times.[24]

96.     During the arraignment, prosecutors raised to the court Mr. Trump's recent "public statements threatening our city, our justice system, our courts, and our office."   They noted Mr. Trump had made "irresponsible social media posts that target various individuals involved in this matter, and even their families"; that he had "threatened potential death and destruction, and that is a quote, and world war three, another quote, if these charges were brought and he was indicted."   Prosecutors also informed the Court that Mr. Trump had posted "a picture that depicts Mr. Trump wielding a baseball bat at the head of the District Attorney."   Before handing the court copies of

---

[21]   Statement of Facts, *The People of the State of New York v. Donald J. Trump*, IND-714543-23 (Apr. 4, 2023).

[22]   *Id*.

[23]   CNBC Television, *Manhattan DA Alvin Bragg holds press conference following Trump's arraignment*, YouTube (Apr. 4, 2023), https://www.youtube.com/watch?v=C2XoDZjOMs8.

[24]   *Id.*

these posts, prosecutors noted that Mr. Trump's comments have "led to extensive public safety measures being put into place." Prosecutors asked the court to impose an "appropriately restricted protective order" to ensure "the defendant does not disseminate any information provided as discovery through threatening online posts."

97.     Following the parties' discussion of the prosecutors' concerns, the court instructed the parties' counsel "speak to [their] client [or witnesses] and anybody else you need to, and remind them to please refrain [] from making statements that are likely to incite violence or civil unrest. Please refrain from making comments or engaging in conduct that has the potential to incite violence, create civil unrest, or jeopardize the safety or well-being of individuals." And the court concluded, "please do not engage in words or conduct which jeopardizes the rule of law, particularly as it applies to these proceedings in this courtroom."

98.     Hours later, Mr. Trump made a statement in Florida. He told his supporters: "[t]he criminal is the District Attorney because he illegally leaked massive amounts of grand jury information, for which he should be prosecuted or at a minimum, he should resign" and "I have a Trump hating judge, with a Trump hating wife and family, whose daughter worked for Kamala Harris and now receives money from the Biden-Harris campaign and a lot of it."[25]

99.     On April 6, 2023, two days after Mr. Trump was arraigned, Chairman Jordan and the House Judiciary Committee served a subpoena on Mr. Pomerantz directing him to appear and testify at a deposition before the Committee regarding the District Attorney's investigation. The subpoena directs Mr. Pomerantz to appear before the Committee on April 20, 2023.

---

[25]     Kelly Garrity, *Trump decries charges against him as an 'insult to our country,'* Politico (Apr. 4, 2023), https://www.politico.com/news/2023/04/04/donald-trump-mar-a-lago-indictment-00090499.

100.    In the cover letter accompanying the subpoena, the Committee states that based on Mr. Pomerantz's "role as a special assistant district attorney leading the investigation into President Trump's finances," he is "uniquely situated to provide information that is relevant necessary to inform the Committee's oversight and potential legislative reforms" related to "insulat[ing] current and former Presidents from [] politically motivated state and local prosecutions."  The Committee claims that such potential legislative reforms could include: (i) broadening "the existing statutory right of removal of certain criminal cases from state court to federal court"; (ii) investigating potential conflicts between "federal law-enforcement officials required by federal law to protect a former President and local law-enforcement officials required to enforce an indictment"; and (iii) enhancing "reporting requirements concerning the use of federal forfeiture funds or to prohibit the use of federal forfeiture funds to investigate a current or former President or presidential candidate."

101.    The letter states that Mr. Pomerantz has "no basis to decline to testify" regarding matters he wrote about (and later promoted in television interviews) in his February 2023 book, *People vs. Donald Trump: An Inside Account*.  The book details some of Mr. Pomerantz's views and his depiction of his personal experiences working on the District Attorney's investigation into Donald Trump.  The letter cites passages in Mr. Pomerantz's book, which the letter argues reveal that the District Attorney's Office's investigation of Donald Trump was politically motivated.  The letter says, for instance, that Mr. Pomerantz "frivolously compare[d] President Trump to mob boss John Gotti."  And it alleges that Mr. Pomerantz said there was "no doubt in [Mr. Pomerantz's] mind that [President] Trump deserved to be prosecuted," demonstrating that Mr. Pomerantz was personally "searching for any basis on which to bring criminal charges" against Mr. Trump.  The letter also points to Mr. Pomerantz's personal perceptions of Mr. Trump as a "malignant narcissist"

and "megalomaniac who posed a real danger to the country" whose behavior made Mr. Pomerantz "angry, sad, and [] disgusted."   These views, the letter speculates, were evidence that Mr. Pomerantz "prejudg[ed] the results of the District Attorney's investigation" which contributed to the "political pressure" on District Attorney Bragg to "bring charges against former President Trump."

