**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

ALVIN L. BRAGG, JR., in his official capacity as District
Attorney for New York County,

*Plaintiff*,

    v.

JIM JORDAN, in his official capacity as Chairman of the
Committee on the Judiciary, et al.,

*Defendants*.

Case No. 23-cv-3032

---

**MEMORANDUM OF LAW IN SUPPORT OF THE DISTRICT ATTORNEY'S MOTION
FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................ 3

ARGUMENT .................................................................................................... 6

I.   The District Attorney Is Likely To Succeed on the Merits ........................................ 6

A.   The Subpoena Lacks Any Valid Legislative Purpose and Therefore
     Exceeds Congress's Authority Under Article I. ...................................................... 6

B.   The Subpoena Does Not Survive the Heightened Scrutiny *Mazars*
     Requires for Congressional Inquiries Implicating Significant Separation of
     Powers or Federalism Concerns ........................................................................ 13

II.  The District Attorney Will Be Irreparably Injured Absent Injunctive Relief. .......... 22

III. The Balance of Equities and the Public Interest Strongly Favor Injunctive
     Relief. ............................................................................................................... 24

CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Co. v. Performance Supply, LLC*,
    458 F. Supp. 3d 181 (S.D.N.Y. 2020)........................................................................................6

*Adler v. U.S. Dep't of Justice*,
    2018 WL 4571677 (S.D.N.Y. Sept. 24, 2018)........................................................................22

*Bionpharma Inc. v. CoreRx, Inc.*,
    582 F. Supp. 3d 167 (S.D.N.Y. 2022)....................................................................................24

*Blumenthal v. Drudge*,
    186 F.R.D. 236 (D.D.C. 1999)...............................................................................................21

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020)...........................................................................................................18

*Eastland v. U.S. Servicemen's Fund*,
    421 U.S. 491 (1975)..........................................................................................................7, 10

*Engle v. Isaac*,
    456 U.S. 107 (1982).................................................................................................................9

*Georgia v. Pruitt*,
    326 F. Supp. 3d 1356 (S.D. Ga. 2018)...................................................................................24

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991).................................................................................................................9

*Illinois ex rel. Harris v. Bd. of Govs. of the Fed. Reserve Sys.*,
    751 F. Supp. 1323 (N.D. Ill. 1991) .......................................................................................24

*Hertzog, Calamari & Gleason v. Prudential Ins. Co. of Am.*,
    850 F. Supp. 255 (S.D.N.Y. 1994)........................................................................................21

*Hickman v. Taylor*,
    329 U.S. 495 (1947)...............................................................................................................23

*Hopkins v. U.S. Dep't of Housing & Urb. Dev.*,
    929 F.2d 81 (2d Cir. 1991).....................................................................................................22

*House Comm. on Judiciary v. McGahn*,
    968 F.3d 755 (D.C. Cir. 2020) ..............................................................................................10

*House Comm. on Ways & Means v. U.S. Dep't of Treasury*,
  45 F.4th 324 (D.C. Cir. 2022) ...........................................................................10

*Jane Doe v. Yorkville Plaza Assocs.*,
  1996 WL 343059 (S.D.N.Y. June 21, 1996) .......................................................17

*Kilbourn v. Thompson*,
  103 U.S. 168 (1881).........................................................................7, 8, 12

*LaRoque v. Holder*,
  650 F.3d 777 (D.C. Cir. 2011) .........................................................................14

*Mashpee Wampanoag Tribe v. Bernhardt*,
  2020 WL 3034854 (D.D.C. June 5, 2020)...........................................................24

*McCoy v. City of New York*,
  2008 WL 3286270 (E.D.N.Y. Aug. 7, 2008)........................................................20

*Merrill v. City of New York*,
  2005 WL 2923520 (S.D.N.Y. Nov. 4, 2005) ........................................................21

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012).........................................................................................12

*New York v. United States*,
  505 U.S. 144 (1992)...........................................................................................9

*Plaut v. Spendthrift Farm, Inc.*,
  514 U.S. 211 (1995)...........................................................................................8

*Printz v. United States*,
  521 U. S. 898 (1997).....................................................................................9, 25

*Rodgers v. Bryant*,
  942 F.3d 451 (8th Cir. 2019) ...........................................................................25

*In re Sealed Case No. 98-3077*,
  151 F.3d 1059 (D.C. Cir. 1998).........................................................................24

*In re Search Warrant Issued June 13, 2019*,
  942 F.3d 159 (4th Cir. 2019) ...........................................................................23

*Seila Law LLC v. CFPB*,
  140 S. Ct. 2183 (2020).......................................................................................14

*Tenney v. Brandhove*,
  341 U.S. 367 (1951)............................................................................................9

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*,
  60 F.3d 27 (2d Cir. 1995) ...................................................................................23

*Trump v. Mazars USA, LLP*,
  140 S. Ct. 2019 (2020) ...................................2, 6, 11, 13, 14, 15, 16, 17, 18, 20, 21

*Trump v. Vance*,
  140 S. Ct. 2412 (2020) .........................................................................10, 11, 20

*United States v. Lopez*,
  514 U.S. 549 (1995) .........................................................................................2, 9

*United States v. Morrison*,
  529 U.S. 598 (2000) ............................................................................................9

*United States v. Rowe*,
  96 F.3d 1294 (9th Cir. 1996) ...........................................................................21

*Watkins v. United States*,
  354 U.S. 178 (1957) ...........................................................................2, 7, 12, 18

*White v. City of Mt. Vernon*,
  2022 WL 16578086 (S.D.N.Y. Nov. 1, 2022) .................................................22

*Winter v. Nat. Res. Def. Council*,
  555 U.S. 7 (2008) ................................................................................................6

*In re World Trade Ctr. Bombing Litig.*,
  709 N.E.2d 452 (N.Y. 1999) ............................................................................22

*Younger v. Harris*,
  401 U.S. 37 (1971) ...............................................................................2, 14, 23

**Constitution**

U.S. Const. art. I ...............................................................................1, 6, 12, 20

U.S. Const. amend. X .............................................................................................9

**Statutes**

N.Y. Crim. P. Law § 190.25 .................................................................................20

N.Y. Penal Law § 215.70 .....................................................................................20

**Other Authorities**

118th Congress Regulations For Use of Deposition Authority and Remote
  Participation of Committee Witnesses, 169 Cong. Rec. H147 (Jan. 10, 2023) .....................23

William K. Rashbaum & Kate Christobek, *The Only Other Arrest of a U.S. President Involved a Speeding Horse*, N.Y. Times (Apr. 4, 2023) .........................................10

## INTRODUCTION

Chairman Jim Jordan and the House Committee on the Judiciary have issued a subpoena to former Manhattan prosecutor Mark Pomerantz for the purpose of interfering with New York's criminal prosecution of a single individual—former President Donald J. Trump.  Ex. 1.[1]  On March 30, 2023, an independent New York grand jury returned an indictment charging Mr. Trump with 34 felony counts under New York law.  Ex. 36.  Mr. Trump has leveraged his extensive social media network to undermine public confidence in the charges and threaten District Attorney Alvin Bragg Jr. ("District Attorney" or "D.A.").  Compl. ¶¶ 34, 50–53, 63–65, 69–70, 84–86.  At the urging of Mr. Trump's defense counsel, powerful allies in Congress have carried the refrain that the charges are "politically motivated" and have vowed to use the power of their office to hold the District Attorney "accountable."  *Id.* ¶¶ 37–38, 72–74, 88–90; Ex. 2, at 1.  Their latest salvo—the subpoena to Mr. Pomerantz—is an abuse of congressional process and a brazen incursion into New York's exercise of its sovereign prosecutorial powers.

