# EXHIBIT 11

March 25, 2023

Mr. Alvin L. Bragg, Jr.
District Attorney
New York County
One Hogan Place
New York, NY 10013

Dear Mr. Bragg:

     Our Committees are conducting oversight of your reported effort to indict a former President of the United States and current declared candidate for that office. On March 20, 2023, we wrote to you requesting that you voluntarily cooperate with our oversight by providing relevant documents and testimony.[1] We received a reply letter sent on your behalf dated March 23, 2023, which set forth several purported reasons for why you could not cooperate with our investigation.[2]

     Notably, your reply letter did not dispute the central allegations at issue—that you, under political pressure from left-wing activists and former prosecutors in your office, are reportedly planning to use an alleged federal campaign finance violation, previously declined by federal prosecutors, as a vehicle to extend the statute of limitations on an otherwise misdemeanor offense and indict for the first time in history a former President of the United States. Moreover, you are apparently attempting to *upgrade* a misdemeanor charge to a felony using an untested legal theory at the same time when you are simultaneously downgrading felony charges to misdemeanors in a majority of other cases in your jurisdiction.[3]

     Contrary to the central argument set forth in your letter, this matter does not simply involve *local* or *state* interests. Rather, the potential criminal indictment of a former President of the United States by an elected local prosecutor of the opposing political party (and who will face the prospect of re-election) implicates substantial *federal* interests, particularly in a jurisdiction where trial-level judges also are popularly elected. If state or local prosecutors are able to engage in politically motivated prosecutions of Presidents of the United States (former or current) for personal acts, this could have a profound impact on how Presidents choose to

---

[1] Letter from Rep. Jim Jordan, H. Comm. on the Judiciary, et al., to Mr. Alvin L. Bragg, Jr., Manhattan District Attorney (Mar. 20, 2023).
[2] Letter from Leslie B. Dubeck, Gen. Counsel, N.Y. Co. District Att'y Off., to Rep. Jim Jordan, H. Comm. on the Judiciary, et al. (Mar. 23, 2023) [hereinafter "Letter from Dubeck"].
[3] *See, e.g.*, Melissa Klein, *NYC Convictions Plummet, Downgraded Charges Surge under Manhattan DA Bragg*, N.Y. Post (Nov. 26, 2022).

exercise their powers while in office. For example, a President could choose to avoid taking action he believes to be in the national interest because it would negatively impact New York City for fear that he would be subject to a retaliatory prosecution in New York City.

Likewise, because the federal government has a compelling interest in protecting the physical safety of former or current Presidents, any decision to prosecute a former or current President raises difficult questions concerning how to vindicate that interest in the context of a state or local criminal justice system. For these reasons and others, we believe that we now must consider whether Congress should take legislative action to protect former and/or current Presidents from politically motivated prosecutions by state and local officials, and if so, how those protections should be structured. Critically, due to your own actions, you are now in possession of information critical to this inquiry.

I. **The Arguments in Defense of Your Unprecedented Prosecutorial Conduct Are Conclusory and Unconvincing.**

The Supreme Court has recognized that Congress has a "broad and indispensable" power to conduct oversight, which "encompasses inquiries into the administration of existing laws, studies of proposed laws, and surveys in our social, economic or political system for the purpose of enabling Congress to remedy them."[4] In *Wilkinson v. United States*, the Supreme Court articulated a three-prong test to determine the legal sufficiency of a congressional subpoena: "(1) the Committee's investigation of the broad subject matter area must be authorized by Congress; (2) the investigation must be pursuant to 'a valid legislative purpose'; and (3) the specific inquiries involved must be pertinent to the broad subject matter areas which have been authorized by Congress."[5]

