# EXHIBIT 36-A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------

THE PEOPLE OF THE STATE OF NEW YORK

                -against-

DONALD J. TRUMP,

                            Defendant.

------------------------------------------------------

STATEMENT OF FACTS
IND-71543-23

## INTRODUCTION

1.     The defendant DONALD J. TRUMP repeatedly and fraudulently falsified New York business records to conceal criminal conduct that hid damaging information from the voting public during the 2016 presidential election.

2.     From August 2015 to December 2017, the Defendant orchestrated a scheme with others to influence the 2016 presidential election by identifying and purchasing negative information about him to suppress its publication and benefit the Defendant's electoral prospects. In order to execute the unlawful scheme, the participants violated election laws and made and caused false entries in the business records of various entities in New York. The participants also took steps that mischaracterized, for tax purposes, the true nature of the payments made in furtherance of the scheme.

3.     One component of this scheme was that, at the Defendant's request, a lawyer who then worked for the Trump Organization as Special Counsel to Defendant ("Lawyer A"), covertly paid $130,000 to an adult film actress shortly before the election to prevent her from publicizing a sexual encounter with the Defendant. Lawyer A made the $130,000 payment through a shell corporation he set up and funded at a bank in Manhattan. This payment was illegal, and Lawyer A has since pleaded guilty to making an illegal campaign contribution and

1

served time in prison.  Further, false entries were made in New York business records to effectuate this payment, separate and apart from the New York business records used to conceal the payment.

4.      After the election, the Defendant reimbursed Lawyer A for the illegal payment through a series of monthly checks, first from the Donald J. Trump Revocable Trust (the "Defendant's Trust")—a Trust created under the laws of New York which held the Trump Organization entity assets after the Defendant was elected President—and then from the Defendant's bank account.  Each check was processed by the Trump Organization, and each check was disguised as a payment for legal services rendered in a given month of 2017 pursuant to a retainer agreement.  The payment records, kept and maintained by the Trump Organization, were false New York business records.  In truth, there was no retainer agreement, and Lawyer A was not being paid for legal services rendered in 2017.  The Defendant caused his entities' business records to be falsified to disguise his and others' criminal conduct.

## BACKGROUND

5.      The Defendant is the beneficial owner of a collection of business entities known by the trade name the Trump Organization.  The Trump Organization comprises approximately 500 separate entities that, among other business activities, own and manage hotels, golf courses, commercial real estate, condominium developments, and other properties.  The Trump Organization is headquartered at 725 Fifth Avenue in New York County.

6.      From approximately June 2015 to November 2016, the Defendant was a candidate for the office of President of the United States.  On January 20, 2017, he became President of the United States.

# THE SCHEME

**I.     The Catch and Kill Scheme to Suppress Negative Information**

7.     During and in furtherance of his candidacy for President, the Defendant and others agreed to identify and suppress negative stories about him.  Two parties to this agreement have admitted to committing illegal conduct in connection with the scheme.  In August 2018, Lawyer A pleaded guilty to two federal crimes involving illegal campaign contributions, and subsequently served time in prison.  In addition, in August 2018, American Media, Inc. ("AMI"), a media company that owned and published magazines and supermarket tabloids including the *National Enquirer*, admitted in a non-prosecution agreement that it made a payment to a source of a story to ensure that the source "did not publicize damaging allegations" about the Defendant "before the 2016 presidential election and thereby influence that election."

**A.     The 2015 Trump Tower Meeting**

8.     In June 2015, the Defendant announced his candidacy for President of the United States.

9.     Soon after, in August 2015, the Defendant met with Lawyer A and AMI's Chairman and Chief Executive Officer (the "AMI CEO") at Trump Tower in New York County.  At the meeting, the AMI CEO agreed to help with the Defendant's campaign, saying that he would act as the "eyes and ears" for the campaign by looking out for negative stories about the Defendant and alerting Lawyer A before the stories were published.  The AMI CEO also agreed to publish negative stories about the Defendant's competitors for the election.

**B.     Suppressing the Doorman's Story**

10.     A few months later, in or about October or November 2015, the AMI CEO learned that a former Trump Tower doorman (the "Doorman") was trying to sell information regarding a child that the Defendant had allegedly fathered out of wedlock.  At the AMI CEO's

3

direction, AMI negotiated and signed an agreement to pay the Doorman $30,000 to acquire exclusive rights to the story.  AMI falsely characterized this payment in AMI's books and records, including in its general ledger.  AMI purchased the information from the Doorman without fully investigating his claims, but the AMI CEO directed that the deal take place because of his agreement with the Defendant and Lawyer A.

11.     When AMI later concluded that the story was not true, the AMI CEO wanted to release the Doorman from the agreement.  However, Lawyer A instructed the AMI CEO not to release the Doorman until after the presidential election, and the AMI CEO complied with that instruction because of his agreement with the Defendant and Lawyer A.

