**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

ALVIN L. BRAGG, JR., in his official capacity as
District Attorney for New York County,

*Plaintiff,*

v.

JIM JORDAN, in his official capacity as Chairman of
the Committee on the Judiciary; COMMITTEE ON
THE JUDICIARY OF THE UNITED STATES
HOUSE OF REPRESENTATIVES; and
MARK F. POMERANTZ,

*Defendants.*

Case No. 1:23-cv-03032-MKV

**OPPOSITION OF CONGRESSIONAL DEFENDANTS JIM JORDAN AND THE
COMMITTEE ON THE JUDICIARY OF THE UNITED STATES HOUSE OF
REPRESENTATIVES TO PLAINTIFF'S MOTION FOR A TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

MATTHEW BERRY
*General Counsel*
TODD B. TATELMAN
*Deputy General Counsel*
BROOKS M. HANNER
SARAH CLOUSE
BRADLEY CRAIGMYLE
*Associate General Counsels*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
matthew.berry@mail.house.gov

*Counsel for Congressional Defendants*

April 17, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................................ii

INTRODUCTION AND BACKGROUND ....................................................................................1

ARGUMENT...................................................................................................................................5

    I.    Plaintiff Cannot Show Likelihood Of Success On The Merits ..............................................5

    A.    The Speech Or Debate Clause Bars Plaintiff's Suit And Requested Relief ..............................5

        B.    Issuing A Subpoena Is A "Legislative Act" ...........................................................6

        C.    The Pomerantz Subpoena Is Absolutely Protected By The Clause ....................................7

        D.    Congressional Defendants Are Necessary Parties Under Rule 19....................................10

            1.    Congressional Defendants Are Required Parties...........................................10

            2.    Congressional Defendants Are Immune, Which Prevents This Case From Proceeding In Equity And Good Conscience ...............................................11

            3.    The Rule 19(b) Factors All Favor Congressional Defendants....................................13

        E.    Judicial Restraint Cautions Against Entertaining Plaintiff's Suit........................................14

        F.    Plaintiff's Arguments Against The Subpoena Lack Merit........................................14

            1.    *Mazars* Is Not The Appropriate Framework .............................................14

            2.    The Subpoena Serves A Valid Legislative Purpose ........................................15

            3.    Potential Privilege Claims Do Not Excuse Pomerantz's Appearance....................18

    II.    Plaintiff Has Failed To Establish A Likelihood Of Irreparable Harm....................................22

    III.  The Balance Of Equities And Public Interest Favor Congressional Defendants ...................25

CONCLUSION...............................................................................................................................25

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Ansara v. Eastland,*
    442 F.2d 751 (D.C. Cir. 1971) ................................................................................. 14

*Ass'n of Am. Physicians & Surgeons, Inc. v. Schiff,*
    518 F. Supp. 3d 505 (D.D.C. 2020) ....................................................................... 15

*Barenblatt v. United States,*
    360 U.S. 109 (1959) ................................................................................................ 14

*Bogan v. Scott-Harris,*
    523 U.S. 44 (1998) .................................................................................................... 6

*Brown & Williamson Tobacco Corp. v. Williams,*
    62 F.3d 408 (D.C. Cir. 1995) .................................................................................... 7

*Budowich v. Pelosi,*
    610 F. Supp. 3d 1 (D.D.C. 2022) .............................................................................. 1

*Bus. Integration Servs., Inc. v. AT & T Corp.,*
    251 F.R.D. 121 (S.D.N.Y. 2008) ........................................................................... 20

*Comm. on Judiciary, U.S. House of Reps. v. Miers,*
    558 F. Supp. 2d 53 (D.D.C. 2008) ........................................................... 18, 19, 25

*ConnTech Dev. Co. v. Univ. of Conn. Educ. Props., Inc.,*
    102 F.3d 677 (2d Cir. 1996) ................................................................................... 10

*CP Solutions PTE, Ltd. v. General Electric Co.,*
    553 F.3d 156 (2d Cir. 2009) ................................................................................... 13

*Davis v. United States,*
    192 F.3d 951 (10th Cir. 1999) ................................................................................ 11

*Doe v. McMillan,*
    412 U.S. 306 (1973) ....................................................................................... 6, 7, 11

*Dombrowski v. Eastland,*
    387 U.S. 82 (1967) .................................................................................................... 5

*Eastland v. U.S. Servicemen's Fund,*
    421 U.S. 491 (1975) ........................................... 1, 5, 6, 7, 8, 9, 11, 12, 17, 25

*Eastman v. Thompson,*
    2022 WL 1407965 (C.D. Cal. Jan. 25, 2022) ........................................................18

*Eastman v. Thompson,*
    594 F. Supp. 3d 1156 (C.D. Cal. 2022) ..................................................................1

*Errico v. Stryker Corp.,*
    281 F.R.D. 182 (S.D.N.Y. 2012) ..........................................................................13

*Exxon Corp. v. FTC,*
    589 F.2d 582 (D.C. Cir. 1978) .......................................................................23, 25

*Faiveley Transp. Malmo AB v. Wabtec Corp.,*
    559 F.3d 110 (2d Cir. 2009) ......................................................................22, 23, 24

*Fluent v. Salamanca Indian Lease Auth.,*
    928 F.2d 542 (2d Cir. 1991) ..................................................................................11

*Friess v. Thompson,*
    2022 WL 14813721 (D. Colo. Oct. 26, 2022) ...................................................1, 18

*Georgia v. Pruitt,*
    326 F. Supp. 3d 1356 (S.D. Ga. 2018) ..................................................................24

*Gravel v. United States,*
    408 U.S. 606 (1972) ..........................................................................................5, 6

*Harris v. Bd. of Govs. of Fed. Rsrv. Sys.,*
    938 F.2d 720 (7th Cir. 1991) .................................................................................24

*Helstoski v. Meanor,*
    442 U.S. 500 (1979) .................................................................................................6

*Hutcheson v. United States,*
    369 U.S. 599 (1962) ...............................................................................................17

*In re Excel Innovations, Inc.,*
    502 F.3d 1086 (9th Cir. 2007) ...............................................................................23

*In re Grand Jury Proc.,*
    219 F.3d 175 (2d Cir. 2000) ..................................................................................19

*In re Guanro,*
    2022 WL 2237232 (D.D.C. June 22, 2022) .............................................................4

*In re Sealed Case,*
    877 F.2d 976 (D.C. Cir. 1989) ...............................................................................21

*In re von Bulow,*
  828 F.2d 94 (2d Cir. 1987) ............................................................................................20

*In re World Trade Ctr. Bombing Litig.,*
  709 N.E.2d 452 (N.Y. 1999) .........................................................................................21

*Jud. Watch, Inc. v. Schiff,*
  474 F. Supp. 3d 305 (D.D.C. 2020) .............................................................................15

*Kilbourn v. Thompson,*
  103 U.S. 168 (1880) ......................................................................................................16

*Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Res. Trust Corp.,*
  5 F.3d 1508 (D.C. Cir. 1993) .......................................................................................25

*Madanes v. Madanes,*
  186 F.R.D. 279 (S.D.N.Y. 1999) .................................................................................20

*Martir v. City of New York,*
  2009 WL 2355901 (S.D.N.Y. July 29, 2009) ..............................................................24

*Marvel Characters, Inc. v. Kirby,*
  726 F.3d 119 (2d Cir. 2013) .........................................................................................10

*Mashpee Wampanoag Tribe v. Bernhardt,*
  2020 WL 3034854 (D.D.C. June 5, 2020) ...................................................................24

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ........................................................................................................5

*McGrain v. Daugherty,*
  273 U.S. 135, 177 (1927) .......................................................................................15, 25

*McPhaul v. United States,*
  364 U.S. 372 (1960) ......................................................................................................15

*Meadows v. Pelosi,*
  2022 WL 16571232 (D.D.C. Oct. 31, 2022) ..................................................................1

*MINPECO, S.A. v. Conticommodity Servs., Inc.,*
  844 F.2d 856 (D.C. Cir. 1988) ..................................................................................7, 11

*New York v. United States,*
  505 U.S. 144 (1992) ......................................................................................................16

*Nken v. Holder,*
  556 U.S. 418 (2009) ......................................................................................................25

*N.Y. Times Co. v. DOJ,*
    939 F.3d 479 (2d Cir. 2019) ................................................................21

*Printz v. United States,*
    521 U.S. 898 (1997) ............................................................... 16, 17

*Provident Tradesmens Bank & Trust Co. v. Patterson,*
    390 U.S. 102 (1968) ................................................................11