102.    Contrary to the Chairman's contentions, however, Mr. Pomerantz's book did not and could not waive any privilege belonging to the District Attorney's Office.  Prior to the book's publication, the District Attorney had instructed Mr. Pomerantz to make no disclosures relating to the "existence, nature, or content" of any communications or records or documents that relate in any manner to the investigation he participated in as a Special Assistant.  The District Attorney's Office also did not have the opportunity to review any drafts or excerpts of Mr. Pomerantz's book prior to publication.

103.    The letter also states that under Rule X of the House of Representatives, the Committee has jurisdiction "to conduct oversight of criminal justice matters to inform potential legislation."  Rule X, however, makes no reference to *State* criminal justice—only stating that the Committee has jurisdiction over "[c]riminal law enforcement and criminalization" as well as "[t]he judiciary and judicial proceedings, civil and criminal."  H.R. Rule X, clause 1 (*l*)(1), (7).  Other sections of Rule X expressly make reference to the States, however, confirming that Rule X(*l*) on the Judiciary Committee's jurisdiction does not confer on the Judiciary Committee jurisdiction over State criminal (let alone civil) matters.

104.    In the hours following his service of the subpoena, Chairman Jordan tweeted the following:



105.    He also retweeted a report by Breitbart News that "Rep @Jim_Jordan has issued his *first* subpoena for House Republicans' investigation of the Manhattan district attorney's indictment of former President Donald Trump," suggesting more subpoenas would follow. (emphasis added).

106.    Media reports after the subpoena was served indicated that the subpoena was part of an "all-out blitz" Mr. Trump was preparing to commence.[26]  That blitz will reportedly be directed towards "Manhattan District Attorney Alvin Bragg, Judge Juan Merchan, and anyone else in the judicial system who dares cross" Mr. Trump.[27]  "Meanwhile, powerful Republican lawmakers on Capitol Hill are preparing to use the levers of the legislative branch to run interference for Trump following his historic arrest and arraignment in Manhattan this week."[28]

---

[26]    Tim Dickenson, Asawin Suebsaeng, Adam Rawnsley, *Trump's Lawyers Are Begging Him for Restraint. His Political Allies Are Preparing to 'Fight Dirty'*, Rolling Stone (Apr. 6, 2023), https://www.rollingstone.com/politics/politics-features/trump-lawyers-alvin-bragg-indictment-debate-1234711049/.

[27]    *Id.*

[28]    *Id.*

**M.    Chairman Jordan Demands Documents And Testimony From A Current Employee Of The District Attorney's Office.**

107.    On April 7, 2023, Chairman Jordan sent a letter to Matthew Colangelo, Senior Counsel at the District Attorney's Office.

108.    The letter requested documents and testimony in light of Mr. Colangelo's "history of working for law-enforcement entities that are pursuing President Trump and the public reporting surrounding [his] decision to work for the New York County District Attorney's Office."  The Chairman argued Mr. Colangelo is "uniquely situated to provide information that is relevant and necessary to inform the Committee's oversight and potential legislative reforms."  The Chairman requested Mr. Colangelo's cooperation in his "personal capacity."  The Chairman's letter requested four categories of documents from Mr. Colangelo for the period June 22, 2021 to December 5, 2022:

- All documents and communications between or among you and anyone affiliated, in any way, with the New York County District Attorney's Office referring or relating to your potential or future employment with that Office, including, but not limited to (a) [t]he substance or type of work that you would potentially do for that Office; (b) [t]hat Office's motivation for or interest in hiring you; or (c) [y]our personal motivation for or interest in working for that Office;

- All documents and communications between or among you and anyone affiliated, in any way, with the New York County District Attorney's Office referring or relating to President Donald J. Trump; the Trump Organization; or any other entity owned, controlled by, or associated with President Donald J. Trump;

- All documents and communications between or among you and anyone not affiliated with the New York County District Attorney's Office referring or relating to both your potential or future employment with that Office and (a) President Donald J. Trump; (b) [t]he Trump Organization; or (c) [a]ny other entity owned, controlled by, or associated with President Donald J. Trump;

- Any other documents or communications referring or relating to both your potential or future employment with the New York County District Attorney's Office and (a) President Donald J. Trump; (b) [t]he Trump

Organization; or (c) [a]ny other entity owned, controlled by, or associated with President Donald J. Trump.