The District Attorney hereby moves for a temporary restraining order and preliminary injunction to bar Chairman Jordan and his Committee from enforcing this unlawful and unconstitutional subpoena and to prohibit Mr. Pomerantz from complying with it.  According to Chairman Jordan, the Committee seeks to question Mr. Pomerantz about the "internal deliberations" of the District Attorney's office and the "unique role" he played "as a special assistant district attorney leading the investigation into President Trump's finances."  Ex. 1, at 2.  This unprecedented federal intrusion into a state criminal prosecution exceeds Congress's authority under Article I of the Constitution and frustrates New York's prerogative to enforce its own criminal law.  "Under our federal system, the States possess primary authority for defining

---

[1] Exhibits cited herein are exhibits to the Declaration of Theodore J. Boutrous Jr.

and enforcing the criminal law." *United States v. Lopez*, 514 U.S. 549, 561 n.3 (1995).  The Constitution requires the federal government to strictly observe a policy of "no interference" with the state officers who are "charged with the duty of prosecuting offenders against the laws of the State and must decide when and how this is to be done." *Younger v. Harris*, 401 U.S. 37, 45 (1971).  Congress is not "a law enforcement or trial agency," *Watkins v. United States*, 354 U.S. 178, 187 (1957), and the Judiciary Committee has no "valid legislative purpose" for hauling a former state prosecutor to Washington, D.C. to second guess the exercise of prosecutorial authority reserved to New York State.  *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020).

Mr. Jordan claims that the Judiciary Committee's unprecedented interference with a state criminal case is justified because, in his opinion, a "popularly elected" district attorney and state "trial-level judges" who "lack life tenure" cannot possibly be trusted to respect Mr. Trump's rights. Ex. 1, at 2.  But if Mr. Jordan believes the charges are "Outrageous," Ex. 17—a view not shared by the independent grand jury that indicted Mr. Trump—the proper forum for that objection is Mr. Trump's upcoming trial in New York Supreme Court.  Like every other criminal defendant, Mr. Trump will have the opportunity to confront the state's evidence and argue his innocence to the jury.  And the District Attorney will have the burden of proving his charges by the most rigorous standard known to the law—beyond a reasonable doubt.  A public trial, conducted with the robust procedural protections our Constitution and New York law afford, provides the ultimate safeguard against what Mr. Jordan derides as a "politically motivated" prosecution.  Exs. 1, 2.  That process alone, and not a congressional cross-examination of a former local prosecutor, will determine whether the charges will result in a conviction.

This Court should issue the preliminary injunction and temporary restraining order barring enforcement of the Committee's unconstitutional subpoena.

## BACKGROUND

The Judiciary Committee's subpoena is one of multiple efforts to undermine and disrupt the criminal proceedings in New York.  Compl. ¶ 110.  Twelve days before the indictment issued, Mr. Trump falsely announced that he would be arrested in three days and began stoking unrest on social media.  *Id.* ¶ 34.  In the same Truth Social post where he predicted his own arrest, Mr. Trump denigrated the District Attorney's office as "CORRUPT & HIGHLY POLITICAL" and pressed his followers to "TAKE OUR NATION BACK!"  Ex. 6.  His rhetoric only sharpened from there. Mr. Trump maligned the District Attorney as a "SOROS BACKED ANIMAL" and "a degenerate psychopath that truely [sic] hates the USA."  Exs. 7, 8; Compl. ¶¶ 50, 53.  He threatened that "the thugs and criminals who are corrupting our justice system will be defeated, discredited, and totally disgraced."  Ex. 55; Compl. ¶ 5.  Most ominously, he warned that his arrest or indictment would unleash "death & destruction," words reminiscent of the tweet that launched the insurrection at the U.S. Capitol on January 6, 2021.  Exs. 8, 29, 34; Compl. ¶ 53.

As Mr. Trump fired up his supporters for a "war," his attorney reportedly worked behind the scenes to enlist help from representatives in Congress.  Ex. 9; Compl. ¶¶ 5, 33.  Mr. Trump's lawyer reportedly sent Chairman Jordan a letter urging Congress to investigate what he called an "egregious abuse of power" by a "rogue local district attorney."  Ex. 25; Compl. ¶ 33.  Mr. Jordan and U.S. Reps. James Comer and Bryan Steil marched in step to these orders, sending their own letter to the District Attorney demanding that he produce documents and appear before Congress to "testify about what plainly appears to be a politically motivated prosecutorial decision."  Ex. 2, at 1.  The trio then delivered a similar demand to Mr. Pomerantz and Carey Dunne, former prosecutors in the Manhattan D.A.'s office who at one time led the investigation into Mr. Trump and his businesses.  Exs. 58, 59; Compl. ¶¶ 43–45.

The District Attorney's general counsel responded that the demand was "an unlawful incursion into New York's sovereignty" and requested the opportunity to meet and confer "to understand whether the Committee has any legitimate legislative purpose in the requested materials that could be accommodated without impeding those sovereign interests." Ex. 10, at 3, 5; *see also* Ex. 19. In a follow-up letter, Jordan, Comer, and Steil ignored the request to meet and confer, manufactured new supposed legislative objectives, and reiterated their intent to conduct "an examination of the facts" underlying the District Attorney's investigation. Ex. 11, at 2.

Meanwhile, the District Attorney's office directed Pomerantz and Dunne not to provide the documents or testimony the congressmen demanded in their letter. Mr. Pomerantz informed Chairman Jordan on March 27, 2023, that he would "act in a manner consistent with the instructions" he had received from the District Attorney. Ex. 12; Compl. ¶ 66. He also requested that Chairman Jordan direct any future requests for his testimony to the District Attorney's office. *Id.* Mr. Dunne did the same. Ex. 13; Compl. ¶ 67.