   A. *The Committees Are Authorized to Conduct Such an Inquiry.*

Contrary to your assertion otherwise, the Committees' inquiry plainly satisfies this three-prong test. First, the Committee on the Judiciary is charged by the House of Representatives with upholding fundamental American civil liberties and with promoting fairness and consistency in our nation's criminal justice system. In fact, Rule X of the Rules of the House of Representatives authorizes the Committee on the Judiciary to conduct oversight of criminal justice matters to inform potential legislation.[6] In the Committees' view, the circumstances of any prosecutorial decision to indict a former President of the United States on a novel and untested legal theory based on facts known for years and conduct previously uncharged by federal prosecutors, shortly after your former high-ranking employee has publicly criticized you for *not* making such an indictment, require an examination of the facts and potential consequences of this unprecedented decision. The Committee on the Judiciary has an interest in the fair and evenhanded application of justice at both the state and federal level.

---

[4] *See, e.g., Trump v. Mazars LLP*, No. 19-715 at 11 (U.S. slip op. July 9, 2020) (internal quotation marks and citations omitted).
[5] *Wilkinson v. United States*, 365 U.S. 399, 408-09 (1961); *see* Ashland Oil, Inc. v. FTC, 409 F. Supp. 297, 305 (D.D.C. 1976).
[6] Rules of the U.S. House of Representatives, R. X(l)(5) (2023).

### B. *The Inquiry Is on a Matter on Which Legislation Could be Had.*

Second, the Committees' inquiry has an obvious legitimate legislative purpose and is "a subject on which legislation could be had."[7] To begin with, as discussed above, Congress has a specific and manifestly important interest in preventing politically motivated prosecutions of current and former Presidents by elected state and local prosecutors, particularly those tried before elected state and local trial-level judges. Therefore, the Committee on the Judiciary, as a part of its broad authority to develop criminal justice legislation, must now consider whether to draft legislation that would, if enacted, insulate current and former presidents from such improper state and local prosecutions. These legislative reforms may include, for example, broadening the existing statutory right of removal of certain criminal cases from state court to federal court. Because your impending indictment of a former President is an issue of first impression, the Committees require information from your office to inform our oversight.

Moreover, as discussed above, your prosecutorial decision to indict a former President may cause a potential confrontation between federal and local law-enforcement authorities. Federal law requires the United States Secret Service to protect a former President.[8] Therefore, your unprecedented prosecutorial decision raises the potential for conflict between the federal law-enforcement officials required to protect the former President and local law-enforcement officials required to enforce your indictment and exercise control of him throughout his presence in the local criminal justice system. Such a novel and potentially fraught collision of federal and local law-enforcement officials with the safety of a former President at stake is certainly a matter of interest for the Committees. The Committees' oversight is necessary to inform potential legislation that would address or remedy any potential conflicts between federal and local authorities.

In addition, the federal campaign finance charges you are reportedly attempting to use to upgrade a misdemeanor charge to a felony have previously been considered—and rejected—by federal prosecutors.[9] In light of this fact, to bring uniformity to the law and prevent future attempts by state or local prosecutors to pursue politically motivated prosecutions related to campaign finance regulations applicable to federal elections, Congress may elect to consider legislation that broadens the preemption provision in the Federal Election Campaign Act. This reform could have the effect of better delineating the prosecutorial authorities of federal and local officials in this area and blocking the selective or politicized enforcement by state and local prosecutors of campaign finance restrictions pertaining to federal elections.

Furthermore, your reported decision to indict a former President requires congressional scrutiny about how federal public safety funds appropriated by Congress are implemented by

---

[7] *See, e.g., Mazars*, No. 19-715 at 12 (internal quotation marks and citations omitted).
[8] 18 U.S.C. § 3056.
[9] Jonathan Turley, *"America's Got Trump": Get Ready for a Truly Made-for -TV Prosecution*, Res Ipsa Loquitur – The Thing Itself Speaks (Mar. 20, 2023) ("Although it may be politically popular, the case is legally pathetic. Bragg is struggling to twist state laws to effectively prosecute a federal case long ago rejected by the Justice Department . . . .").