### C.     Suppressing Woman 1's Account

12.     About five months before the presidential election, in or about June 2016, the editor-in-chief of the *National Enquirer* and AMI's Chief Content Officer (the "AMI Editor-in-Chief") contacted Lawyer A about a woman ("Woman 1") who alleged she had a sexual relationship with the Defendant while he was married.  The AMI Editor-in-Chief updated Lawyer A regularly about the matter over text message and by telephone.  The Defendant did not want this information to become public because he was concerned about the effect it could have on his candidacy.  Thereafter, the Defendant, the AMI CEO, and Lawyer A had a series of discussions about who should pay off Woman 1 to secure her silence.

13.     AMI ultimately paid $150,000 to Woman 1 in exchange for her agreement not to speak out about the alleged sexual relationship, as well as for two magazine cover features of Woman 1 and a series of articles that would be published under her byline.  AMI falsely characterized this payment in AMI's books and records, including in its general ledger.  The AMI CEO agreed to the deal after discussing it with both the Defendant and Lawyer A, and on

the understanding from Lawyer A that the Defendant or the Trump Organization would reimburse AMI.

14. In a conversation captured in an audio recording in approximately September 2016 concerning Woman 1's account, the Defendant and Lawyer A discussed how to obtain the rights to Woman 1's account from AMI and how to reimburse AMI for its payment. Lawyer A told the Defendant he would open up a company for the transfer of Woman 1's account and other information, and stated that he had spoken to the Chief Financial Officer for the Trump Organization (the "TO CFO") about "how to set the whole thing up." The Defendant asked, "So what do we got to pay for this? One fifty?" and suggested paying by cash. When Lawyer A disagreed, the Defendant then mentioned payment by check. After the conversation, Lawyer A created a shell company called Resolution Consultants, LLC on or about September 30, 2016.

15. Less than two months before the election, on or about September 30, 2016, the AMI CEO signed an agreement in which AMI agreed to transfer its rights to Woman 1's account to Lawyer A's shell company for $125,000. However, after the assignment agreement was signed but before the reimbursement took place, the AMI CEO consulted with AMI's general counsel and then told Lawyer A that the deal to transfer the rights to Lawyer A's shell company was off.

### D. Suppressing Woman 2's Account

16. About one month before the election, on or about October 7, 2016, news broke that the Defendant had been caught on tape saying to the host of *Access Hollywood*: "I just start kissing them [women]. It's like a magnet. Just kiss. I don't even wait. And when you're a star, they let you do it. You can do anything. . . . Grab 'em by the [genitals]. You can do anything." The evidence shows that both the Defendant and his campaign staff were concerned that the tape would harm his viability as a candidate and reduce his standing with female voters in particular.

17. Shortly after the *Access Hollywood* tape became public, the AMI Editor-in-Chief contacted the AMI CEO about another woman ("Woman 2") who alleged she had a sexual encounter with the Defendant while he was married. The AMI CEO told the AMI Editor-in-Chief to notify Lawyer A.

18. On or about October 10, 2016, the AMI Editor-in-Chief connected Lawyer A with Woman 2's lawyer ("Lawyer B"). Lawyer A then negotiated a deal with Lawyer B to secure Woman 2's silence and prevent disclosure of the damaging information in the final weeks before the presidential election. Under the deal that Lawyer B negotiated, Woman 2 would be paid $130,000 for the rights to her account.

19. The Defendant directed Lawyer A to delay making a payment to Woman 2 as long as possible. He instructed Lawyer A that if they could delay the payment until after the election, they could avoid paying altogether, because at that point it would not matter if the story became public. As reflected in emails and text messages between and among Lawyer A, Lawyer B, and the AMI Editor-in-Chief, Lawyer A attempted to delay making payment as long as possible.

20. Ultimately, with pressure mounting and the election approaching, the Defendant agreed to the payoff and directed Lawyer A to proceed. Lawyer A discussed the deal with the Defendant and the TO CFO. The Defendant did not want to make the $130,000 payment himself, and asked Lawyer A and the TO CFO to find a way to make the payment. After discussing various payment options with the TO CFO, Lawyer A agreed he would make the payment. Before making the payment, Lawyer A confirmed with the Defendant that Defendant would pay him back.

21.     On or about October 26, shortly after speaking with the Defendant on the phone, Lawyer A opened a bank account in Manhattan in the name of Essential Consultants LLC, a new shell company he had created to effectuate the payment.  He then transferred $131,000 from his personal home equity line of credit ("HELOC") into that account.  On or about October 27, Lawyer A wired $130,000 from his Essential Consultants LLC account in New York to Lawyer B to suppress Woman 2's account.

E.    **Post-Election Communications with AMI CEO**

22.     On November 8, 2016, the Defendant won the presidential election and became the President-Elect.  Thereafter, AMI released both the doorman and Woman 1 from their non-disclosure agreements.