*Republic of Philippines v. Pimentel,*
    553 U.S. 851 (2008) ................................................................12

*Rynasko v. N.Y. Univ.,*
    63 F.4th 186 (2d Cir. 2023) ......................................................18

*Seneca Nation of Indians v. New York,*
    383 F.3d 45 (2d Cir. 2004) ......................................................11

*Tenney v. Brandhove,*
    341 U.S. 367 (1951) ................................................................8

*Trump v. Mazars USA, LLP,*
    140 S. Ct. 2019 (2020) ...........................................................14, 15

*United States v. Biaggi,*
    853 F.2d 89 (2d Cir. 1988) ......................................................8

*United States v. Brewster,*
    408 U.S. 501 (1972) ...............................................................5, 7

*United States v. Helstoski,*
    442 U.S. 477 (1979) ................................................................6

*United States. v. Johnson,*
    383 U.S. 169 (1966) ...............................................................6, 7, 12

*United States v. Mejia,*
    655 F.3d 126 (2d Cir. 2011) ....................................................19

*United States v. Morrison,*
    529 U.S. 598 (2000) ................................................................16

*United States v. Rumely,*
    345 U.S. 41 (1952) ................................................................14

*United States v. Tobin,*
    306 F.2d 270 (D.C. Cir. 1962) .................................................14

*United States v. U.S. House of Reps.,*
   556 F. Supp. 150 (D.D.C. 1983) ...........................................................................14

*Utica Mut. Ins. Co. v. INA Reinsurance Co.,*
   2012 WL 12874471 (N.D.N.Y. Nov. 6, 2012),
   *R. & R. adopted*, 2012 WL 12874470 (N.D.N.Y. Dec. 14, 2012) ...................23

*Ward v. Thompson,*
   2022 WL 434386788 (D. Ariz. Sept. 22, 2022) .....................................................1

*White v. City of Mount Vernon,*
   2022 WL 16578086 (S.D.N.Y. Nov. 1, 2022) ......................................................22

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ...............................................................................5, 22, 25

**Statutes and Rules**

3 U.S.C. § 102 note (a), (c), (g) .................................................................................8

18 U.S.C. § 3056 .......................................................................................................8

39 U.S.C. § 3214 .......................................................................................................8

Fed. R. Civ. P. 19(a)(1)(B) ................................................................................. 10, 11

N.Y. Crim. Proc. Law § 1.20 ....................................................................................20

N.Y. R. Prof. Conduct 1.6(b)(6) (2021) ....................................................................20

**Constitution**

U.S. Const. Art I, § 6, cl. 1 .........................................................................................5

**Other Authorities**

26A Charles Alan Wright et al., *Fed. Prac. & Proc.* § 5692 (Apr. 2023 update) .......................22

Andrew Weissmann, *Where Law Ends: Inside the Mueller Investigation* (2021) .............................20

Jeffrey Toobin, *Opening Arguments: A Young Lawyer's First Case:*
*United States v. Oliver North* (1991) ..........................................................................20

Ken Starr, *Contempt: A Memoir of the Clinton Investigation* (2018) ..............................................20

Mark Pomerantz, *People vs. Donald Trump: An Inside Account* (2023) ......................2, 19, 22

Richard Ben-Veniste & George Frampton, Jr.,
*Stonewall: The Real Story of the Watergate Prosecution* (1977) ...................................20

Rita M. Glavin, Note, *Prosecutors Who Disclose Prosecutorial Information for Literary or Media Purposes: What About the Duty of Confidentiality?*, 63 Fordham L. Rev. 1809 (1995).................................... 19, 20

Vincent Bugliosi & Curt Gentry,
   *Helter Skelter: The True Story of the Manson Murders* (1974) ...................................................................20

## INTRODUCTION AND BACKGROUND

Plaintiff District Attorney Alvin Bragg, Jr., seeks extraordinary and unconstitutional relief from this Court to impede a Congressional inquiry by preventing a witness from complying with a duly issued subpoena.  Plaintiff (i) has sued Congressional Defendants Chairman Jim Jordan and the U.S. House Committee on the Judiciary (Committee) (yet failed to apprise the Court of these Defendants' immunity from suit under the U.S. Constitution's Speech or Debate Clause); and (ii) demands emergency relief to stop a former employee from cooperating with a Congressional investigation (even though that individual has authored a detailed public account about his employment discussing subjects of inquiry by the Committee).  Courts have consistently rejected attempts to enjoin compliance with Congressional subpoenas,[1] and Plaintiff does not cite a single case where a court has taken such an action.  This Court should reject Plaintiff's invitation to do so here.

The New York County District Attorney's Office (Office) has been investigating former President Donald Trump for years.  ECF 1 at ¶ 28.  In February 2021, Defendant Mark Pomerantz was hired as a Special Assistant District Attorney by Plaintiff's predecessor, Cyrus Vance, Jr., to assist with the Office's investigation of the former President.  During his 2021 campaign to replace Vance, Plaintiff made the former President a central issue.  For example, Plaintiff was asked in a media interview: "I know a lot of people are wondering, whoever has this job, are they going to convict Donald Trump?"  Decl. of Todd B. Tatelman (Decl.), Ex. A (00:46 to 00:55).  He responded: "Look that is the number one issue we know [Vance] is investigating. … I'm the candidate in the race who has the experience with Donald Trump."  *Id.* (00:55 to 01:16).  As a candidate, Plaintiff said, "[i]t is a fact that I have sued [the former President] more than a hundred times."  Decl., Ex. B.  The campaign of Plaintiff's principal rival for the Democratic nomination even "accused [him] of attacking [the former President] 'for political advantage every chance he gets.'"  *Id.*

---

[1] *See, e.g.*, *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 512 (1975); *Budowich v. Pelosi*, 610 F. Supp. 3d 1, 12 (D.D.C. 2022); *Meadows v. Pelosi*, 2022 WL 16571232, at *1 (D.D.C. Oct. 31, 2022); *Ward v. Thompson*, 2022 WL 4386788, at *11 (D. Ariz. Sept. 22, 2022); *Eastman v. Thompson*, 594 F. Supp. 3d 1156, 1174, 1199 (C.D. Cal. 2022); *Friess v. Thompson*, 2022 WL 14813721, at *1 (D. Colo. Oct. 26, 2022), *R & R adopted*, 2022 WL 17039241 (D. Colo. Nov. 17, 2022).

Plaintiff became the District Attorney on January 1, 2022, and Pomerantz resigned from the Office less than three months later. His publicly available resignation letter noted he did so because he was frustrated by Plaintiff's failure to prosecute the former President. Decl., Ex. C. His public resignation reportedly left Plaintiff "deeply stung," and caused him to issue an "unusual" public statement "emphasizing that the investigation into [the former President] and his business was far from over." Decl., Ex. D.

Pomerantz later wrote a book that gave the public a firsthand account of the Office's inner workings. *See* Mark Pomerantz, *People vs. Donald Trump: An Inside Account* (2023). In his words, he told the public "all about" his work investigating the former President, and "described the inner dialogue of the investigation." *Id.* at 2, 279. For example, he recounted internal conversations between attorneys working on the investigation, summarized internal discussions with witnesses, and discussed the attorneys' mental impressions about the strength or weakness of potential prosecutorial theories. *See, e.g.*, *id.* at 11-13, 16, 41, 50-56, 58, 171-78. On the other hand, Pomerantz indicated that he would not discuss what happened in front of the grand jury or in sealed litigation. *Id.* at 277.

Plaintiff apparently took no legal action to prevent Pomerantz from disclosing the information in the book. He never sued to block the book's publication, and it was released in early February 2023. Pomerantz then gave a flurry of media interviews about his work on the investigation of the former President. He appeared, for instance, on CBS's 60 Minutes, ABC's Good Morning America, MSNBC's The Rachel Maddow Show, and CNN This Morning. Decl., Exs. E-O. Similarly, Plaintiff apparently took no legal action to stop these interviews, to prevent Pomerantz from discussing any information, or to seek any redress from or discipline of him for disclosing the information. All the Office did was send a single letter to Pomerantz, claiming that he was required to obtain permission before making certain disclosures and asking for a chance to review the book. Pomerantz publicly responded that he was "confident that all of [his] actions with respect to the Trump investigation, including the writing of [his] forthcoming book, [were] consistent with [his] legal and ethical obligations." ECF 1 at ¶ 90 (citation omitted).