The letter also asked that Mr. Colangelo testify before the Committee no later than April 21, 2023.

109.    The Chairman's letter said he sought information and documents relating to the "circumstances and chain of events that led to [Mr. Colangelo's] hiring by the New York County District Attorney's Office."  In other words, the Chairman now wanted to exercise "oversight" of the District Attorney's personnel decisions.  The Chairman argued this information would "shed substantial light on the underlying motives for that Office's investigation into and indictment of President Trump."  Specifically, the Chairman pointed to the fact that when Mr. Colangelo worked at the New York Attorney General's Office, he "ran investigations into President Trump, leading 'a wave of state litigation against Trump administration policies.'"  The Chairman opined that District Attorney Bragg hired Mr. Colangelo to "fill the void left by the departure of . . . Mark Pomerantz and Carey Dunne."

110.    The letter to Mr. Colangelo confirms the subpoena issued to Mr. Pomerantz is just the first of many the Chairman is planning to send to current and former District Attorney's Office employees and officials to wreak havoc on their prosecutorial activities pursuant to New York law.  In fact, Representative Wesley Hunt, a member of the Judiciary Committee, confirmed just that when he gave an interview on *Fox News* on April 6, 2023.  During that interview, Mr. Hunt stated: "I can assure you that Jim Jordan, who's the head of the Judiciary Committee, we have a plan for all of these people to expose them for exactly who they are."[29]  He continued:  "They have an agenda to destroy our country.  They have an agenda to destroy the very fabric of America.  We've got to expose this so that in two years, the American people—we, the people—can get this right."

---

[29]    *See* Rep. Wesley Hunt Press Office (@RepWPH), Twitter (Apr. 7, 2023), https://twitter.com/RepWPH/status/1644341609440370688?cxt=HHwWgICzger-79EtAAAA.

Chairman Jordan retweeted a clip of Mr. Hunt's interview, signaling, on information and belief, that he approved of Mr. Hunt's statements.  Mr. Trump subsequently posted the clip to his Truth Social account as well.

111.    On April 10, 2023, the *New York Post* reported that the House Judiciary Committee would hold a "field hearing" in New York City at 9:00 am Monday, April 17 at the Jacob Javits Federal Building to examine "New York's rampant crime and victims of Alvin Bragg."[30]  A source told the New York Post that purported "victims" of District Attorney Bragg's "policies" and "failure[s] to prosecute" would be witnesses at the hearing, although a witness list was not made immediately available for examination.  A source also told the *New York Post* that the House Judiciary Committee and Congressman Jordan had not ruled out inviting the District Attorney to attend the hearing.  Chairman Jordan and the Judiciary Committee specifically tweeted about the hearing:



---

30    Steven Nelson, *House panel to examine 'victims' of Bragg policies as GOP casts doubt on NYC prosecutor who took on Trump*, New York Post (Apr. 10, 2023), https://nypost.com/2023/04/10/house-judiciary-committee-to-hold-nyc-hearing-on-victims-of-da-alvin-braggs-policies/.



**FIRST CAUSE OF ACTION**
**(Injunctive & Declaratory Relief)**
**The Subpoena Is *Ultra Vires* And**
**Exceeds the Committee's Constitutional Authority**

112.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

113.    The subpoena served on Mr. Pomerantz is invalid, unenforceable, unconstitutional, and *ultra vires* because it has no legitimate legislative purpose.  *See Watkins*, 354 U.S. at 187.

114.    The Chairman and the Committee have stated that their purpose in seeking information from current and former employees and officials of the District Attorney's Office is to "conduct oversight" into a local criminal prosecution and as part of an overall investigative plot

to demand unconstitutionally that District Attorney Bragg "explain himself" and provide a "good explanation" and a "good argument" to Congress.  They have also made clear that the subpoena is designed to punish District Attorney Bragg for his prosecutorial decisions—*i.e.*, as Speaker McCarthy stated, to "hold Alvin Bragg and his unprecedented abuse of power to account."  The subpoena Chairman Jordan and the Committee have served on Mr. Pomerantz is part and parcel of these unlawful aims.