As the parties exchanged letters, the indictment issued on March 30, 2023, charging Mr. Trump with 34 felony counts of falsifying business records in the first degree. Exs. 36, 36-A; Compl. ¶¶ 68, 93. Mr. Trump pleaded not guilty to the charges. Compl. ¶ 94. Other aspects of the District Attorney's investigation have not resulted in grand jury action. As he awaits trial in the New York Supreme Court, Mr. Trump and others have waged an aggressive campaign to threaten and intimidate the District Attorney and presiding Judge Juan Merchan. *Id.* ¶s¶ 34, 36–38, 50–53, 63–65, 69–74, 84–91; *see also, e.g.*, Exs. 3–9, 23–26, 30–33, 35, 38–46, 49. On his Truth Social account, Mr. Trump posted a photograph of himself that made it appear he was swinging a baseball bat toward the District Attorney's head. Ex. 14; Compl. ¶¶ 5, 52. Then, after Mr. Trump primed his social media followers to believe that Judge Merchan "HATES ME," his

son, Donald Trump Jr., reposted a photograph of the judge's adult daughter.  Ex. 4; Compl. ¶ 69.

Mr. Trump and his allies in Congress have also leveled baseless and inflammatory accusations that

the state's case is "politically motivated."  Exs. 2, 5-A, 11, 24, 25, 47; Compl. ¶¶ 39, 44, 57, 88,

100–01.  Mr. Trump derided the state's charges as "Fake, Corrupt, and Disgraceful," among other,

more noxious descriptions.  Ex. 16; Compl. ¶ 69.  Mr. Jordan tweeted:  "Outrageous."  Ex. 17;

Compl. ¶ 73.  And House Speaker Kevin McCarthy vowed to use the power of his office to "hold

Alvin Bragg and his unprecedented abuse of power to account."  Ex. 18; Compl. ¶ 114; *see also*

Ex. 3; Compl. ¶ 89 (pledging that the District Attorney would be "held accountable by Congress").

On April 6, 2023, two days after Mr. Trump's arraignment, the Judiciary Committee issued

its subpoena to Mr. Pomerantz, ordering him to appear for a deposition on April 20, 2023.  Ex. 1.

According to The New York Times, House Republicans were eager to subpoena the District

Attorney but wanted to avoid "accusations of personal hypocrisy" after Speaker McCarthy and

Chairman Jordan both defied subpoenas from the House Select Committee investigating the

January 6, 2021, insurrection at the U.S. Capitol.  Ex. 15; Compl. ¶ 37 n.9.  Instead, they decided

to start by pursuing what they believed to be an easier initial target—Mr. Pomerantz.  Compl.

¶¶ 99, 110.  In a letter accompanying the subpoena, Chairman Jordan asserted that Mr. Pomerantz

had "no basis to decline to testify" because he published a book about the Trump investigation

after he resigned from the District Attorney's office in February 2022.  Ex. 1, at 2.  Chairman

Jordan asserted that the Committee had "a specific and manifestly important interest in preventing

politically motivated prosecutions of current and former Presidents by elected state and local

prosecutors."  *Id.* at 1–2.  And he contended that Mr. Pomerantz was "uniquely situated" to provide

information because of his "unique role as a special assistant district attorney" who participated in

the office's investigation of Mr. Trump.  *Id.* at 2.  This action followed.

**ARGUMENT**

The Judiciary Committee's extraordinary request to a former state prosecutor requires extraordinary relief.  A party seeking a temporary restraining order or preliminary injunction must demonstrate that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable injury absent preliminary relief; (3) the balance of the equities tips in his favor; and (4) an injunction serves the public interest.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *3M Co. v. Performance Supply, LLC*, 458 F. Supp. 3d 181, 191 (S.D.N.Y. 2020) (recognizing the "same legal standard" governs the issuance of preliminary injunctions and TROs).

The Judiciary Committee's subpoena to Mr. Pomerantz marks the first time in our nation's history that Congress has used its compulsory process to interfere with an ongoing state criminal case.  The District Attorney is likely to succeed on the merits because the subpoena exceeds Congress's authority and obstructs New York's sovereign right to enforce its criminal law.  The subpoena would also irreparably injure the District Attorney by, among other things, interfering with an ongoing criminal case, compromising grand jury secrecy and the attorney-client privilege, and disrupting his preparation for trial.  Finally, the balance of the equities and the public interest favor the District Attorney because the subpoena undercuts federalism principles and the fair administration of justice by injecting politics into a state criminal case.

**I.  The District Attorney Is Likely To Succeed on the Merits.**

**A.  The Subpoena Lacks Any Valid Legislative Purpose and Therefore Exceeds Congress's Authority Under Article I.**

The Judiciary Committee's subpoena is unlawful and unenforceable because it lacks any "valid legislative purpose." *Mazars*, 140 S. Ct. at 2031.  "A congressional subpoena is valid only if it is related to, and in furtherance of, a legitimate task of Congress." *Id.*  A subpoena, in other words, must "concern a subject on which legislation could be had." *Id.* (brackets omitted).  The

Committee's subpoena flunks this basic requirement because its purpose is to undermine and obstruct New York's criminal case against Mr. Trump and retaliate against the District Attorney for what Chairman Jordan falsely described as a "politically motivated" prosecution.  Ex. 1, at 1.  Neither of these falls within "the sphere of legitimate legislative activity," *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 506 (1975), because Congress has no authority to meddle in an ongoing criminal case prosecuted in New York state court under New York law.

Although Congress's subpoena power is broad, "it is not unlimited."  *Watkins*, 354 U.S. at 187.  "Investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible."  *Id.*  "Nor is Congress a law enforcement or trial agency."  *Id.*  "These are functions of the executive and judicial departments of government."  *Id.*  The Supreme Court thus held more than 140 years ago that Congress may not deploy its subpoena power to "interfere with" a case "pending in a court of competent jurisdiction."  *Kilbourn v. Thompson*, 103 U.S. 168, 194 (1881).  In *Kilbourn*, a witness challenged a House subpoena for documents and testimony relating to a company in bankruptcy proceedings where the United States was a creditor.  Because the company's bankruptcy case remained open in the Eastern District of Pennsylvania, the Court held that the House's inquiry into the circumstances of the bankruptcy "was in its nature clearly judicial," *id.* at 192, and "therefore one in respect to which no valid legislation could be enacted," *Watkins*, 354 U.S. at 194.  As a result, the House "had no lawful authority" to require the witness to testify "beyond what he voluntarily chose to tell."  *Kilbourn*, 103 U.S. at 196.