local law-enforcement agencies and how limited resources are prioritized. Under your leadership, the New York County District Attorney's Office has adopted and defended your progressive criminal justice policies, which includes "downgrad[ing] 52 percent of felony cases to misdemeanors."[10] Even with downgrading more than half of your felony cases to misdemeanors, your office's conviction rate when prosecuting serious felony charges was reported to be just 51 percent.[11] Your conviction rate for misdemeanors also dropped sharply—from 53 percent to 28 percent.[12] Your policies have allowed career "criminals [to] run[ ] the streets" of Manhattan[13]—creating such a danger that a judge in your district has taken notice.[14]

To the extent that you are receiving federal funds and are choosing to prioritize apparent political prosecutions over commonsense public safety measures, the Committee on the Judiciary certainly may consider legislation to tie federal funds to improved public safety metrics. In fact, last year, a Judiciary Subcommittee heard testimony from the mother of an army veteran murdered in your district,[15] who criticized your office's handling of her son's murder by offering plea deals to the defendants despite the fact that "the murder and their roles were caught on video . . . ."[16] Her testimony crystallized the need for legislation to prevent dangerous criminals from running free. Additionally, if our oversight determines that improper partisan or political considerations are motivating your prosecutorial decisions, the Committee on the Judiciary may consider legislation to place conditions on federal funding for state and local law-enforcement jurisdictions to ensure that funds are not used to engage in discrimination on the basis of partisan affiliation or political beliefs.

Lastly, because the circumstances of this matter stem, in part, from Special Counsel Mueller's investigation,[17] Congress may consider legislative reforms to the authorities of special counsels and better delineate their relationships with other prosecuting entities.

---

[10] Andrea Cavallier, *REVEALED: Woke Manhattan DA Alvin Bragg has downgraded over HALF of felony cases to misdemeanors as criminals are free to roam streets of the Big Apple*, DAILY MAIL (Nov. 28, 2022); Georgett Roberts and Melissa Klein, *Manhattan DA Alvin Bragg surprised by 'push back' – defends policies*, N.Y. Post (Jan. 8, 2022).
[11] *Numbers show the grim consequences of Manhattan DA Alvin Bragg's pro-crime principles*, N.Y. Post (Nov. 27, 2022).
[12] *Id.*
[13] Alyssa Guzman, *Priorities, eh? Woke DA Alvin Bragg who's set to indict Trump is one of America's most controversial prosecutors after charging self-defense shopkeeper with murder and sending soft-on-crime memo*, DAILY MAIL (Mar. 18, 2023); Cavallier, *supra* note 10.
[14] Joe Marino and Bruce Golding, *Ex-con would have faced 'long time in jail' if not for new Manhattan DA: judge*, N.Y. Post (Jan. 12, 2022) (A career criminal "accused of threatening a drug store worker with a knife was told in court that he should "feel lucky" he got busted after new Manhattan District Attorney Alvin Bragg took office . . . . 'Based on your record, you would have faced a long period of time in jail if convicted," [Manhattan Criminal Court Judge Jay] Weiner said during the court proceeding . . . .")
[15] *Reimagining Public Safety in the COVID-19 Era, Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Sec. of the H. Comm. on the Judiciary*, 117th Cong. (Mar. 8, 2022) (testimony from Madeline Brame).
[16] Jack Morphet and Gabrielle Fonrouge, *Mother of slain Army vet Hason Correa rips Manhattan DA Alvin Bragg for giving plea deals in case*, N.Y. Post (June 10, 2022).
[17] Ben Protess et al., *How Michael Cohen turned against President Trump*, N.Y. Times (Apr. 21, 2019).

   C.  **The Requests Are Pertinent to the Committees' Inquiry.**

The Committees' inquiry satisfies *Wilkinson*'s third prong of pertinence to the oversight. Federal courts have interpreted this prong broadly, requiring "only that the specific inquiries be reasonably related to the subject matter under investigation."[18] The information sought by the Committees will allow us to assess the extent to which your reported effort to indict a former President and current declared candidate for that office is politically motivated and whether Congress should therefore draft legislative reforms to, among other things, protect former and current Presidents from politically motivated prosecutions.