23.     The Defendant was inaugurated as President on January 20, 2017.  Between Election Day and Inauguration Day, during the period of the Defendant's transition to his role as President, the Defendant met with the AMI CEO privately in Trump Tower in Manhattan.  The Defendant thanked the AMI CEO for handling the stories of the Doorman and Woman 1, and invited the AMI CEO to the Inauguration.  In the summer of 2017, the Defendant invited the AMI CEO to the White House for a dinner to thank him for his help during the campaign.

II.    **The Defendant Falsified Business Records**

24.     Shortly after being elected President, the Defendant arranged to reimburse Lawyer A for the payoff he made on the Defendant's behalf.  In or around January 2017, the TO CFO and Lawyer A met to discuss how Lawyer A would be reimbursed for the money he paid to ensure Woman 2's silence.  The TO CFO asked Lawyer A to bring a copy of a bank statement for the Essential Consultants account showing the $130,000 payment.

25.     The TO CFO and Lawyer A agreed to a total repayment amount of $420,000. They reached that figure by adding the $130,000 payment to a $50,000 payment for another

expense for which Lawyer A also claimed reimbursement, for a total of $180,000. The TO CFO then doubled that amount to $360,000 so that Lawyer A could characterize the payment as income on his tax returns, instead of a reimbursement, and Lawyer A would be left with $180,000 after paying approximately 50% in income taxes. Finally, the TO CFO added an additional $60,000 as a supplemental year-end bonus. Together, these amounts totaled $420,000. The TO CFO memorialized these calculations in handwritten notes on the copy of the bank statement that Lawyer A had provided.

26.     The Defendant, the TO CFO, and Lawyer A then agreed that Lawyer A would be paid the $420,000 through twelve monthly payments of $35,000 over the course of 2017. Each month, Lawyer A was to send an invoice to the Defendant through Trump Organization employees, falsely requesting payment of $35,000 for legal services rendered in a given month of 2017 pursuant to a retainer agreement. At no point did Lawyer A have a retainer agreement with the Defendant or the Trump Organization.

27.     In early February 2017, the Defendant and Lawyer A met in the Oval Office at the White House and confirmed this repayment arrangement.

28.     On or about February 14, 2017, Lawyer A emailed the Controller of the Trump Organization (the "TO Controller") the first monthly invoice, which stated: "Pursuant to the retainer agreement, kindly remit payment for services rendered for the months of January and February, 2017." The invoice requested payment in the amount of $35,000 for each of those two months. The TO CFO approved the payment, and, in turn, the TO Controller sent the invoice to the Trump Organization Accounts Payable Supervisor (the "TO Accounts Payable Supervisor") with the following instructions: "Post to legal expenses. Put 'retainer for the months of January and February 2017' in the description."

29. Lawyer A submitted ten similar monthly invoices by email to the Trump Organization for the remaining months in 2017. Each invoice falsely stated that it was being submitted "[p]ursuant to the retainer agreement," and falsely requested "payment for services rendered" for a month of 2017. In fact, there was no such retainer agreement and Lawyer A was not being paid for services rendered in any month of 2017.

30. The TO Controller forwarded each invoice to the TO Accounts Payable Supervisor. Consistent with the TO Controller's initial instructions, the TO Accounts Payable Supervisor printed out each invoice and marked it with an accounts payable stamp and the general ledger code "51505" for legal expenses. The Trump Organization maintained the invoices as records of expenses paid.

31. As instructed, the TO Accounts Payable Supervisor recorded each payment in the Trump Organization's electronic accounting system, falsely describing it as a "legal expense" pursuant to a retainer agreement for a month of 2017. The Trump Organization maintained a digital entry for each expense, called a "voucher," and these vouchers, like vouchers for other expenses, became part of the Trump Organization's general ledgers.

32. The TO Accounts Payable Supervisor then prepared checks with attached check stubs for approval and signature. The first check was paid from the Defendant's Trust and signed by the TO CFO and the Defendant's son, as trustees. The check stub falsely recorded the payment as "Retainer for 1/1-1/31/17" and "Retainer for 2/1-2/28/17." The second check, for March 2017, was also paid from the Trust and signed by two trustees. The check stub falsely recorded the payment as "Retainer for 3/1-3/31/17."

33. The remaining nine checks, corresponding to the months of April through December of 2017, were paid by the Defendant personally. Each of the checks was cut from the

Defendant's bank account and sent, along with the corresponding invoices from Lawyer A, from the Trump Organization in New York County to the Defendant in Washington, D.C.  The checks and stubs bearing the false statements were stapled to the invoices also bearing false statements.  The Defendant signed each of the checks personally and had them sent back to the Trump Organization in New York County.  There, the checks, the stubs, and the invoices were scanned and maintained in the Trump Organization's data system before the checks themselves were detached and mailed to Lawyer A for payment.