Meanwhile, in November 2022, shortly after the former President declared his presidential candidacy, it was publicly reported that the Office was "jump-start[ing]" a criminal investigation into the former President involving alleged hush money "that once seemed to have reached a dead end." Decl., Ex. P.  On March 9, 2023, it was reported that the Office had invited the former President to testify before a grand jury, a move that suggested he could soon be indicted.  Decl., Ex. Q.  It was reported the Office would seek to pursue "unusual" charges against the former President by bootstrapping unnamed (and uncharged) federal crimes onto otherwise misdemeanor conduct, and thus extend the statute of limitations.  Decl., Ex. D.  Given Plaintiff's campaign rhetoric, the timing of the investigation's resurrection, Vance's prior decision not to proceed with such charges, and the unusual nature of the reported charges, this news gave rise to widespread speculation that an impending indictment could be politically motivated.  Decl., Exs. R-S.

The Committee began an investigation soon after, concluding that the prospect of a politically motivated prosecution of a former President could give rise to issues of substantial federal concern. This is because a former President is unlike any other former federal official or employee, and Congress has long recognized that "[t]he interest of the American people in the President does not cease when his term of office has ended."  H. Rep. No. 85-2200, at 3 (1958).  Federal law reflects this unique interest; former Presidents are entitled to protective services and a host of special benefits. Furthermore, the prospect of "politically motivated prosecutions of Presidents of the United States (former or current) for personal acts … could have a profound impact on how Presidents choose to exercise their powers while in office.  For example, a President could choose to avoid taking action he believes to be in the national interest because it would negatively impact New York City for fear that he would be subject to a retaliatory prosecution in New York City."  ECF 12-12 at 2-3.

On March 20, 2023, three House Committee Chairmen sent Plaintiff a letter asking him to provide, among other things, information relating to his Office's receipt and use of federal funds. ECF 12-2.  Unfortunately, Plaintiff has generally been uncooperative with the Committee's investigation.  For example, it has been reported that when a Committee staff member called the Office and identified himself, the person answering the phone hung up.  Decl., Ex. T.  The Committee

staffer called back and was told: "Your committee has no jurisdiction over us.  You're wrong.  Stop calling us with this bullshit."  *Id.*  The person hung up again.  *Id.*  In responding to the March 20 letter, the Office largely refused to comply with the Committee's request.  ECF 12-11 at 2-5.  It did, however, offer to describe how the Office uses federal funds.  *Id.* at 4.

The Committee sent a second letter to Plaintiff that explained its investigation in more detail and again requested his voluntary compliance.  ECF 12-12.  Days later, the fact that the former President had been indicted was made public.  ECF 1 at ¶ 68.  The next day, the Office responded to the Committee's second letter and again largely refused to voluntarily comply with the investigation. ECF 12-20 at 2-4.  However, the Office did inform the Committee that it had spent federal funds, in the form of federal forfeiture money, in its investigation of the former President.  *Id.* at 4.

As part of its investigation, the Committee also sent a letter to Pomerantz.  ECF 12-61. Though the Committee requested his voluntary cooperation, he declined because the Office "ha[d] instructed [him] to not provide any information or materials in response to [the Committee's] request." ECF 12-13 at 2.  Subsequently, the Committee subpoenaed Pomerantz and compelled his appearance for a deposition on April 20.  ECF 12-1 at 7.  The Committee informed Pomerantz that because of his "unique role as a special assistant district attorney leading the investigation into President Trump's finances, [he is] uniquely situated to provide information that is relevant and necessary to inform the Committee's oversight and potential legislative reforms."  ECF 12-1 at 3.

Five days later, Plaintiff sued Chairman Jordan, the Committee, and Pomerantz and requested a temporary restraining order and preliminary injunction barring enforcement of, or compliance with, the subpoena.  ECF 7.[2]  The Court "decline[d] to enter the proposed Temporary Restraining Order and Order to Show Cause," ordered Defendants to respond by April 17, and scheduled a hearing for April 19.  ECF 13 at 1-2.

---

[2] He also asked the Court to prevent the Committee from enforcing any *future* subpoenas to Plaintiff or Plaintiff's former or current employees, ECF 1 at ¶ c, even though "[c]ourt[s] will not quash a hypothetical," *In re Guanro*, 2022 WL 2237232, at *2 (D.D.C. June 22, 2022) (citation omitted).  *See also id.* (dismissing a challenge to a "theoretical subpoena").

## ARGUMENT

Plaintiff's motion for a preliminary injunction should be denied.  A preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis and quotation marks omitted).  To meet that burden, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## I.      Plaintiff Cannot Show Likelihood Of Success On The Merits

### A.      The Speech Or Debate Clause Bars Plaintiff's Suit And Requested Relief

Conspicuously absent from Plaintiff's Complaint or Motion is any mention of the Speech or Debate Clause, the core constitutional immunity infringed upon by this suit.  This is glaring— abundant Supreme Court precedent demonstrates that the Clause absolutely bars litigation of this nature, making it impossible for Plaintiff to establish a likelihood of success on the merits.

The Speech or Debate Clause mandates that Senators and Representatives "shall not be questioned in any other Place" for "any Speech or Debate in either House."  U.S. Const. Art. I, § 6, cl. 1.  By "freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct," *Gravel v. United States*, 408 U.S. 606, 618 (1972), the Clause both "preserve[s] the independence and ... integrity of the legislative process," *United States v. Brewster*, 408 U.S. 501, 524 (1972), and "reinforc[es] the separation of powers," *Eastland*, 421 U.S. at 502.

The Speech or Debate Clause's absolute immunity extends to *all* civil actions.  *See id.* at 503. The Clause protects federal legislators "not only from the consequences of litigation's results but also from the burden of defending themselves." *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967).  "The purpose of the [Speech or Debate] Clause is to insure that the legislative function the Constitution allocates to Congress may be performed *independently*. ... [T]he central role of the Clause is to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary." *Eastland*, 421 U.S. at 502 (emphasis added and internal quotation marks omitted).  The Supreme Court

"has reiterated the central importance of the Clause for preventing intrusion by [the] Executive and Judiciary into the legislative sphere." *United States v. Helstoski*, 442 U.S. 477, 491 (1979).

Because "the guarantees of the Clause are vitally important to our system of government," they "are entitled to be treated by the courts with the sensitivity that such important values require." *Helstoski v. Meanor*, 442 U.S. 500, 506 (1979). Accordingly, the Supreme Court has repeatedly, and "[w]ithout exception, … read the Speech or Debate Clause broadly to effectuate its purposes." *Eastland*, 421 U.S. at 501.[3]

The Speech or Debate Clause provides, *inter alia*, immunity from prosecutions or civil lawsuits with respect to any and all actions "within the 'legislative sphere.'" *McMillan*, 412 U.S. at 312-13 (quoting *Gravel*, 408 U.S. at 624-25). The Supreme Court has stated unequivocally that when the challenged "actions of the [Committee] fall within the sphere of legitimate legislative activity," they "shall not be questioned in any other Place about those activities since the prohibitions of the Speech or Debate Clause are absolute." *Eastland*, 421 U.S. at 501 (internal quotation marks omitted); *see also id.* at 503, 509 n.16, 509-10; *Gravel*, 408 U.S. at 623 n.14.

## B.    Issuing A Subpoena Is A "Legislative Act"

The meaning of "legislative activity" has been broadly construed to encompass much more than merely words spoken in debate. The "cases have plainly not taken a literalistic approach in applying the privilege. … Committee reports, resolutions, and the act of voting are equally covered[.]" *Gravel*, 408 U.S. at 617. The Supreme Court has instructed that, to determine whether the challenged act is "legislative," and thus entitled to Speech or Debate Clause immunity, courts must assess the "nature of the act." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998).

Of particular relevance here, the Supreme Court has unambiguously held that the "power to investigate and to do so through compulsory process" is activity within the legislative sphere. *Eastland*, 421 U.S. at 504. This is because "[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." *Id.*

---

[3] *See also Doe v. McMillan*, 412 U.S. 306, 311 (1973); *Gravel*, 408 U.S. at 617-18; *United States v. Johnson*, 383 U.S. 169, 179 (1966).

(internal quotation marks omitted).

Thus, the "[i]ssuance of subpoenas … has long been held to be a legitimate use by Congress of its power to investigate." *Eastland*, 421 U.S. at 504. "It also has been held that the subpoena power may be exercised by a committee acting … on behalf of one of the Houses." *Id.* at 505. As a result, a committee's "issuance of a subpoena pursuant to an authorized investigation is … an indispensable ingredient of lawmaking," *id.*, and the Speech or Debate Clause precludes litigation challenges to such subpoenas, *see id.* at 507.