115.    But Congress lacks any enumerated power entitling it to "conduct oversight" into a single state prosecution in which a local grand jury has voted to bring criminal charges.  The Supreme Court held more than 140 years ago that Congress may not deploy its subpoena power to "interfere with" a case "pending in a court of competent jurisdiction." *Kilbourn v. Thompson*, 103 U.S. 168, 194 (1880).  Congress is not "a law enforcement or trial agency," for "[t]hese are functions of the executive and judicial departments of government." *Watkins*, 354 U.S. at 187.  "No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress.  Investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." *Id.*  And under the Tenth Amendment, the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend X.  This framework reflects our principles of federalism and dual sovereignty, by which the states "remain independent and autonomous within their proper sphere of authority." *Printz*, 521 U.S. at 928.  The Constitution "reposed [police power] in the States." *Morrison*, 529 U.S. at 618.  It clearly conferred "primary authority for defining and enforcing the criminal law" on the States. *Lopez*, 514 U.S. at 561 n.3.  There is no congressional power to interfere—as the Chairman and the

Committee seek to do here—with the states' "proper sphere of authority" to police. *Printz*, 521 U.S. at 928. In short, Congress has no legitimate legislative objective to pursue here.

116. As a result, in his letters and public statements, Chairman Jordan and his congressional allies have changed their story multiple times, creating new and constantly shifting purported legislative interests and purposes that supposedly justify the Committee's unwarranted "incursion" into a state criminal case. *Printz*, 521 U.S. at 920. These are just obvious pretexts for interfering with the District Attorney's Office's work enforcing the laws of the State of New York on behalf of the People.

117. The subpoena served on Mr. Pomerantz fails to satisfy the Supreme Court's test in *Mazars*. 140 S. Ct. at 2035. Namely, the purported legislative purposes Chairman Jordan has invoked to support the subpoena are unsupported, speculative, specious, and/or unconstitutional. The subpoena is more broad than reasonably necessary to support any claimed congressional objective. Chairman Jordan and the Judiciary Committee have offered no evidence in support of any legislative purpose they have attempted to invoke to justify their subpoena. And the subpoena is unduly burdensome because it would substantially burden both the New York criminal justice system and the District Attorney's Office as it prepares for Mr. Trump's criminal trial. The Committee's subpoena also burdens the District Attorney and the criminal justice system by politicizing Mr. Trump's trial and undermining the public's faith in the integrity of the criminal justice system. The Committee's subpoena to Mr. Pomerantz and its other intrusive serial requests for documents and testimony are plainly aimed at burdening the District Attorney's Office by harassing them, attempting to intimidate them, and trying to distract them from their preparation of Mr. Trump's criminal case.

118.    The subpoena is also *ultra vires* because the Judiciary Committee does not have jurisdiction over State criminal prosecutions under Rule X of the Rules of the House of Representatives.

119.    The demands for documents and testimony that Chairman Jordan has made on District Attorney Bragg and current and former District Attorney's Office employees or officials similarly lack any valid legislative purpose.  In the event Chairman Jordan or the Committee serves a subpoena on the District Attorney himself or any of his current or former employees or officials, such subpoenas will also be invalid, unenforceable, unconstitutional, and *ultra vires*.

120.    Plaintiff suffers and is continuing to suffer irreparable harm from the risk that Mr. Pomerantz may be forced to comply with the subpoena served on him, including but not limited to irreparable harm to New York's sovereign dignitary interests.  Plaintiff further lacks any adequate remedy at law.

### SECOND CAUSE OF ACTION
### (Injunctive & Declaratory Relief)
### Violation of Grand Jury Secrecy And Privilege

121.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

122.    Even if Chairman Jordan and the Committee were able to demonstrate a valid legislative purpose and withstand the *Mazars* test (they cannot), the subpoena still would not be enforceable because it could allow the Committee to seek secret grand jury material, confidential investigative material, and documents and communications that are clearly privileged under the attorney-client privilege, the attorney work product doctrine, the deliberative process privilege, the law enforcement privilege, the informant's privilege, and the public interest privilege.