Here, as in *Kilbourn*, the Judiciary Committee's subpoena is "clearly judicial" in nature because its purpose is to second guess the merits of New York's pending criminal case against Mr. Trump.  103 U.S. at 192.  Chairman Jordan has made no secret that the Committee intends to

conduct "an examination of the facts" with the aim of exposing the charges against Mr. Trump as "an unprecedented abuse of prosecutorial authority."  Ex. 11, at 2; Ex. 2, at 1; *see also* Ex. 50, at 1.[2]  Before the indictment even issued, Chairman Jordan attacked the state's legal theory as "tenuous and untested" and impugned the "credibility" of the state's "star witness"—and then asserted that these supposed defects in the state's case required federal "oversight."  Ex. 2, at 2.  Chairman Jordan then reiterated the "oversight" theme in his letter to Mr. Pomerantz, hammering this word no less than nine times.  *See, e.g.*, Ex. 1, at 1 ("The Committee . . . is conducting oversight of the . . . District Attorney's unprecedented indictment of a former President.").  But the lesson of *Kilbourn* is that Congress does not sit to superintend the work of the courts:  it has "no lawful authority" to "interfere with" a case "pending in a court of competent jurisdiction."  103 U.S. at 194, 196; *see also Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 219, 224 (1995) (recognizing that the Framers abjured "a system of intermingled legislative and judicial powers").  If Mr. Trump and his allies on the Committee believe he is the victim of a "Witch Hunt," Ex. 4; Compl. ¶ 69, his recourse is the same one available to every other criminal defendant—a trial before a New York jury and a right to appeal if convicted.  Congress cannot appoint itself a super grand jury empowered to review the state's charges or a preemptive petit jury ready to acquit on every count.

Here, the Judiciary Committee has strayed even farther beyond its "jurisdiction" than the House did in *Kilbourn*, 103 U.S. at 196, because it is attempting to interfere in a criminal case pending in the courts of a separate sovereign—New York State.  Congress has no authority to

---

[2] Mr. Comer, chairman of the House Committee on Oversight and Accountability and one of the signatories to Chairman Jordan's letters, confirmed that the purpose of Congress's investigation is to probe the merits of the state's case.  He told the press that the committees wanted to force the District Attorney to "come explain to us exactly what he's investigat[ing]."  Ex. 52, at 4:46–5:44.  "If Mr. Bragg wants to come in and explain to us what he is doing and he makes a good explanation, . . . then we'll back off."  *Id.* at 6:26–8:18.

conduct an inquiry into the charges against Mr. Trump because it has no authority to regulate New York's enforcement of its own criminal law.  "Under our federal system, the States possess primary authority for defining and enforcing the criminal law."  *Lopez*, 514 U.S. at 561 n.3.  "Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of . . . crime and vindication of its victims."  *United States v. Morrison*, 529 U.S. 598, 618 (2000).  Because the power to enforce state criminal law is "an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress."  *New York v. United States*, 505 U.S. 144, 156 (1992); *see also Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (recognizing Congress cannot "readily interfere" where states "retain substantial sovereign powers").

The structural separation of powers between the state and federal governments is no mere formality.  Our system of dual sovereignty is designed to "prevent the accumulation of excessive power" in any one part of the government and thereby "reduce the risk of tyranny and abuse from either front."  *Printz v. United States*, 521 U. S. 898, 921 (1997).  But here the Judiciary Committee has arrogated to itself the power to conduct "oversight" of a state criminal prosecution, Ex. 1, at 1, bigfooting the District Attorney's authority to enforce New York law and Judge Merchan's authority to manage the cases on his docket.  This "obvious . . . usurpation of functions exclusively vested" in state governments, *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951), disrupts the constitutional balance and "frustrate[s]" New York's "sovereign power to punish offenders," *Engle v. Isaac*, 456 U.S. 107, 108 (1982).

Chairman Jordan points to alleged legislative interests that supposedly justify the Judiciary Committee's unwarranted "incursion" into a state criminal case, *Printz*, 521 U. S. at 920, but each of these is a baseless pretext for hauling Mr. Pomerantz to Washington for a political spectacle.

According to Mr. Jordan, the Committee could consider legislation—which of course remains entirely hypothetical—to "insulate current and former Presidents" from state criminal prosecutions for "personal acts" unrelated to their conduct in office.  Ex. 1, at 2.  But Congress's "power to investigate" extends only as far as its "power to enact and appropriate under the Constitution." *Eastland*, 421 U.S. at 504–06 & n.15; *see also House Comm. on Judiciary v. McGahn*, 968 F.3d 755, 765 (D.C. Cir. 2020) (recognizing the subpoena power effectuates "the *constitutional*" powers of Congress (emphasis added)).  The Judiciary Committee cannot compel Mr. Pomerantz's testimony because Congress lacks authority to exempt former presidents—that is, private citizens—from the reach of state criminal laws.  Any such legislation would invade the states' prerogative to punish state offenses, *see* pp. 8–9, *supra*, and make a mockery of equal protection principles.  "[E]very President takes office knowing that he will be subject to the same laws as all other citizens upon leaving office."  *House Comm. on Ways & Means v. U.S. Dep't of Treasury*, 45 F.4th 324, 338 (D.C. Cir. 2022); *see also* William K. Rashbaum & Kate Christobek, *The Only Other Arrest of a U.S. President Involved a Speeding Horse*, N.Y. Times (Apr. 4, 2023) (noting that President Grant told the officer who arrested him for speeding that he "admired a man who did his duty").  Mr. Trump himself has acknowledged that "state grand juries are free to investigate a sitting President with an eye toward charging him after the completion of his term."  *Trump v. Vance*, 140 S. Ct. 2412, 2426–27 (2020).  Only the Judiciary Committee appears unaware that "[t]his is a feature of our democratic republic, not a bug."  *Ways & Means*, 45 F.4th at 338.

Chairman Jordan also asserts that the Judiciary Committee could consider legislation "to enhance reporting requirements" about federal funds that local law enforcement officials use "to investigate a current or former President or presidential candidate."  Ex. 1, at 2.  But this purely hypothetical legislation is merely a fig leaf for the Committee's impermissible federal intrusion

into a state prosecution.  In response to Chairman Jordan's letter inquiry, the District Attorney's

general counsel already provided the Committee with detailed information about its use of federal

funds.  She explained that the office has "*contributed* to the federal fisc" by helping the federal

government "secure more than one billion dollars in assert forfeiture funds in the past 15 years."

Ex. 19, at 3.  Of that billion dollars in forfeiture money, the District Attorney spent approximately

$5,000 on matters related to Mr. Trump or the Trump Organization, most of it litigating the U.S.

Supreme Court case *Trump v. Vance*, 140 S. Ct. 2412.  Ex. 19, at 4.  That is the sum total of federal

monies spent by the District Attorney's office on the Trump investigation or prosecution:  "*No

expenses* incurred relating to this matter have been paid from funds that the Office receives through

federal grant programs."   *Id.* (emphasis added).   Were the Committee truly interested in

"legislation to enhance reporting requirements concerning the use of federal forfeiture funds," Ex.

1, at 2, it could have accepted the District Attorney's offer to meet and confer about what additional

information his office could provide, Ex. 10, at 2, 5; Ex. 19, at 6.  The Committee also could have

reviewed the substantial disclosures that the law requires and the office already makes in the

ordinary course regarding its use of forfeiture funds.  Instead, the Committee fired off a subpoena

to Mr. Pomerantz—a former line attorney unlikely to have any information (much less up-to-date

information) about the office's use of federal funds.