II.     **Your State Law-Based Defenses Are Insufficient.**

Your conclusory claim that our constitutional oversight responsibilities will interfere with law enforcement is misplaced and unconvincing. As a threshold matter, whether your office is, in fact, fairly enforcing the law or abusing prosecutorial discretion to engage in a politically motivated indictment of a former President is a serious matter that, as discussed above, implicates significant federal interests. The Committees require information from the New York County District Attorney's Office to advance our oversight over the very matter that you claim is a basis to obstruct our investigation.

In support of your broad claim that compliance with the Committees' requests for documents and a transcribed interview would interfere with law enforcement, you note two New York State statutes that prohibit the disclosure of grand jury materials. The Committees' information requests, however, relate to numerous areas of inquiry that in no way implicate grand jury materials or seek information that would be confidential under New York law. For example, the request for your office's use of federal funds has no connection to any grand jury proceedings. Similarly, the vast majority of the questions that the Committees intend to ask you in an interview also would not implicate grand jury secrecy. Moreover, to the extent that questions are asked that you believe you are not permitted to answer, you would retain the ability to decline to answer or to assert an applicable privilege. Likewise, you remain free to decline to produce certain responsive documents on the basis of appropriate privileges or statutes that preclude production, provided you provide the Committees with a detailed privilege log that will enable us to review and evaluate your claims. The laws cited in your letter do not establish a basis for a complete refusal to cooperate. At best, they provide arguments that may be asserted on either a question-by-question or a document-by-document basis.

Furthermore, your invocation of certain New York laws as precluding you from complying with our oversight request is, at a minimum, overbroad. For example, New York's Freedom of Information Law (Public Officers Law § 87(2)) provides that agencies *may* decline to make certain records available for *public* inspection; it neither requires them to do so nor directly speaks to formal requests from congressional committees. Thus, that statutory provision does not preclude you from providing us with records that were "compiled for law enforcement

---

[18] Morton Rosenberg, When Congress Comes Calling: A Study on the Principles, Practices, and Pragmatics of Legislative Inquiry 18 (2017).

purposes."[19] Indeed, the statute in question states that even when an agency receives a request from a member of the public, as opposed to congressional committees, a "denial of access shall not be based solely on the category or type of such record and shall be valid only when there is a particularized and specific justification for such denial."[20]

### III. The Inquiry Does Not Intrude on Federalism Powers Because Congress Is Exercising Its Core Authority to Legislate.

Your letter raises unfounded and unpersuasive objections to our oversight based on federalism—arguing, in part, that our "requests are an unlawful incursion into New York's sovereignty."[21] You go on to note that "the District Attorney is duty bound by his constitutional oath to New York's sovereign interest in the exercise of police powers reserved to the States under the Tenth Amendment."[22] Contrary to your assertions, this inquiry does not infringe on New York's sovereignty.

To begin with, your argument hinges on your assertion that "Congress cannot have any legitimate legislative task relating to the oversight of local prosecutors enforcing state law." But this claim is simply wrong; as discussed at length above, this matter involves substantial federal interests. Moreover, the cases that you cite, *Younger v. Harris*, 401 U.S. 37 (1971), and *Cameron v. Johnson*, 390 U.S. 611 (1968), involve the question of when federal courts can enjoin prosecutions of state law. And needless to say, our oversight requests do no such thing; they would not block you from conducting any prosecution. Rather, we are simply seeking information to carry out constitutional duties.

Finally, our oversight requests do not implicate what is commonly referred to as the anti-commandeering principle.[23] In establishing the anti-commandeering principle in *New York v. United States*, the Supreme Court concluded that Congress cannot compel states to enact, enforce, or administer federal policies.[24] Unlike the matter before the Court in *New York*, our requests here simply do not compel the state "to enact, enforce, or administer federal policies."[25] Rather, the Committees are merely seeking information pertaining to a matter that is directly within the purview of our jurisdiction and is necessary to inform potential legislative reforms.