34. The $35,000 payments stopped after the December 2017 payment.

**III.   The Investigation into Lawyer A and the Defendant's Pressure Campaign**

35. On or about April 9, 2018, the FBI executed a search warrant on Lawyer A's residences and office.  In the months that followed, the Defendant and others engaged in a public and private pressure campaign to ensure that Lawyer A did not cooperate with law enforcement in the federal investigation.

36. On the day of the FBI searches, Lawyer A called to speak with the Defendant to let him know what had occurred.  In a return call, the Defendant told Lawyer A to "stay strong."

37. On or about April 21, 2018, the Defendant publicly commented on Twitter encouraging Lawyer A not to "flip," stating, "Most people will flip if the Government lets them out of trouble, even if . . . it means lying or making up stories. Sorry, I don't see [Lawyer A] doing that . . . ."

38. In mid-April 2018, Lawyer A was also approached by an attorney ("Lawyer C"), who offered to represent him in the interest of maintaining a "back channel of communication" to the Defendant.  On or about April 21, 2018, Lawyer C emailed Lawyer A, highlighting that he had a close relationship with the Defendant's personal attorney ("Lawyer D") and stating, "[T]his could not be a better situation for the President or you."  Later that day, Lawyer C

emailed Lawyer A again, writing, "I spoke with [Lawyer D]. Very Very Positive. You are 'loved.' . . . [Lawyer D] said this communication channel must be maintained. . . . Sleep well tonight, you have friends in high places."

39. On or about June 14, 2018, Lawyer C emailed Lawyer A a news clip discussing the possibility of Lawyer A cooperating, and continued to urge him not to cooperate with law enforcement, writing, "The whole objective of this exercise by the [federal prosecutors] is to drain you, emotionally and financially, until you reach a point that you see them as your only means to salvation."  In the same email , Lawyer C, wrote, "You are making a very big mistake if you believe the stories these 'journalists' are writing about you.  They want you to cave.  They want you to fail.  They do not want you to persevere and succeed."

40. On August 21, 2018, Lawyer A pleaded guilty in the federal investigation.  The next day, on or about August 22, 2018, the Defendant commented on Twitter, "If anyone is looking for a good lawyer, I would strongly suggest that you don't retain the services of [Lawyer A]!"  Later that day, the Defendant posted to Twitter again, stating, "I feel very badly for" one of his former campaign managers who had been criminally charged, saying, "[U]nlike [Lawyer A], he refused to 'break' – make up stories in order to get a 'deal.'"

IV. **Lawyer A and AMI Admit Guilt in Connection with Payoffs of Woman 1 and Woman 2**

41. Ultimately, other participants in the scheme admitted that the payoffs were unlawful.

42. In or about September 2018, AMI entered into a non-prosecution agreement with the United States Attorney's Office for the Southern District of New York in connection with AMI's payoff of Woman 1, admitting that "[a]t no time during the negotiation or acquisition of [Woman 1's] story did AMI intend to publish the story or disseminate information about it

11

publicly." Rather, AMI admitted that it made the payment to ensure that Woman 1 "did not publicize damaging allegations" about the Defendant "before the 2016 presidential election and thereby influence that election."

43. In August 21, 2018, Lawyer A pleaded guilty to a felony in connection with his role in AMI's payoff to Woman 1, admitting in his guilty plea that he had done so at the Defendant's direction:

> [O]n or about the summer of 2016, **in coordination with, and at the direction of, a candidate for federal office**, I and the CEO of a media company at the request of the candidate worked together to keep an individual with information that would be harmful to the candidate and to the campaign from publicly disclosing this information. After a number of discussions, we eventually accomplished the goal by the media company entering into a contract with the individual under which she received compensation of $150,000. I participated in this conduct, which on my part took place in Manhattan, for the principal purpose of influencing the election.

(emphasis added).

44. Lawyer A also pleaded guilty to a felony in connection with his payoff of Woman 2 to secure her silence, again at the Defendant's direction. Lawyer A admitted as part of his guilty plea:

> [O]n or about October of 2016, **in coordination with, and at the direction of, the same candidate,** I arranged to make a payment to a second individual with information that would be harmful to the candidate and to the campaign to keep the individual from disclosing the information. To accomplish this, I used a company that was under my control to make a payment in the sum of $130,000. The monies I advanced through my company were later repaid to me by the candidate. I participated in this conduct, which on my part took place in Manhattan, for the principal purpose of influencing the election.

(emphasis added).[1]

---

[1] This Statement of Facts contains certain of the information that is relevant to the events described herein, and does not contain all facts relevant to the charged conduct.

DATED:   New York, New York
         April 4, 2023

                                             ALVIN L. BRAGG, JR.
                                             *District Attorney*
                                             *New York County*