The Clause also bars any "inquiry … into … the motivation for [legislative] acts." *Brewster*, 408 U.S. at 512; *see also Johnson*, 383 U.S. at 180, 184-85 (a charge that legislative "conduct was improperly motivated … is precisely what the Speech or Debate Clause generally forecloses from executive and judicial inquiry"). Thus, the protections afforded by the Clause are not abrogated by allegations that a Legislative Branch official acted unlawfully or with an unworthy purpose. *See, e.g.*, *McMillan*, 412 U.S. at 312-13 (Clause applies to all legislative activities "even though [the] conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes").

Finally, courts have consistently held that once the legislative-act test is satisfied, that is "the end of the matter." *See, e.g.*, *MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856, 861 (D.C. Cir. 1988); *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 418-19 (D.C. Cir. 1995) ("Once the legislative-act test is met, … the privilege is absolute." (citation omitted)).

### C. The Pomerantz Subpoena Is Absolutely Protected By The Clause

Plaintiff's Complaint and Motion are squarely foreclosed by binding Supreme Court precedent, specifically *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975). *Eastland* involved a Senate Committee investigation of various activities of the United States' Serviceman's Fund, Inc. (USSF) to determine whether they were potentially harmful to the morale of the U.S. Armed Forces. *See id.* at 493. USSF sued the Chairman, Members, and Chief Counsel of the Committee to enjoin a subpoena issued to USSF's bank for account records. *See id.* at 494-95. The Supreme Court rejected the notion that the subpoena could be judicially quashed because "the Speech or Debate Clause provides

complete immunity for the Members for issuance of this subpoena." *Id.* at 507.

*Eastland* also confirms the exceedingly limited role of the Judiciary in determining whether a Congressional committee's issuance of a subpoena involves legislative matters protected by the Speech or Debate Clause. "The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province." *Id.* at 506 (quoting *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951)); *see also United States v. Biaggi*, 853 F.2d 89, 103 (2d Cir. 1988). Thus, the *only* permissible judicial inquiry is a deferential assessment of whether "the investigation upon which the [committee] had embarked concerned a subject on which 'legislation could be had.'" *Eastland*, 421 U.S. at 506 (citation omitted). The delay and distraction to the legislative inquiry in *Eastland* "illustrates vividly the harm that judicial interference may cause." *Id.* at 511. The Speech or Debate Clause "was written to prevent the need to be confronted by such 'questioning' and to forbid invocation of judicial power to challenge the wisdom of Congress' use of its investigative authority." *Id.*

Here, there can be no question that the subpoena to Pomerantz was issued in furtherance of the Committee's investigation concerning "a subject on which 'legislation could be had.'" *Id.* at 506 (citation omitted). Plaintiff's actions necessarily implicate important federal legislative interests. For starters, Plaintiff has admitted that the Office has spent federal forfeiture money on its investigation of the former President. *See* ECF 8 at 11; ECF 12-20 at 3-4. Therefore, Congress, which holds the power of the purse, may examine whether it is appropriate for federal monies to be used in such investigations. That alone is a subject upon which "legislation could be had." Indeed, the Committee is considering legislation that would prohibit the use of federal forfeiture funds to investigate a current or former President. Decl., Ex. V (text of H.R. 2582, 118th Cong. (2023)).

The federal government also has a substantial interest in the welfare of former Presidents. Under federal law, former Presidents are entitled to funding for an office staff, "suitable office space, appropriately furnished and equipped," a substantial lifetime federal pension, travel funds, and franked mail privileges. *See* 3 U.S.C. § 102 note (a), (c), (g); 39 U.S.C. § 3214. They also have Secret Service protection. 18 U.S.C. § 3056(a)(3). Congress may therefore examine whether former Presidents are being subject to politically motivated state investigations and prosecutions due to the policies they

advanced as President, and, if so, what legislative remedies may be appropriate.  For example, the Committee is considering legislation that would expressly allow current and former Presidents and Vice Presidents to remove any criminal actions against them from state to federal court.  Decl., Ex. W (text of H.R. 2553, 118th Cong. (2023)).  Such legislation could help protect current and former Presidents from potentially politically motivated prosecutions by having all such matters heard in federal courts, pursuant to uniform federal rules of procedure, and overseen by life-tenured federal judges.  Moreover, Congress is actively investigating and considering the effects that Plaintiff's actions, and actions similar to it, are having and may continue to have on all of the benefits and federal expenses applicable to former Presidents to determine what, if any, legislative reforms are needed.

In any event, to effectively propose legislation for Congressional consideration, the Committee must gather information so that it can make informed decisions about the need for legislative action and the precise content of such proposed legislation.  This power of inquiry is protected regardless of whether legislation actually results.  *Eastland*, 421 U.S. at 509 ("Nor is the legitimacy of a congressional inquiry to be defined by what it produces.").

Given Pomerantz's familiarity with the inner workings of the Office and this investigation of a former President, he may be able to provide information shedding light on whether new restrictions on the use of federal funds are appropriate and whether Congress should take steps to help protect former Presidents from politically motivated prosecutions.  He may also be able to explain how federal interests may (or may not) have factored into the Office's decision-making process.  Even if the answers are ultimately unhelpful to the Committee, the Supreme Court has made clear that "[t]he wisdom of the congressional approach or methodology is not open to judicial veto" and has recognized that Congressional investigations may lead "up some 'blind alleys' and into nonproductive enterprises.  To be a valid legislative inquiry there need be no predictable end result." *Id.*

Here, because Congressional Defendants can conclusively establish that the issuance of the subpoena was a legitimate legislative act related to a subject on which legislation could be had, that is the end of the judicial inquiry.  Accordingly, they are immune from suit by virtue of the Speech or Debate Clause, and Plaintiff's motion must be denied.  *See id.* at 506.

### D.    Congressional Defendants Are Necessary Parties Under Rule 19

This case is a dispute over *the Committee's* subpoena to Pomerantz.  Therefore, Congressional Defendants are necessary parties under Federal Rule of Civil Procedure 19.  As just discussed, the inclusion of Congressional Defendants is improper because the Speech or Debate Clause provides them absolute immunity from suit.  And because the Rule 19 factors weigh decisively against this action proceeding without them, Plaintiff cannot show a likelihood of success on the merits.

Rule 19(a) establishes a three-part test for determining joinder.  *First*, the court must determine whether, as set forth in Rule 19(a)(1), the party is necessary for a just adjudication.  *See ConnTech Dev. Co. v. Univ. of Conn. Educ. Props., Inc.*, 102 F.3d 677, 681 (2d Cir. 1996).  *Second*, the court evaluates whether joinder of that party is feasible.  *See id.*  *Third*, if joinder is not feasible, the court then turns to Rule 19(b), which "requires courts to consider whether, 'in equity and good conscience,' the party is one without whom the action between the remaining parties cannot proceed."  *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 132 (2d Cir. 2013) (quoting Fed. R. Civ. P. 19(b)).

### 1.    Congressional Defendants Are Required Parties

Rule 19 describes a party as "required" if that party "claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest."  Fed. R. Civ. P. 19(a)(1)(B).

Under these criteria, Congressional Defendants are required parties.  Granting the relief sought by Plaintiff will impede the Committee's investigation.  Plaintiff seeks a declaratory judgment that "the subpoena served on … Pomerantz is invalid, unconstitutional, *ultra vires*, and/or unenforceable," as well as a "permanent injunction, preliminary injunction, and [TRO] enjoining any enforcement of the subpoena served on … Pomerantz and enjoining … Pomerantz's compliance with the subpoena."  ECF 1 at ¶¶ a-b.  Without any doubt, such relief would frustrate the Committee's investigation.

Because the case against Pomerantz puts the Committee's subpoena in jeopardy, Congressional Defendants' absence would impair its ability to protect its interests, which are distinct

from those of Pomerantz.  Thus, Congressional Defendants are required parties to this litigation.

> **2.**   **Congressional Defendants Are Immune, Which Prevents This Case From Proceeding In Equity And Good Conscience**

As argued above, Congressional Defendants are absolutely immune from this suit under the Speech or Debate Clause and must be dismissed.  Joinder of Congressional Defendants is therefore not feasible under Rule 19.