123.    Grand jury materials are secret and privileged under New York State law.  *See* N.Y. Crim. Proc. Law § 190.25(4)(a); N.Y. Penal Law § 215.70.  "The attorney-client privilege protects

communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011). The attorney work product doctrine protects documents prepared in anticipation of litigation by a party or its representative. Fed. R. Civ. P. 26(b)(3); *Hickman v. Taylor*, 329 U.S. 495, 511–12 (1947); *PepsiCo, Inc. v. SEC*, 563 F. Supp. 828, 830 (S.D.N.Y. 1983) (explaining that work product privileges are part of federal law). The deliberative process privilege protects deliberations regarding agency information, such as recommendations and analysis. The law enforcement privilege protects, among other things, law enforcement techniques and procedures, confidentiality of sources, and otherwise prevents interference with an investigation. The informant's privilege protects from retaliation members of the public who provide information to the government during an investigation. The public interest privilege applies to confidential communications between or to public officers in the performance of their duties where the public interest requires that those confidential communications or sources should not be revealed. The risk of disclosure is only heightened because the regulations governing House depositions permit only two "personal, nongovernmental" attorneys to accompany Mr. Pomerantz to his deposition and bar "government agency personnel" from the District Attorney's Office to attend and protect the Office's privilege. The regulations also empower a partisan decisionmaker—the Committee chairman—to overrule a privilege objection and order a witness to answer a question.

124. Privilege has not been waived by virtue of Mr. Pomerantz's book. Nor can grand jury secrecy be waived at all. Mr. Pomerantz did not receive written authorization to disclose any communications, records, or documents that relate in any manner to the investigation he participated in as a Special Assistant. He was expressly informed of the need to receive that written

authorization prior to the publication of his book and was expressly unauthorized to reveal any privileged or secret information. The District Attorney's Office did not have the opportunity to review any drafts or excerpts of Mr. Pomerantz's book prior to publication, despite asking to conduct such a pre-publication review. And Mr. Pomerantz publicly stated before the book was published that he was "confident that all of my actions with respect to the Trump investigation, including the writing of my forthcoming book, are consistent with my legal and ethical obligations."

125.   The demands for documents and testimony that Chairman Jordan has made on District Attorney Bragg and current and former District Attorney's Office employees or officials also improperly seek privileged and confidential material.

126.   Plaintiff will suffer imminent irreparable harm if the secret and privileged material is compelled to be disclosed, including but not limited to irreparable harm to New York's sovereign dignitary interests.

127.   Plaintiff lacks any adequate remedy at law.

**WHEREFORE**, Plaintiff asks this Court to enter judgment in his favor and to provide the following relief:

> a.   A declaratory judgment that the subpoena served on Mr. Pomerantz is invalid, unconstitutional, *ultra vires*, and/or unenforceable;

> b.   A permanent injunction, preliminary injunction, and temporary restraining order enjoining any enforcement of the subpoena served on Mr. Pomerantz and enjoining Mr. Pomerantz's compliance with the subpoena;

> c.   In the event Chairman Jordan or the Committee serves subpoenas on the District Attorney himself or any of his current or former employees or officials, a

declaratory judgment that those subpoenas are invalid, unconstitutional, *ultra vires*, and/or unenforceable as well as a permanent and preliminary injunction enjoining enforcement of any such subpoena;

d.      Plaintiff's reasonable costs and expenses, including attorneys' fees; and

e.      For such other and further relief as this Court determines proper.

Dated: April 11, 2023

GIBSON DUNN & CRUTCHER LLP

/s Theodore J. Boutrous, Jr.
Theodore J. Boutrous, Jr.
333 South Grand Ave.,
Los Angeles, California 90071
Tel:  (213) 229-7804
tboutrous@gibsondunn.com

Mylan L. Denerstein
Lee R. Crain
200 Park Avenue
New York, New York 10166
Tel:  (212) 351-3850
mdenerstein@gibsondunn.com
lcrain@gibsondunn.com

Katherine Moran Meeks (*phv forthcoming*)
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel:  (202) 955-8258
kmeeks@gibsondunn.com

NEW YORK COUNTY DISTRICT
ATTORNEY'S OFFICE

Leslie B. Dubeck
General Counsel to the New York County
District Attorney
One Hogan Place
New York, New York 10013
Tel: (212) 335-9000
Dubeckl@dany.nyc.gov

*Counsel for Plaintiff Alvin L. Bragg, Jr.*