The Court need not credit the charade, nor "blind" itself to "what all others can see":  the

subpoena to Mr. Pomerantz is not "a run-of-the-mill legislative effort but rather a clash between

rival" sovereigns "over records of intense political interest." *Mazars*, 140 S. Ct. at 2034.  The

purpose of the Committee's subpoena is not to legislate, but to disrupt New York's criminal

prosecution of Mr. Trump and punish the prosecutor who had the temerity to submit potential

charges to a grand jury.  As Mr. Trump escalated his invective against the District Attorney, his

allies in Congress—working at the behest of Mr. Trump's lawyer—stepped in to abet the campaign of obstruction and intimidation.  Exs. 24–26; Compl. ¶¶ 33–38.  Speaker McCarthy pledged to hold the District Attorney "accountable," Ex. 3; Compl. ¶ 89, while Chairman Jordan and the Committee wielded the subpoena power to "run interference" for Mr. Trump, Ex. 26; Compl. ¶ 106.  U.S. Rep. Wesley Hunt, a Judiciary Committee member, confirmed to Fox & Friends that the Committee's "plan" was political payback:  "I can assure you that Jim Jordan, who's the head of the Judiciary Committee, we have a plan for all of these people to expose them for exactly who they are. . . .  We've got to expose this so that in two years, the American people . . . can get this right."  Ex. 20-A; Compl. ¶ 110.  Far from denying this agenda, Mr. Jordan retweeted the interview.  Ex. 20; Compl. ¶ 110.

In its scramble to insulate a single powerful individual from the rule of law, the Judiciary Committee has strayed far beyond its Article I powers and into a constitutional wilderness.  The Committee has no warrant to conduct "oversight" of a state's "indictment" of a single criminal defendant.  Ex. 1, at 1; *Kilbourn*, 103 U.S. at 192–96.  Nor may the Committee abuse the subpoena power to "punish" the District Attorney or "aggrandize[]" itself or Mr. Trump.  *Watkins*, 354 U.S. at 187.  These uses of Congress's compulsory process lack any valid legislative purpose and are constitutionally "indefensible."  *Id.*  Tellingly, the District Attorney could identify *no* prior case in which Congress has attempted to subpoena a state prosecutor for the purpose of extracting information about an ongoing state prosecution.  *Cf.* Ex. 27, at 116; Compl. ¶ 8 ("there hasn't been a subpoena enforcement against a state attorney general in 200 years").  Although "[l]egislative novelty is not always fatal, . . . sometimes the most telling indication of a severe constitutional problem is the lack of historical precedent for Congress's action."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549 (2012) (Roberts, C.J.).  The subpoena to Mr. Pomerantz subverts two

centuries of constitutional norms and impermissibly interferes with New York's power to prosecute and punish those who violate its laws.  The Court should enjoin this unlawful overreach.

**B.    The Subpoena Does Not Survive the Heightened Scrutiny *Mazars* Requires for Congressional Inquiries Implicating Significant Separation of Powers or Federalism Concerns.**

Even assuming that the Judiciary Committee could concoct a valid legislative purpose for Mr. Pomerantz's testimony, the Court should still enjoin compliance with the subpoena because the Committee has not come close to satisfying the heightened standard of review that *Trump v. Mazars USA, LLP* prescribes for congressional subpoenas implicating significant separation-of-powers concerns.  140 S. Ct. 2019, 2032–34.  That standard requires Congress to tailor its demand to a valid legislative purpose and avoid burdening other branches of government with requests for information that could be obtained from other sources.  *Id.* at 2035–36.  It also permits the courts to scrutinize Congress's asserted legislative purposes for pretext.  *Id.* at 2034–36.  The Judiciary Committee's subpoena to Mr. Pomerantz satisfies none of these factors.

Like this case, *Mazars* involved subpoenas that would have given Congress leverage over another branch of government—there the executive, here a state.  Three House committees issued subpoenas to the accounting firm Mazars USA for the financial records of then-President Trump, his children, and his businesses.  140 S. Ct. at 2026.  President Trump sued Mazars to enjoin the company from complying, and the three committees intervened to enforce their subpoenas.  *Id.* Until then, the Supreme Court had never confronted the scope of Congress's power to subpoena presidential documents because the branches had historically "hashed out" such disputes "in the hurly-burly . . . of the political process."  *Id.* at 2029.  Faced with this unprecedented clash between rival branches, the Court placed constraints on Congress's power to investigate the President's information.  "Without limits," the Court concluded, "Congress could 'exert an imperious controul' over the Executive Branch and aggrandize itself at the President's expense."  *Id.* at 2034

(quoting The Federalist No. 71 (A. Hamilton)).   The Court held that, in assessing whether a congressional subpoena for the President's personal information was "related to, and in furtherance of, a legitimate task of Congress, courts must perform a careful analysis that takes adequate account of the separation of powers principles at stake." *Id.* at 2035.

That "careful analysis" involves four factors.  *Mazars*, 140 S. Ct. at 2035.  Federal courts must (1) "carefully assess whether the asserted legislative purpose warrants the significant step of involving the President and his papers," including by asking whether "other sources could reasonably provide Congress the information it needs," (2) "insist on a subpoena no broader than reasonably necessary to support Congress's legislative objective," (3) "be attentive to the nature of the evidence offered by Congress to establish that a subpoena advances a valid legislative purpose," and (4) "assess the burdens imposed . . . by a subpoena." *Id.* at 2035–36.

The Judiciary Committee's flagrant intrusion on New York's sovereign power to conduct a criminal prosecution warrants application of the *Mazars* test here.  If the courts must rigorously scrutinize a congressional subpoena that threatens the balance of power between Congress and the executive, *Mazars*, 140 S. Ct. at 2034, then so too must they rigorously analyze a subpoena that poses a triple threat—to a state executive officer, a state judicial proceeding, and our federal system itself, *see Younger*, 401 U.S. at 44.  The separation of powers and federalism doctrines are each "foundational," *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2205 (2020), and they function in parallel to check the exercise of federal power and secure the rights and freedoms enumerated in the Constitution.   *See LaRoque v. Holder*, 650 F.3d 777, 792 (D.C. Cir. 2011) (describing federalism as a "vertical . . . separation of powers").  Like the subpoenas in *Mazars* that threatened to "aggrandize" Congress "at the President's expense," the Judiciary Committee's subpoena in this case imperils our federal system and gives rise to the same "weighty concerns" that justified the

14

Supreme Court's four-factor analysis.  *Mazars*, 140 S. Ct. at 2034–36.  The subpoena does not withstand that heightened scrutiny.