### IV. The Inquiry Does Not Usurp Executive Powers

In your reply letter, you cited the Supreme Court of the United States in *Watkins v. United States* as saying, "Congress [is not] a law enforcement or trial agency."[26] We agree. The Committees do not seek to step into the shoes of the Executive Branch or usurp its powers.

---

[19] Public Officers Law § 87(2)(e).
[20] *Id.* at § 87(2).
[21] Letter from Dubeck, *supra* note 2.
[22] *Id.*
[23] The Committee's oversight does not involve the federal spending power. As such, the anti-coercion principle cannot be reasonably implicated.
[24] 505 U.S. 144, 188 (1992).
[25] *Id.*
[26] Letter from Dubeck, *supra* note 2 (citing *Watkins v. United States*, 354 U.S. 178, 187 (1957)).

Rather, as explained, we are exercising the broad powers afforded Congress by the Constitution to conduct oversight to inform potential legislative reforms. This power

> encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes. It includes surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them. It comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste.[27]

Indeed, as the Supreme Court has recognized, Congress retains broad authority to conduct oversight of ongoing civil and criminal investigations. In *Sinclair v. United States*, the Supreme Court noted that the pendency of litigation does not stop Congress's ability to investigate, stating:

> It may be conceded that Congress is without authority to compel disclosures for the purpose of aiding the prosecution of pending suits; but the authority of that body, directly or through its committees, to require pertinent disclosures in aid of its own constitutional power is not abridged because the information sought to be elicited may also be of use in such suits.[28]

The Court has further noted that "a congressional committee . . . engaged in legitimate legislative investigation need not grind to a halt whenever responses to its inquiries might potentially be harmful to a witness in some distinct proceeding . . . or when crime or wrongdoing is exposed."[29] Phrased another way, the Committees' oversight will in no way "stop [your] prosecution or set limits on the management of a particular case."[30] Accordingly, your refusal to cooperate with our oversight inquires on this basis is therefore unavailing.

V. **Your Offer to Provide Information About Your Office's Use of Federal Funds Is Insufficient**

While we appreciate your offer to submit a letter detailing the District Attorney's Office's use of federal funds, and we look forward to that submission, such a letter alone does not satisfy our oversight requests or preclude the Committees from proceeding with them. For example, as we have explained in detail, the Committee on the Judiciary is examining whether legislative reforms are necessary to insulate former and current Presidents from politically motivated prosecutions by state and local officials. And while your letter regarding your office's use of federal funds will not shed meaningful light on that question, we expect that your response to our other information requests will do so.

---

[27] *Id.*
[28] 279 U.S. 263, 295 (1929).
[29] *Hutcheson v. United States*, 369 U.S. 599, 617 (1962).
[30] *See* Morton Rosenberg, Congressional Research Service, Investigative Oversight: An Introduction to the Law, Practice and Procedure of Congressional Inquiry (1995).

Accordingly, we reiterate the requests in our March 20 letter and ask that you comply in full as soon as possible but no later than March 31, 2023. We trust the information in this letter satisfies your request to "understand whether the Committee has any legitimate legislative purpose . . . ."[31] Thank you for your attention to this matter.

Sincerely,

Jim Jordan
Chairman
Committee on the Judiciary

Bryan Steil
Chairman
Committee on House Administration

James Comer
Chairman
Committee on Oversight and Accountability

cc: The Honorable Jerrold Nadler, Ranking Member
Committee on the Judiciary

The Honorable Joseph Morelle, Ranking Member
Committee on House Administration

The Honorable Jamie Raskin, Ranking Member
Committee on Oversight and Accountability

---

[31] Letter from Dubeck, *supra* note 2.