Rule 19(b) provides that if a party "who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  In cases where, as here, "an indispensable party is immune from suit, there is very little room for balancing of other factors set out in Rule 19(b), because immunity may be viewed as one of those interests compelling by themselves." *Fluent v. Salamanca Indian Lease Auth.*, 928 F.2d 542, 548 (2d Cir. 1991) (internal quotation marks and citation omitted); *see also Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 119 (1968).  According to the Second Circuit, immunity can be dispositive "in the weighing of [R]ule 19(b) factors" because, in such situations, the inability to join the absent party does not stem from "some procedural defect such as venue," but rather from the substantive choice "to shield [the absent party] from suit." *Fluent*, 928 F.2d at 548 (citation omitted).

Courts regularly dismiss cases under Rule 19 when a necessary party is immune from suit. Indeed, Courts of Appeals have emphasized the "strong policy" that favors dismissal when a court cannot join a party due to sovereign immunity. *See, e.g.*, *Davis v. United States*, 192 F.3d 951, 960 (10th Cir. 1999); *see also Seneca Nation of Indians v. New York*, 383 F.3d 45, 48 (2d Cir. 2004) (noting other Rule 19(b) factors were "outweighed by the paramount importance to be accorded to … immunity from suit" (internal quotation marks and citation omitted)).  The same is true of Speech or Debate Clause immunity, which the Supreme Court has emphasized affords absolute immunity from suit when, as here, "the actions upon which [a plaintiff] sought to predicate liability were legislative acts." *McMillan*, 412 U.S. at 312.  Like sovereign immunity, Speech or Debate Clause immunity is also an immunity from suit, not just from liability.  *See, e.g.*, *Eastland*, 421 U.S. at 503; *MINPECO*, 844 F.2d at 859.

Here, the question is whether Speech or Debate Clause dismissal of Congressional Defendants requires dismissal of the entire case pursuant to Rule 19, and the answer is yes.  There is no reason that Speech or Debate Clause immunity should function differently from sovereign immunity for Rule 19 purposes.  Because Speech or Debate Clause "immunity is asserted, and the claims of the [Congressional Defendants] are not frivolous, dismissal of the action must be ordered" because "there is a potential for injury to the interests of the [Congressional Defendants]."  *Republic of Philippines v. Pimentel*, 553 U.S. 851, 867 (2008).

The Supreme Court has acknowledged that "[d]ismissal under Rule 19(b) will mean, in some instances, that plaintiffs will be left without a forum for definitive resolution of their claims."  *Id.* at 872.  Here, however, the substantive choice was made by the Framers of the Constitution, who—mindful of English parliamentary history—chose to enshrine in the Speech or Debate Clause immunity from suit for Congress as a means of protecting it against encroachment from the other branches.  *See Johnson*, 383 U.S. at 177-79 (discussing the origins of the Clause).

It should be noted that the Supreme Court and the D.C. Circuit have suggested that, when a Congressional subpoena is issued to a "neutral third party" who "could not be expected to resist the subpoena by placing itself in contempt," *Eastland*, 421 U.S. at 514 (Marshall, J., concurring), the interested party should have an avenue for judicial review of the subpoena.  In a footnote, the *Eastland* Court stated that the D.C. Circuit "correctly held that the District Court properly entertained this action initially" because, where a Congressional subpoena seeks information from such a party, "unless a court may inquire to determine whether a legitimate legislative purpose is present, compliance by the third person could frustrate any judicial inquiry."  *Id.* at 501 n.14 (majority opinion) (citations omitted).

But the parties did not raise, and *Eastland* did not address, Rule 19, and thus the Court had no occasion to consider the interaction between Speech or Debate Clause immunity and the indispensable-party doctrine.  *See id.* at 517 (Marshall, J., concurring) ("This case does not present the questions of what would be the proper procedure, and who might be the proper parties … in an effort to get before a court a constitutional challenge to a subpoena duces tecum issued to a third party.").

Nor is Pomerantz a "neutral third party" as contemplated by *Eastland*; rather, he clearly believes that he has legal and ethical obligations as an attorney and former employee of the Office.

### 3.    The Rule 19(b) Factors All Favor Congressional Defendants

Even setting aside the overriding importance of immunity in the Rule 19 context, the Rule 19(b) factors also favor dismissal. "Rule 19(b) specifies four factors: (1) whether a judgment rendered in a person's absence might prejudice that person or parties to the action, (2) the extent to which any prejudice could be alleviated, (3) whether a judgment in the person's absence would be adequate, and (4) whether the plaintiff would have an adequate remedy if the court dismissed the suit." *CP Solutions PTE, Ltd. v. General Electric Co.*, 553 F.3d 156, 159 (2d Cir. 2009).

The first Rule 19(b) factor "overlaps considerably with the Rule 19(a) analysis, as both require the Court to determine the potential for prejudice to existing and absent parties." *Errico v. Stryker Corp.*, 281 F.R.D. 182, 187 (S.D.N.Y. 2012). Since Congressional Defendants are required parties under Rule 19(a), there can be little doubt that a judgment in Plaintiff's favor would prejudice the Committee's investigation by depriving it of the opportunity to depose Pomerantz. Under the second factor, any prejudice to Congressional Defendants cannot be "lessened or avoided." Plaintiff seeks to enjoin Pomerantz from complying with the Committee's subpoena. *See* ECF 1 at ¶¶ a-b. There is simply no way to mitigate the impact of such an injunction. Regarding the third factor, most of Plaintiff's claims and requests target Congressional Defendants, not Pomerantz. Thus, at most, this Court could only partially proceed with the case. Finally, the fourth factor also points to dismissal. Plaintiff did have another forum before which he could seek relief: Congress. If Plaintiff had specific concerns with certain aspects of the subpoena, he could have raised them directly with the Committee prior to filing this suit.

In sum, Rule 19 requires that Congressional Defendants be parties to this litigation, but because they are immune from suit, this case cannot proceed without them. Therefore, Plaintiff cannot establish a likelihood of success on the merits.

**E.**     **Judicial Restraint Cautions Against Entertaining Plaintiff's Suit**

This is not the first attempt by a government official to obtain a judicial ruling regarding compliance with a Congressional subpoena based on privilege and alleged structural constitutional concerns.  In 1983, the Administrator of the Environmental Protection Agency (EPA) sued the House of Representatives.  *See United States v. U.S. House of Reps.*, 556 F. Supp. 150 (D.D.C. 1983).  The Administrator sought a declaratory judgment that she acted lawfully when, in responding to a Congressional subpoena, she withheld certain EPA documents because they were assertedly protected by executive privilege.  *See id.* at 151.  There, as here, the district court was asked to "determine whether to resolve the constitutional controversy in the context of a civil action."  *Id.* at 152.

The district court declined to adjudicate the dispute, noting that "[c]ourts have a duty to avoid unnecessarily deciding constitutional issues."  *Id.* (citing *United States v. Rumely*, 345 U.S. 41, 45-46 (1952)).  Critically, the district court observed that the types of constitutional claims and other objections at issue could be raised "as defenses [to] a criminal prosecution" should that occur.  *Id.* (citing *Barenblatt v. United States*, 360 U.S. 109 (1959); *Ansara v. Eastland*, 442 F.2d 751 (D.C. Cir. 1971); and *United States v. Tobin*, 306 F.2d 270, 276 (D.C. Cir. 1962)).

This Court should likewise decline to adjudicate Plaintiff's claims.  This case also tees up a purported constitutional conflict between different asserted authorities for which "[j]udicial resolution ... will never become necessary unless [Pomerantz] becomes a defendant in either a criminal contempt proceeding[,] or *other legal action [is] taken by Congress*."  *Id.* at 153 (emphasis added) (citing *Ansara*, 442 F.2d at 753-54).

**F.**     **Plaintiff's Arguments Against The Subpoena Lack Merit**

**1.**     ***Mazars* Is Not The Appropriate Framework**

Plaintiff characterizes this case as one involving the structural separation of powers and therefore argues that the Supreme Court's framework in *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020), applies.  *See* ECF 8 at 9.  Plaintiff's reliance on *Mazars* is misplaced.

*First*, none of the Committees in *Mazars* asserted Speech or Debate Clause immunity, and the Supreme Court's opinion does not refer to the Clause.  Thus, the reasoning of *Mazars* does not bear

on whether a particular subpoena is legislative in nature or falls within the legitimate legislative sphere. In fact, other district courts have expressly held that *Mazars* "has no bearing" on the question of whether Congressional activity is protected by the Speech or Debate Clause. *See, e.g.*, *Jud. Watch, Inc. v. Schiff*, 474 F. Supp. 3d 305, 318, 319 n.7 (D.D.C. 2020); *Ass'n of Am. Physicians & Surgeons, Inc. v. Schiff*, 518 F. Supp. 3d 505, 519 (D.D.C. 2020).