> **1.      The Judiciary Committee's Asserted Purposes Do Not Justify the "Significant Step" of a Serving a Subpoena on a State Prosecutor for Information Related to an Active Criminal Case.**

The Judiciary Committee's subpoena fails the first *Mazars* factor because its "asserted legislative purpose" does not justify the "significant step" of deposing a former state prosecutor about a pending criminal case, and information is available to the Committee through other, less intrusive alternatives.   140 S. Ct. at 2035.   For the reasons explained above, the Judiciary Committee has no valid legislative purpose; its subpoena to Mr. Pomerantz is a thinly veiled ruse to obstruct the state's criminal case and retaliate against the District Attorney.  But even taking the Committee's asserted legislative purposes at face value, none warrants the Committee's significant interference with New York's ongoing criminal case.

Chairman Jordan suggests that the Judiciary Committee could consider legislation to "insulate current and former Presidents" from "state and local prosecutions," including by creating a statutory right for former presidents to remove state criminal charges to federal court.  Ex. 1, at 2.   Even if such legislation were constitutional, which the District Attorney doubts, the Committee's demand for testimony from Mr. Pomerantz is unnecessary and unjustified.   The Committee has many sources from which it could seek information about the wisdom of such legislation, including from former prosecutors not personally involved in the Trump investigation who might *voluntarily* give testimony.  Congress may not politicize an ongoing state prosecution by using it as "a 'case study' for general legislation."  *Mazars*, 140 S. Ct. at 2036.

Chairman Jordan also suggests that the Committee could consider "reforms" that would ameliorate the potential for conflict between federal law enforcement officials required to protect a former president and state law enforcement officials required to jail him if he is found guilty.

Ex. 1, at 2.  Mr. Trump's recent trip from Florida to New York for his arraignment, where he was accompanied by the Secret Service and arrested and fingerprinted by state officials at the Manhattan Criminal Court, indicates that the potential for conflict among these professionals is illusory at best.  Compl. ¶ 92.  But even assuming Congress might consider "reforms" to address this nonexistent problem, Mr. Pomerantz has no obvious value to the Committee as a witness:  he is an attorney whose expertise lies in enforcing the law rather than managing the physical security of defendants.  The tenuous connection between his testimony and the Committee's asserted legislative ends requires the Committee to look to "other sources" that could "reasonably provide" information without intruding into an active state criminal case.  *Mazars*, 140 S. Ct. at 2035–36.

Finally, Mr. Jordan asserts that the Committee could "enhance reporting requirements" by state law enforcement officials who use federal forfeiture funds to investigate a current or former president.  Ex. 1, at 2.  Once again, the Committee has obvious alternative sources of information.  The District Attorney's general counsel already sent the Committee detailed disclosures about the office's use of $5,000 in federal forfeiture funds in the Trump investigation and offered to meet and confer about what other documentation was needed.  Ex. 19, at 4, 6.  If the Committee's objective were truly to consider reporting requirements, then it could easily have pursued additional voluntary disclosures or reviewed the information the District Attorney's office already provides pursuant to existing reporting requirements.  Instead, its subpoena to Mr. Pomerantz is a non sequitur.  Deposing Mr. Pomerantz about the office's "internal deliberations" about the Trump investigation and his alleged personal animus toward Mr. Trump would not illuminate the need for a reporting requirement on the use of federal forfeiture funds.  Ex. 1, at 2.

None of the Committee's asserted legislative purposes warrants the "significant step," *Mazars*, 140 S. Ct. at 2035, of placing a former prosecutor on the witness stand to testify about his

"unique role" in New York's pending criminal case against Mr. Trump, Ex. 1, at 2.  The first *Mazars* factor strongly favors injunctive relief.

### 2.     The Subpoena Is Broader Than Necessary To Support Any Purported Legislative Objective.

The subpoena also fails the second *Mazars* factor because it is "broader than reasonably necessary to support Congress's legislative objective." 140 S. Ct. at 2036.  The Committee served an unbounded demand for Mr. Pomerantz's testimony and indicated its intent to question him about topics ranging from the "internal deliberations" of the D.A.'s office to his alleged personal animosity toward Mr. Trump. Ex. 1, at 2–4.  Far from tailoring its deposition request to its asserted legislative purposes, the Committee has engaged in an overbroad fishing expedition for any information that could conceivably bolster Mr. Trump's defense and undermine the prosecutors. *See, e.g.*, *Jane Doe v. Yorkville Plaza Assocs.*, 1996 WL 343059, at *4 (S.D.N.Y. June 21, 1996) (denying "overbroad" request to New York County District Attorney to produce entire criminal file).  This "broader than . . . necessary" demand for Mr. Pomerantz's testimony does not survive scrutiny under the second *Mazars* factor.  140 S. Ct. at 2036.

### 3.     Chairman Jordan and the Judiciary Committee Lack Evidence that the Subpoena Advances a Valid Legislative Purpose.

The subpoena fails the third *Mazars* factor because the Committee has offered only flimsy "evidence" that its demand to Mr. Pomerantz "advances a valid legislative purpose." 140 S. Ct. at 2036.  In cases like this one implicating substantial federalism or separation of powers concerns, however, *Mazars* requires strong proof of a valid legislative objective—"[t]he more detailed and substantial the evidence . . . , the better." *Id.*

Although the Committee has paid lip service to potential legislative reforms, Speaker McCarthy and Chairman Jordan's own words disclose that the objective is to cross-examine Mr. Pomerantz to bolster the narrative that the case against Mr. Trump is "politically motivated."  Ex.

1, at 1.  Speaker McCarthy vowed to hold the District Attorney "accountable."  Ex. 3; Compl. ¶ 89.

Rep. Hunt "assure[d]" Fox News that "we have a plan . . . to expose" "these people."  Ex. 20-A;

Compl. ¶ 110.  And Chairman Jordan has asserted that his inquiry will thwart the District Attorney

from engaging in alleged "election interference."  Ex. 54, at 0:35–0:39; *see also* Exs. 2, 11, 53.

But subpoenas issued "to 'punish' those investigated are indefensible."  *Watkins*, 354 U.S. at 187.

Meanwhile, the legislative record is bereft of any evidence that the Judiciary Committee

actually intends to pursue the agenda that supposedly justifies its demand for testimony.  Mr.

Jordan's initial letter to the District Attorney nowhere suggested that the Committee was

considering legislation to insulate former Presidents from state prosecutions or avoid clashes

between Secret Service agents and state jailors.  Ex. 2.  Mr. Jordan invented these alleged reforms

after the D.A.'s office questioned whether the Committee "has any legitimate legislative purpose

in the requested materials."  Ex. 10, at 5.  Such "*post hoc* rationalizations" hardly "serve as a

sufficient predicate" for congressional intrusion into a state criminal case.  *Dep't of Homeland Sec.*

*v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020).  Underscoring that the Committee's

supposed legislative agenda is baseless pretext, the Congressional Record does not reveal a *single*

reference to the legislative reforms for which the Committee supposedly requires testimony.