*Second*, *Mazars* addressed only "significant separation of powers issues raised by congressional subpoenas for the President's information." *Mazars*, 140 S. Ct. at 2033. No such issues are present here. Additionally, neither the federalism nor intrusion into state sovereignty arguments advanced by Plaintiff are applicable for the reasons explained below; thus, the *Mazars* factors do not apply.

*Third*, Plaintiff's apparent suggestion that this Court should apply a "heightened standard of review," ECF 8 at 13, here to vindicate the separation of powers is irrelevant where, for the reasons stated above, this Court lacks jurisdiction.

*Finally*, the procedural posture of *Mazars* is inapposite. There, the President, in his personal capacity, filed two lawsuits against financial institutions that held his documents, seeking to prevent them from complying with Committee subpoenas. *See Mazars*, 140 S. Ct. at 2028. The Committees were not sued by the President; they affirmatively intervened in the cases brought by the President to defend the validity of their subpoenas. *See id.*

### 2.      The Subpoena Serves A Valid Legislative Purpose

Plaintiff asserts that the Committee's subpoena is invalid because it lacks any "valid legislative purpose." ECF 8 at 6. Quite the opposite is true. As the Supreme Court has made clear, this Court's examination should be limited to whether the Committee's inquiry is authorized under House Rules (which it is), and whether Plaintiff can demonstrate that the subpoena is "plainly incompetent or irrelevant to any lawful purpose," *McPhaul v. United States*, 364 U.S. 372, 381 (1960) (citation omitted), which he cannot. The only other requirement is that the subject matter of the legislative inquiry be "one on which legislation *could* be had." *McGrain v. Daugherty*, 273 U.S. 135, 177 (1927) (emphasis added).

Plaintiff advances three main arguments to support his claim that the Committee's subpoena is invalid. Each fails. *First*, Plaintiff argues that under *Kilbourn v. Thompson*, 103 U.S. 168 (1881), the subpoena is invalid because Congress cannot interfere with pending judicial proceedings. ECF 8 at 7. *Kilbourn* is easily distinguishable. There, the House could not identify a federal legislative interest that its constitutional powers could redress, rather only a judicial one. Contrary to Plaintiff's characterizations, this Committee's investigation is not intended to "interfere with," "second guess the merits of," or "regulate New York's enforcement of its own criminal law." ECF 8 at 7-9. Rather, the Committee seeks to fully understand whether a problem involving politically motivated prosecutions of former Presidents is emerging and the scope and effect that pursuing criminal indictments against former Presidents may have—especially given the significant federal interests implicated and the difficult legal questions raised—and to determine if federal legislation is needed to respond to those effects. For example, one such complicated question is the effect, if any, that such potential criminal prosecutions may have on Presidents while serving in office. If a President fears post-office criminal prosecution by locally elected prosecutors in retaliation for actions and decisions he takes while in office, would the President have an incentive to refrain from making decisions that may be in the national interest, but not in a particular local interest, as a way of guarding against future criminal liability? Or would the President have an interest in shaping his policy agenda to gain popularity in a particular jurisdiction? Whether potential legislation is necessary and appropriate on this issue is one of the many facets of this investigation that Plaintiff flatly ignores. Thus, the Committee's subpoena here is well within its constitutional authority and clearly differs from the one at issue in *Kilbourn*.

*Second*, Plaintiff refers to and relies on several federalism-related cases that he argues protect New York's sovereign authority over its own laws. *See* ECF 8 at 9 (citing *United States v. Morrison*, 529 U.S. 598 (2000); *Printz v. United States*, 521 U.S. 898 (1997); and *New York v. United States*, 505 U.S. 144 (1992)). None of these cases are applicable here because the Committee's attempt to depose Pomerantz is not a use of federal authority intended to delay, obstruct, or otherwise impede the pending criminal proceedings. To be clear, Congress is not trying to block a pending state proceeding;

rather, it is Plaintiff who has gone to court to block a federal proceeding. Similarly, nothing about the Committee's subpoena to Pomerantz—the Plaintiff's former employee, who has already published a book and made numerous public statements about this investigation—constitutes an "unwarranted 'incursion,'" *id.* (quoting *Printz*, 521 U.S. at 920), on the sovereignty of the State of New York and its ability to enforce its laws, or an attempt to commandeer state officials to perform federal functions. Indeed, two prosecutors from the Office have previously appeared before a House Committee pursuant to subpoenas to discuss an investigation. Decl., Ex. X (statements of Joseph J. Dawson and Richard T. Preiss, Assistant District Attorneys, New York County District Attorney's Office) (entire testimony at pages 75-110 of full transcript). But even if there were some attenuated effect on the criminal proceedings, the Supreme Court has held that would not invalidate the Committee's legitimate legislative purpose. *See Hutcheson v. United States*, 369 U.S. 599, 618 (1962) ("[S]urely a congressional committee which is engaged in a legitimate legislative investigation need not grind to a halt whenever responses to its inquiries might potentially be harmful to a witness in some distinct proceeding, … or when crime or wrongdoing is disclosed[.]" (citation omitted)).

*Finally*, Plaintiff argues that, regarding its "purely hypothetical" legislative interest in the federal funds used to investigate the former President, the Committee had alternatives to subpoenaing Pomerantz. ECF 8 at 10-11. Specifically, Plaintiff alleges that the Committee could have "accepted the [Office's] offer to meet and confer about what additional information the office could provide" or reviewed the Office's legally required disclosures on the use of forfeiture funds. *Id.* at 11. None of these arguments merit granting the relief requested here. To start, the Committee's interest in the use of forfeiture funds is not hypothetical, but actual and backed by proposed legislation that has been introduced in the House. Decl., Ex. V (text of H.R. 2582, 118th Cong. (2023)). Moreover, the fact that other investigative options exist is of no moment. Given that Pomerantz was an employee at the time the funds were spent, it is certainly permissible for the Committee to seek to ask him questions that go to the issue of whether this is the type of investigation upon which federal funds should be disbursed. Neither Plaintiff nor this Court is empowered to question the "wisdom of the congressional approach or methodology." *Eastland*, 421 U.S. at 509.

### 3.      Potential Privilege Claims Do Not Excuse Pomerantz's Appearance

If the Court finds that the Speech or Debate Clause applies here, it need not rule on any of Plaintiff's privilege arguments.  *See Friess*, 2022 WL 14813721, at *6 ("[T]he Court is unaware of any legal authority holding that any state or federal privilege statute would be able to overcome the immunity afforded by the Speech or Debate Clause, especially in light of its 'absolute' nature.").  But if the Court reaches those points, it should reject Plaintiff's claims.

**a.**  Even if a privilege could potentially apply to certain questions at Pomerantz's deposition, that is no basis to quash the subpoena.  Instead, Pomerantz must appear and invoke any claimed privilege on a question-by-question basis.  *See Comm. on Judiciary, U.S. House of Reps. v. Miers*, 558 F. Supp. 2d 53, 106 (D.D.C. 2008) ("[The former White House counsel] is not excused from compliance with the Committee's subpoena by virtue of a claim of executive privilege that may ultimately be made.  Instead, she must appear before the Committee to provide testimony, and invoke executive privilege where appropriate."); *see also Eastman v. Thompson*, 2022 WL 1407965, at *9 (C.D. Cal. Jan. 25, 2022) (explaining that a blanket assertion of privilege in response to a subpoena was "extremely disfavored").  The Committee, in turn, will be free to ask questions about the basis of any such privilege claims so that it can assess whether they are valid.

Plaintiff does not and cannot claim that Pomerantz's responses to *all* of the Committee's questions will be covered by privilege.  The Committee will surely ask him questions that do not involve purportedly privileged material in any way (e.g., inquiries about the circumstances that led him to work for the Office, conversations he had after leaving the Office, and so on).[4]  Plaintiff has no standing whatsoever to stop Pomerantz from appearing before the Committee to answer such questions; some of the information that Pomerantz would provide the Committee is indisputably not Plaintiff's.  Or, put another way, Plaintiff has no legal interest in Pomerantz's unprivileged testimony, so he cannot obtain an injunction blocking the deposition.  *Cf. Rynasko v. N.Y. Univ.*, 63 F.4th 186, 193 (2d Cir. 2023) ("To pursue her claims, [plaintiff] must allege an injury to her *own* legally protected

---

[4] Plaintiff suggests that the Committee should not be able to ask Pomerantz questions about nonprivileged material that he disclosed in his book because the testimony would be redundant.  ECF 8 at 22.  How to run and execute an investigation is the Committee's—not Plaintiff's—prerogative.

interests." (emphasis added)).  In sum, Plaintiff's "proposed absolute immunity would thus deprive Congress of even non-privileged information.  That is an unacceptable result." *Miers*, 558 F. Supp. 2d at 106.