### 4. The Subpoena Unreasonably Burdens the District Attorney's Office and the State Criminal Justice System.

The subpoena fails the fourth *Mazars* factor because it would substantially burden both the

New York criminal justice system itself and the District Attorney's Office as it prepares for Mr.

Trump's criminal trial.  140 S. Ct. at 2036.  The Committee's subpoena would force discovery to

take place along parallel tracks: one overseen by a New York judge under New York's criminal

procedure law, the other in freewheeling congressional hearings unconstrained by the rules of

evidence.  But partial disclosures of the state's evidence, filtered to the public through partisan

hearings, would substantially prejudice the right to a fair trial and interfere with New York's ongoing investigation.  The Committee should not be permitted to preempt the ordinary processes of a New York courtroom or conduct a partisan show trial for the television cameras before the District Attorney's office has the opportunity to present its case to a jury.

The Committee's subpoena also burdens the District Attorney and the criminal justice system by politicizing Mr. Trump's trial and undermining the public's faith in the integrity of the criminal justice system.  Under Mr. Jordan's leadership, the Judiciary Committee has served the Justice Department with three subpoenas and 11 letters containing 183 requests for information in the first three months of 2023 alone.  Ex. 21, at 4.  In rebuffing the Committee's demands for information relating to "active investigations," the Justice Department explained that disclosures to Congress would "risk jeopardizing those investigations and creating the appearance that Congress may be exerting improper political pressure or attempting to influence Department decisions in certain cases."  Ex. 22; Compl. ¶ 39 n.10.  That is equally true here.  Chairman Jordan's pledge that he will investigate the investigators for supposed political bias against Mr. Trump undermines public faith in the proceedings and injects partisan passions into a forum where they do not belong—a criminal courtroom.

Finally, the Committee's subpoena and its other intrusive discovery requests are plainly aimed at harassing and intimidating Manhattan prosecutors as they prepare Mr. Trump's criminal case for trial.  Beyond litigating this action for emergency relief, the District Attorney's office has prepared two detailed letters responding to Chairman Jordan's demands for information about the Trump investigation.  Exs. 10, 19.  And these demands were only the beginning:  one day after serving Mr. Pomerantz with a subpoena, Chairman Jordan demanded that Matthew Colangelo, senior counsel in the District Attorney's office, produce all documents and communications related

to Mr. Trump, along with information concerning his decision to join the District Attorney's office. Ex. 28; *see also* Ex. 37.  These serial requests, made by Chairman Jordan with great public fanfare, are plainly intended to harass and intimidate New York's prosecutors and distract from their preparation of Mr. Trump's criminal case.  *See* Exs. 48, 51, 56, 57.

In sum, each of the *Mazars* factors confirms that the subpoena to Mr. Pomerantz is an unlawful and unenforceable attempt to interfere with New York's sovereign right to enforce the criminal law and exceeds Congress's powers under Article I of the Constitution.  This Court should enjoin the subpoena's enforcement.

### C.  The Subpoena Impermissibly Seeks Secret Grand Jury Communications, Privileged Communications, and Attorney Work Product.

Even if Chairman Jordan and the Committee could show a valid legislative purpose and satisfy the *Mazars* test, the District Attorney is still likely to succeed on the merits because the subpoena seeks grand jury material whose secrecy is protected by New York law as well as documents and communications protected by the attorney-client privilege and work product doctrine.  Injunctive relief is warranted to protect these sensitive materials.

***Grand Jury Material—New York Law***.  New York law prohibits disclosure of "the nature or substance of any grand jury testimony, evidence, or any decision, result or other matter attending a grand jury proceeding."  N.Y. Crim. P. Law § 190.25(4)(a).  "Those who make unauthorized disclosures regarding a grand jury subpoena do so at their peril."  *Vance*, 140 S. Ct. at 2427 (citing N.Y. Penal Law § 215.70).  The secrecy of the grand jury under New York law is recognized as a privilege.  *See McCoy v. City of New York*, 2008 WL 3286270, at *1 (E.D.N.Y. Aug. 7, 2008).

Although Chairman Jordan represents that he does not seek information protected by New York's grand jury secrecy laws, that assurance rings hollow.  The Committee seeks Mr. Pomerantz's testimony because of his "role as a special assistant district attorney leading the

20

investigation into the former President's finances," Ex. 1, at 1, but such an inquiry could include questions about grand jury matters.  Questioning Mr. Pomerantz about his investigation into Mr. Trump, particularly while Mr. Trump is being prosecuted, would seriously risk disclosure of grand jury material protected under New York law.

*Attorney-Client Privilege and Work Product*.  The Committee also improperly seeks Mr. Pomerantz's testimony concerning "internal deliberations" within the District Attorney's office about the investigation of Mr. Trump.  Ex. 1, at 3.  Like communications within a law firm, internal deliberations within the D.A.'s office are protected by the attorney-client privilege and the work product doctrine.  *See United States v. Rowe*, 96 F.3d 1294 (9th Cir. 1996); *Hertzog, Calamari & Gleason v. Prudential Ins. Co. of Am.*, 850 F. Supp. 255 (S.D.N.Y. 1994).  A subpoena from Congress does not override those protections.  *See Mazars*, 140 S. Ct. at 2032.

The Committee seeks to depose Mr. Pomerantz about an investigation he undertook at the District Attorney's office.  Much of the information that would be responsive to the Committee's questions will be covered by the attorney-client privilege or work product doctrine.  Chairman Jordan suggested that Mr. Pomerantz waived these protections by publishing his book about the Trump investigation.  Ex. 1, at 2.  But the privilege belongs to the District Attorney and was not Mr. Pomerantz's to waive.  *See Merrill v. City of New York*, 2005 WL 2923520, at *1 n.2 (S.D.N.Y. Nov. 4, 2005) ("disclosure of such privileged information by a . . . former employee would not constitute a waiver of the privilege by the employer"); *Blumenthal v. Drudge*, 186 F.R.D. 236, 242 (D.D.C. 1999) (recognizing that a former government employee was not authorized to waive the government's privilege).  Far from relinquishing any privileges, the District Attorney diligently sought to protect them, reminding Mr. Pomerantz of his obligations not to disclose confidential or privileged information and requesting the opportunity for prepublication review (which Mr.

21

Pomerantz and his publisher denied).  Compl. ¶ 90.  The District Attorney thus has every right to assert those privileges here.  To the extent Mr. Pomerantz's book contains relevant, nonprivileged material, his testimony is redundant—the Committee already has his book.