**b.**  Beyond that fatal problem, Plaintiff also has not carried his burden of showing that the deposition will implicate privileged material.  Starting with the issue of grand jury information, consistent with the limits Pomerantz set out in his book, Pomerantz, *supra*, at 277, the Committee's investigation relates to numerous areas of inquiry that in no way implicate grand jury materials.  To the extent that questions are asked that Pomerantz believes he is not permitted to answer, he would retain the ability to decline to answer or to assert an applicable privilege.  While Plaintiff claims "that assurance rings hollow" because the Committee would like to ask Pomerantz questions about his role in investigating the former President, ECF 8 at 20-21, Pomerantz wrote a 280-page book about that very topic and did so without discussing events that occurred before a grand jury.

Plaintiff raises other privileges but again has failed to show that they apply here.  As the party asserting privilege, Plaintiff has the burden to show its existence and applicability.  *See In re Grand Jury Proc.*, 219 F.3d 175, 182 (2d Cir. 2000).  Starting with the attorney-client privilege, Plaintiff comes up short for two reasons.

**i.**  Plaintiff has not established that the attorney-client privilege applies to prosecutors, let alone to information the Committee seeks here.  Relying on a comparison to law firms, Plaintiff argues—in just a single sentence—that internal deliberations in his Office are protected by the privilege.  ECF 8 at 21.  But the cases Plaintiff cites do not make that comparison.  Indeed, Plaintiff cites no case that says the privilege applies to prosecutors.  *See* ECF at 21.

And there is good reason to think it does not.  *See* Rita M. Glavin, Note, *Prosecutors Who Disclose Prosecutorial Information for Literary or Media Purposes: What About the Duty of Confidentiality?*, 63 Fordham L. Rev. 1809, 1817 (1995) ("The attorney-client privilege is inapplicable to the prosecutor because no particular client reveals information to him for the purpose of obtaining legal advice.").  The attorney-client privilege protects certain communications "between a client and his or her attorney." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011).  But prosecutors represent the general public, *see* N.Y.

Crim. Proc. Law § 1.20, which means "no particular client reveals information to him for the purpose of obtaining legal advice," Glavin, *supra*, at 1817.  Given this fundamental difference, Plaintiff's comparison to law firms unravels.[5]

To be sure, professional responsibility rules regarding confidentiality may apply to prosecutors. *See, e.g.*, Glavin, *supra*, at 1817-20.  But those rules contain more exceptions than the attorney-client privilege.  *See, e.g.*, N.Y. R. Prof. Conduct 1.6(b)(6) (2021) ("A lawyer may reveal or use confidential information to the extent that the lawyer reasonably believes necessary … when permitted or required … to comply with other law or court order.").  Nor do they appear to give Plaintiff any legally cognizable right to block Pomerantz from giving information to Congress.

**ii.**  Moreover, even if the attorney-client privilege did apply, it has been waived.  *See Bus. Integration Servs., Inc. v. AT & T Corp.*, 251 F.R.D. 121, 124 (S.D.N.Y. 2008) (noting that when confidential attorney-client material is disclosed, it is the privilege-claiming party's "burden to show that its privilege was not waived through disclosure" (citation omitted)).

The attorney-client privilege belongs to the client, and only the client may waive it.  *See In re von Bulow*, 828 F.2d 94, 100 (2d Cir. 1987); ECF 8 at 21 (arguing the privilege was Plaintiff's and "not Mr. Pomerantz's to waive").  But a client may waive the privilege without disclosing the privileged material himself.  *See id.* at 100-01.  Indeed, when a third party discloses privileged material—even inadvertently or without the client's express permission—the client waives the privilege unless he or she takes reasonable steps to protect the privilege.  *See Madanes v. Madanes*, 186 F.R.D. 279, 293 (S.D.N.Y. 1999) (noting the client waived attorney-client privilege "[b]y failing to take reasonable steps to maintain the confidentiality of [privileged] documents" when they were "publicly filed without objection in legal proceedings" (citing *von Bulow*, 828 F.2d at 100-01)).

If Pomerantz disclosed privileged material in his book, Plaintiff waived the privilege unless he took reasonable steps to protect that information.  *See von Bulow*, 828 F.2d at 101 ("It is not asking too

---

[5] Numerous examples exist of prosecutors writing books about their work, which casts further doubt on whether the privilege applies to them.  *See, e.g.*, Vincent Bugliosi & Curt Gentry, *Helter Skelter: The True Story of the Manson Murders* (1974); Richard Ben-Veniste & George Frampton, Jr., *Stonewall: The Real Story of the Watergate Prosecution* (1977); Jeffrey Toobin, *Opening Arguments: A Young Lawyer's First Case: United States v. Oliver North* (1991); Ken Starr, *Contempt: A Memoir of the Clinton Investigation* (2018); Andrew Weissmann, *Where Law Ends: Inside the Mueller Investigation* (2021).

much to insist that if a client wishes to preserve the privilege [when privileged communications are inadvertently disclosed], he must take some affirmative action to preserve confidentiality." (alteration and citation omitted)).  But Plaintiff has not shown that he made a serious attempt to stop Pomerantz from disclosing any confidential material and thus waived any privilege that might have existed.

Plaintiff does not say that he took legal action to prevent Pomerantz from speaking out. Instead, Plaintiff sent a single letter that (1) reminded Pomerantz that he had no authority to reveal any privileged or confidential information he acquired while working for the Office and (2) "requested"—but did not demand—a chance to review the manuscript before it was published.  *See* ECF 8 at 21-22; ECF 1 at ¶ 90.  In short, he offered Pomerantz a reminder and asked for an advance copy of the book.  After the book was published and Plaintiff had knowledge of what information had been disclosed, he does not claim that he pursued any recourse against Pomerantz.  Nor is there any evidence that Plaintiff took any action to prevent Pomerantz from revealing information on national television—before millions of viewers—in interview after interview.  Plaintiff's inaction is inconsistent with how someone vested with protecting privileged information would act.  *Cf. In re Sealed Case*, 877 F.2d 976, 980 (D.C. Cir. 1989) ("[I]f a client wishes to preserve the privilege, it must treat the confidentiality of attorney-client communications like jewels—if not crown jewels.").

**iii.**  Plaintiff similarly fails to meet his burden regarding his perfunctory invocation of other privileges.  *First*, the Committee has not subpoenaed any documents from Pomerantz, and Plaintiff makes no effort to explain how the work product doctrine therefore applies here.  *See N.Y. Times Co. v. DOJ*, 939 F.3d 479, 489 (2d Cir. 2019).  *Second*, the only case Plaintiff cites involving the deliberative process privilege, ECF 8 at 22, is a FOIA case involving a request for documents from a federal agency, and Plaintiff does not explain how it is relevant to this Congressional subpoena.  *Third*, the public interest privilege case cited by Plaintiff indicates that the privilege protects certain confidential "information from ordinary disclosure, as an exception to liberal discovery rubrics" in litigation, *In re World Trade Ctr. Bombing Litig.*, 709 N.E.2d 452, 455 (N.Y. 1999); it does not reference Congressional subpoenas.  *Fourth*, the case Plaintiff cites, *see* ECF 8 at 22, shows that the law enforcement privilege and informant's privilege are qualified: the defendants there "would normally produce," for attorney's

eyes only, the materials at issue, but they did not because the plaintiff was *pro se*. *White v. City of Mount Vernon*, 2022 WL 16578086, at *1 (S.D.N.Y. Nov. 1, 2022). Plaintiff has not shown that either privilege justifies keeping this information from the Committee, especially since a disclosure to Congress is not a public disclosure (explained more below). Indeed, most of these privileges are not absolute, but instead require balancing tests, and the disclosure of information in Pomerantz's book and interviews severely weakens the case for them to carry the day here, even if they applied. *Cf.* Pomerantz, *supra*, at 195 ("Reporters and media outlets have no statutory or constitutional privileges to resist giving testimony about matters they already have disclosed.").

Finally, the same waiver problem applies to all of these privileges. Because Plaintiff did not take reasonable steps to protect any privileged material (regardless of the underlying privilege), he waived the privileges. *Cf.* 26A Charles Alan Wright et al., *Fed. Prac. & Proc.* § 5692 (Apr. 2023 update) ("True waiver of the governmental privileges is accomplished in the same fashion as waiver of other privileges; i.e., by voluntary disclosure of a significant portion of the information claimed to be privileged." (footnote omitted)); *id.* ("[W]here the government takes no steps to insure that its secrets are not disclosed, it ought to be held to have acquiesced in the 'unofficial' disclosure and the leak should be held to be a waiver.").