*Law Enforcement and Informant's Privileges*.  The testimony the Judiciary Committee seeks concerning an "ongoing criminal matter[]" also falls squarely within the scope of the law enforcement privilege.  *Adler v. U.S. Dep't of Justice*, 2018 WL 4571677, at \*4 (S.D.N.Y. Sept. 24, 2018).  Along with its close cousin, the informant's privilege, the law enforcement privilege shields information that would compromise the confidentiality of sources, endanger witnesses or law enforcement officers, reveal investigatory techniques, or "impair the ability of a law enforcement agency to conduct future investigations."  *White v. City of Mt. Vernon*, 2022 WL 16578086, at \*3 (S.D.N.Y. Nov. 1, 2022).  As with the attorney-client privilege, the Judiciary Committee's questions would have virtually complete overlap with the law enforcement privilege, providing yet another reason to enjoin the Committee's intrusive and improper demand.

*Public Interest and Deliberative Process Privileges*.  The subpoena also risks disclosure of material protected by the public interest privilege, which applies to communications involving public officers where the public interest requires secrecy, *In re World Trade Ctr. Bombing Litig.*, 709 N.E.2d 452, 456 (N.Y. 1999), and by the deliberative process privilege, which protects pre-decisional communications of executive officials and their staff, *Hopkins v. U.S. Dep't of Housing & Urb. Dev.*, 929 F.2d 81, 84–85 (2d Cir. 1991).  The exposure of such communications would chill the office's deliberations and undermine the secrecy of grand jury investigations.

## II.    The District Attorney Will Be Irreparably Injured Absent Injunctive Relief.

Absent a temporary restraining order and preliminary injunction, the District Attorney will face at least three forms of immediate and irreparable harm—that is, harm which is "not remote or

speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995).

*First*, the subpoena to Mr. Pomerantz is part of a collusive scheme to harass and intimidate the District Attorney and sabotage the criminal trial. "In performing his various duties, . . . it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties." *Hickman v. Taylor*, 329 U.S. 495, 510–11 (1947). "Proper preparation of a . . . case demands that he . . . plan his strategy without undue and needless interference." *Id.* Allowing the Judiciary Committee to open up an extrajudicial pathway for discovery and expose the "when and how" of an ongoing criminal case, *Younger*, 401 U.S. at 45, would sow chaos in the trial preparation process and irreparably injure not only the District Attorney, but the integrity of the state criminal proceeding itself.

*Second*, the subpoena will compromise the District Attorney's confidential communications and risk disclosing secret grand jury information. The regulations governing House depositions permit only two "personal, nongovernmental" attorneys to accompany Mr. Pomerantz to his deposition and bar "government agency personnel" from the District Attorney's office to attend and protect the privilege. *See* 118th Congress Regulations For Use of Deposition Authority and Remote Participation of Committee Witnesses, 169 Cong. Rec. H147 (Jan. 10, 2023). Not only does the D.A. lack a seat in the room, but the House regulations empower a partisan decisionmaker—the Committee Chairman—to overrule privilege objections and order a witness to answer a question. *Id.* Mr. Pomerantz could therefore face the dilemma of potentially being held in contempt if he refused to divulge privileged or confidential information over the Chairman's orders. Public disclosure of privileged or protected materials is a quintessential irreparable injury. *See In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019)

(holding that adverse party's review of attorney-client privileged materials irreparably harms the privilege holder); *cf. In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1065 (D.C. Cir. 1998) (granting mandamus petition where independent counsel argued he would be "irreparably harmed" by disclosure of grand jury material).

*Finally*, the Judiciary Committee's subpoena will cause irreparable injury to New York's dignitary interests.  A state official "is not a minion" of the federal government, "scurrying here and there" to do the federal government's bidding—rather, "he is an officer of the State . . . , carrying out the duties imposed upon him by this office." *Illinois ex rel. Harris v. Bd. of Govs. of the Fed. Reserve Sys.*, 751 F. Supp. 1323, 1331 (N.D. Ill. 1991).  But the Committee's subpoena would subordinate New York's sovereign interests to the federal government's—even though our Constitution reserves the power of criminal prosecution to the states.  That injury to New York's sovereign dignity is irreparable as a matter of law.  *Cf. Mashpee Wampanoag Tribe v. Bernhardt*, 2020 WL 3034854, at *3 (D.D.C. June 5, 2020); *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1367 (S.D. Ga. 2018) ("Loss of sovereignty is an irreparable harm.").

## III.     The Balance of Equities and the Public Interest Strongly Favor Injunctive Relief.

The balance of equities and public interest strongly favor interim relief.  "In determining whether the balance of the equities tips in the plaintiff's favor and whether granting the preliminary injunction would be in the public interest, the Court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, as well as the public consequences in employing the extraordinary remedy of injunction." *Bionpharma Inc. v. CoreRx, Inc.*, 582 F. Supp. 3d 167, 178 (S.D.N.Y. 2022).

The balance of equities tips powerfully in the District Attorney's favor.  The Judiciary Committee will suffer no injury if this Court enjoins compliance with its subpoena because the Committee has no jurisdiction to "conduct[] oversight," Ex. 1, at 1, of state prosecutions in the

first place.  If Committee members believe the charges against Mr. Trump are unjust, they will have the opportunity to follow the progress of Mr. Trump's trial and communicate their views to constituents.  But they have no warrant to put the state's case on trial before the District Attorney has presented it to a jury—a scenario that would undermine the interests of justice and irreparably injure New York's sovereign authority to prosecute violations of its criminal law.

The public's interest also favors injunctive relief.  "[I]t is always in the public interest to protect constitutional rights."  *Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019).  The District Attorney is pursuing this criminal prosecution on behalf of the people of New York pursuant to state laws intended to protect the public. The Judiciary Committee, by way of its subpoena, is seeking to undermine the District Attorney as he carries out his public duties and is violating fundamental principles of constitutional federalism by attempting to usurp New York's right to prosecute this criminal case free from federal interference.  Because "a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front," *Printz*, 521 U.S. at 921, the public interest lies in deflecting the Committee's incursions on the rights of the people of the State of New York.

## CONCLUSION

This Court should grant a temporary restraining order and preliminary injunction barring enforcement of, or compliance with, the subpoena.

25

Dated: April 11, 2023

Respectfully submitted,

GIBSON DUNN & CRUTCHER LLP

/s/ *Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr.
333 South Grand Ave.,
Los Angeles, California 90071
Tel:  (213) 229-7804
tboutrous@gibsondunn.com

Mylan L. Denerstein
Lee R. Crain
200 Park Avenue
New York, New York 10166
Tel:  (212) 351-3850
mdenerstein@gibsondunn.com
lcrain@gibsondunn.com

Katherine Moran Meeks (*pro hac pending*)
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel:  (202) 955-8258
kmeeks@gibsondunn.com

NEW YORK COUNTY DISTRICT
ATTORNEY'S OFFICE

Leslie Dubeck
General Counsel to the New York County
District Attorney
One Hogan Place
New York, New York 10013
(212) 335-9000
Dubeckl@dany.nyc.gov

*Counsel for Plaintiff Alvin L. Bragg, Jr.*