## II. Plaintiff Has Failed To Establish A Likelihood Of Irreparable Harm

This Court should deny Plaintiff's Motion for the independent reason that it does not establish a likelihood of irreparable harm. A plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. The injury cannot be "remote nor speculative," but rather must be "actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). Further, a plaintiff must provide evidentiary support of irreparable harm; bare allegations and conclusory statements are insufficient. *See id.* at 118-20.

**A.** Plaintiff first argues that the deposition would interfere with a criminal proceeding. ECF 8 at 23. But he provides no specific explanation whatsoever about how the subpoena to Pomerantz itself would "sabotage the criminal trial." *Id.* If Plaintiff's concerns arise from the disclosure of any

information, they lack credibility given the book that Pomerantz has already written and the interviews that he has already done.  Moreover, unlike Pomerantz's very public disclosures, the deposition will be conducted, pursuant to the House's deposition rules, Decl., Ex. U, in private, with attendance restrictions.  The deposition rules also provide procedural protections to the deponent and prescribe a process the Committee must follow before releasing any deposition information to the public.  *Id.*

Even outside the deposition context, the D.C. Circuit has held that the "release of information to the Congress does not constitute 'public disclosure.'"  *Exxon Corp. v. FTC*, 589 F.2d 582, 589 (D.C. Cir. 1978) (citation omitted).  Absent an "evident" showing that the Committee intends to make confidential information publicly available, third parties like Plaintiff have no right to an injunction that would prevent a subpoenaed party from disclosing information to Congress.  *See id.*  For these reasons, the Committee's private deposition of Pomerantz would not pose any "actual [or] imminent" injury to the integrity of an ongoing criminal proceeding.  *Faiveley*, 559 F.3d at 118.

**B.**  Plaintiff's conclusory argument that the deposition would compromise grand jury or privileged information also fails.  *See* ECF 8 at 23-24.  First, the Committee's investigation relates to numerous areas of inquiry that in no way implicate grand jury materials.  To the extent that questions are asked that Pomerantz believes he is not permitted to answer, he would retain the ability to decline to answer or to assert an applicable privilege, thus obviating any irreparable grand-jury-related harm that could result from the deposition.  Next, Plaintiff's privilege arguments not only fail for the reasons explained above, but also because the bare allegation that the Committee's possession of privileged information would cause harm is insufficient.  *See, e.g.*, *Utica Mut. Ins. Co. v. INA Reinsurance Co.*, 2012 WL 12874471, at *5 (N.D.N.Y. Nov. 6, 2012) (finding no irreparable harm because plaintiff presented "nothing more than conclusory statements that … it has privileged information"), *R & R adopted*, 2012 WL 12874470 (N.D.N.Y. Dec. 14, 2012); *see also In re Excel Innovations*, 502 F.3d 1086, 1098-99 (9th Cir. 2007) (conclusory allegations that privileged communications could be revealed are insufficient to establish irreparable harm).

Nor does Plaintiff offer any explanation of how he would be irreparably harmed given Pomerantz's book and many public interviews.  Had Plaintiff truly been concerned about irreparable

harm from the release of this information, he could have taken legal action to prevent Pomerantz from publishing his book or speaking about internal deliberations to the media.  Plaintiff took no such action.  *See Martir v. City of New York*, 2009 WL 2355901, at *2 (S.D.N.Y. July 29, 2009) (reasoning that a delay in seeking injunctive relief regarding privileged documents "suggests the alleged irreparable harm … occasioned by" mere possession of the documents "is not 'imminent'" (citation omitted)).  Now that the Committee seeks to receive the same information from Pomerantz, Plaintiff belatedly raises a concern about the "harm" to the Office's ongoing work and asks this Court to issue a first-of-its-kind injunction preventing the Committee from asking Pomerantz *any* questions—including, for example, questions about exact statements made in his book or his conduct before joining the Office and after leaving it.  This does not provide any basis to enjoin the deposition from even taking place.  If there are any privilege concerns, they should properly be addressed on a question-by-question basis in the deposition, pursuant to the House's procedural rules.  *See* Decl., Ex. U.

**C.**  Finally, the deposition will not harm New York's "dignitary interests" because it in no way usurps the State's ability to prosecute or investigate the conduct at issue, nor would it "subordinate" New York's sovereign interests.  ECF 8 at 24.  Plaintiff's hyperbolic attempts to reframe the Committee's valid Congressional inquiry shed no light on how the private deposition of a *former* employee would irreparably harm New York's sovereignty.  As with Plaintiff's other supposed irreparable harms, he has not provided any specific evidence to support his bare allegation.  Again, Plaintiff's concern is, at best, speculation about events that could occur after the deposition, not about the deposition itself.  *See Faiveley*, 559 F.3d at 118 (injury must be actual and imminent, not remote or speculative).  And none of the cases cited by Plaintiff support the notion that a Congressional deposition of a former State employee would irreparably harm New York's sovereign interests.[6]

---

[6] *See* ECF 8 at 24 (citing *Mashpee Wampanoag Tribe v. Bernhardt*, 2020 WL 3034854, at *3 (D.D.C. June 5, 2020) (enjoining *agency* action that would have removed *Tribal* land from a trust because "[i]f the land is taken out of trust, then the Mashpee Tribe will lose its sovereignty over the land in its entirety"); and *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1367 (S.D. Ga. 2018) (enjoining enforcement of an administrative rule, in part, because it would have at least doubled federal jurisdiction over intrastate waters, resulting in a loss of 11 states' sovereign interests in land and water use)).  Plaintiff makes "much of the sovereign character of the State of [New York], but neglect[s] to note that the right of Congress to use compulsory process in aid of its investigations also enjoys a certain dignity within our governmental system."  *Harris v. Bd. of Govs. of Fed. Rsrv. Sys.*, 938 F.2d 720, 723-24 (7th Cir. 1991).

### III.    The Balance Of Equities And Public Interest Favor Congressional Defendants

In weighing the balance of equities and public interest, because Congressional Defendants are the federal government, these last two factors "merge." *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court "must balance the competing claims of injury," paying "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.

While Plaintiff fails to show that he would suffer any irreparable harm without a preliminary injunction, an injunction would hamper the Committee's ongoing investigation, inflicting the legally protectable harms of loss of information and the institutional diminution of subpoena power on the Committee. *See Miers*, 558 F. Supp. 2d at 71.  Congress's "power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function." *McGrain*, 273 U.S. at 174. There is a "clear public interest in maximizing the effectiveness of the investigatory powers of Congress," and "the investigatory power is one that the courts have long perceived as essential to the successful discharge of the legislative responsibilities of Congress." *Exxon Corp.*, 589 F.2d at 594. Even in the less-pressing context of administrative investigations, which derive from statutory authority (while Congress's power of investigation is derived from the Constitution itself), there is "a strong public interest in having [such] investigations proceed 'expeditiously and without impediment.'" *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Res. Trust Corp.*, 5 F.3d 1508, 1514 (D.C. Cir. 1993) (citation omitted).  The public interest in expeditious and unimpeded Congressional investigations is even more compelling. *Cf. Exxon Corp.*, 589 F.2d at 593-94.

The requested relief would, itself, improperly usurp the Committee's constitutional power to investigate and conduct oversight.  No outside entity, whether a subpoena recipient like Pomerantz or his former employer, is permitted to challenge "the wisdom of the congressional approach or methodology." *Eastland*, 421 U.S. at 509.

### CONCLUSION

For these reasons, Plaintiff's motion for a temporary restraining order and preliminary injunction should be denied.

Respectfully submitted,

*/s/ Matthew Berry*
MATTHEW BERRY
  *General Counsel*
TODD B. TATELMAN
  *Deputy General Counsel*
BROOKS M. HANNER
SARAH CLOUSE
BRADLEY CRAIGMYLE
  *Associate General Counsels*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
matthew.berry@mail.house.gov

*Counsel for Congressional Defendants*

April 17, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on April 17, 2023, I caused the foregoing document to be filed via the CM/ECF system for this Court, which I understand caused service on all registered parties.  I further certify that I served a copy of the foregoing via the United States Postal Service and served a courtesy copy via email on the following non-registered filer:

Mark Pomerantz
128 East Broadway, Unit 793
New York, NY 10002

/s/ *Matthew Berry*
Matthew Berry