# Exhibit D

# The Washington Post
*Democracy Dies in Darkness*

JUSTICE

# The prosecutor, the ex-president and the 'zombie' case that came back to life

By Mark Berman, Shayna Jacobs, Devlin Barrett and Josh Dawsey
March 17, 2023 at 6:54 p.m. EDT

It was just weeks into Manhattan District Attorney Alvin Bragg's time in office, and he was being assailed on multiple fronts.

A memo he had released outlining his strategy for prosecuting crimes in New York City was being vilified by critics, including the mayor and police commissioner. Bragg became a punching bag across cable news and on tabloid covers. Then two prosecutors from his office quit in protest over what they called Bragg's decision not to prosecute former president Donald Trump. People who know Bragg say he was deeply stung by the criticism.

The district attorney soon issued an unusual public statement — emphasizing that the investigation into Trump and his business was far from over and that a team of investigators was "exploring evidence not previously explored."

The message he wanted conveyed, it seemed, was simple: I'm still on this.

Almost a year later, Bragg's investigation into one particular issue involving Trump — a payment made before the 2016 presidential election to an adult-film actress to keep her from publicly discussing an affair she said she had with Trump years earlier — appears to be nearing its conclusion.

A grand jury in Manhattan looking at the case could be on the precipice of charging Trump with a crime, though no decision has been announced and it remains unclear whether the group will issue an indictment or when that could happen.

This looming legal decision comes against a backdrop of high-profile challenges for Bragg, a Democrat who took office at the start of last year, and Trump, a former president who lost his reelection bid to Joe Biden in 2020 and is running for that office again amid a thicket of ongoing investigations.

Trump has lumped this case in with others, including the ongoing investigations into his handling of highly classified material and his efforts to overturn the 2020 election results, denying wrongdoing and denouncing the probes as part of a system that's out to get him.

For Bragg, meanwhile, the case is a high-wire balancing act for an official who has navigated controversies before but could find himself both being praised and pilloried if he becomes the first prosecutor to criminally charge a former president.

Bragg has been circumspect in his public remarks about the Trump probe, saying mainly that investigators were continuing their work. After his office won a conviction of Trump's namesake business for tax crimes last year, Bragg noted in one interview: "We're going to do our talking in the courtroom."

Some legal experts, though, are scratching their heads about why this particular investigation might be the first one to result in Trump being indicted. They describe it as an unusual case, given the potential charges involved as well as the fact that prosecutors have repeatedly examined the long-established details but decided not to pursue charges against him.

The case involves a $130,000 payment that Michael Cohen, a former Trump attorney and confidant turned nemesis, made to Stormy Daniels, an adult-film actress, before the 2016 presidential election.

Daniels, whose real name is Stephanie Clifford, had told people years earlier that she had an affair with Trump, which he has long denied. Cohen has acknowledged making the payment, saying he did so expecting to be reimbursed; that refund was allegedly documented as payment for legal work.

Cohen later served time in prison after pleading guilty in two criminal cases in 2018, including one involving campaign finance violations related to payments made to Daniels and another woman alleging an affair with Trump. During one of his guilty pleas, Cohen said he acted at Trump's direction and described the payments as intended to influence the 2016 election by keeping the women from sharing their stories publicly.

Cohen has also pleaded guilty to other crimes, including lying to Congress, and his credibility has been an issue that has left some authorities deeply wary of relying on him in bringing cases. Bragg and his team, for instance, initially expressed skepticism about bringing any criminal case that hinged on Cohen, according to a person familiar with the matter who spoke on the condition of anonymity to describe private conversations and a former prosecutor in the district attorney's office whose recently published book included details about its inner workings.

At times in 2022, officials in the office of New York Attorney General Letitia James (D) complained that Bragg's office seemed uninterested in pursuing criminal charges against Trump and pushed for a more aggressive posture, said two people familiar with the matter who also spoke on the condition of anonymity to describe private conversations. Asked to respond, an official in James's office said she did not believe the lawyers in the attorney general's office shared this view.

Prosecutors scrutinizing Trump and the payment case in Manhattan are believed to be considering state charges of falsifying business records, which is a misdemeanor but can be elevated to a felony if records are falsified to cover up or commit another crime. In this case, the underlying crime could involve concealing the true nature of a campaign donation.

> **Ongoing investigations involving Donald Trump**
>
> Donald Trump is facing historic legal scrutiny for a former president, under investigation by the Justice Department, district attorneys in Manhattan and Fulton County, Ga., and a state attorney general. He denies wrongdoing.

Here is a list of the key investigations and where they stand.

It is unlikely that any new facts or witnesses have emerged since Cohen first publicly discussed the Daniels payment in 2018, according to a person with knowledge of the case. This person, speaking on the condition of anonymity to discuss a sensitive matter, said Cohen was interviewed at length earlier in the probe by investigators for Cyrus Vance Jr., the previous Manhattan district attorney, and the parameters of the case have "been known for years."

During Vance's tenure, the investigative team considered attaching charges related to the Daniels payment to a prosecution involving alleged manipulation of asset valuations — if such a case were brought against Trump, at least — because it did not seem worthwhile or practical to bring the false records case on its own, the person said.

Bragg has suggested that his team was conducting a broad review of the case. His office declined to comment for this article and declined to make him available for an interview.

Whatever Bragg decides on the Trump question will undoubtedly become a defining part of his tenure as district attorney.

Bragg, a veteran prosecutor and former deputy to New York's attorney general, won the job in 2021 pledging to institute reforms, becoming the fourth person elected Manhattan district attorney since World War II.

His early tenure, though, was almost immediately beset by controversy.

Days after assuming office, Bragg issued a memo outlining his prosecutorial policy and describing a more lenient approach to certain crimes. The 10-page "Day One" memo, as it was called, listed certain charges that his office would generally not prosecute, including resisting arrest, and it ignited outrage.

One of its critics, Keechant Sewell, the New York City police commissioner, told officers she was "very concerned" about how the memo could affect public safety. Bragg issued an update, saying that his original memo had "been a source of confusion" and that cases would be assessed individually.

Those loudest outcries that greeted Bragg in office have cooled down somewhat. Kathryn Wylde, the chief executive of the Partnership for New York City, a nonprofit group made up of businesses and their leaders, described Bragg as turning a tide since those early days. Wylde said that after she sharply criticized Bragg's policy memo last year, he called her, asked for a meeting, and began huddling with business leaders and groups to talk about shoplifting and other street crimes.

"There was great fear when that memo was circulated that he was going to encourage rather than prosecute crime," she said in an interview. "But I think he has won over much of New York."

Soon after revising his policy memo, Bragg found himself facing more criticism, some of it from within his own office.

Two prosecutors working on his office's investigation into Trump's business dealings resigned. One of them wrote a resignation letter indicating that he felt frustrated that the Trump case had "been suspended indefinitely."

The ex-prosecutor, Mark Pomerantz, wrote that Trump's financial statements included lies about his assets, and said Vance, the previous district attorney, had directed officials to seek an indictment. (Vance declined to seek another term, opening the door to Bragg taking office.)

Pomerantz's letter also called Bragg misguided for not prosecuting Trump. This departure spurred another round of public criticism for Bragg, who issued his statement pledging that the Trump investigation was ongoing.

Pomerantz, who resigned less than two months after Bragg became district attorney, went on to write a book that published last month, laying out what he says unfolded amid these Trump investigations in Manhattan. The book included his depictions of meetings that focused on the case, criticized Bragg and others within his office, and argued that Trump should be prosecuted.

What still remains unclear is why Bragg and his office seemingly pivoted from a probe centered on Trump's alleged practice of overvaluing his assets to the hush money issue that now appears to be the grand jury's focus. Within Bragg's office, this matter had been known in the past as the "zombie" case.

The case has gained some momentum this year. Bragg's office convened a new grand jury in January to evaluate the issue. Grand jury proceedings are generally kept secret, so it remains unknown precisely what has unfolded before the panel.

Cohen has made multiple appearances before the grand jury, speaking to reporters near where they have met. An attorney for Daniels has said she spoke with prosecutors recently. Bragg also gave Trump an opportunity to appear before the grand jury, which legal experts say is typically among the things that happen late in such a probe.

Trump has said he never had an affair with Daniels and described her as extorting him. He also lambasted the case. In a lengthy statement posted on social media last week, Trump insulted Daniels's physical appearance, belittled Bragg and described this case, along with others scrutinizing him, as "a weaponization of our judicial system." He has also repeatedly criticized Cohen.

A spokesman for Trump this week issued a statement maintaining that Trump was innocent and suggesting he is being targeted to weaken him in next year's presidential election. An attorney for Trump also wrote a letter last week to New York City's Department of Investigation, demanding an investigation of Bragg's office and accusing it of conducting a "politically motivated investigation."

A criminal case against Trump stemming from the Daniels payment could face at least one significant hurdle: relying even in part on testimony from Cohen, the former Trump attorney.

So far, Cohen has been the only person charged in connection with the Daniels payment. When Cohen pleaded guilty in 2018, saying he worked "in coordination" with Trump to silence Daniels and another woman before the 2016 election, his attorney questioned why these actions were not criminal for the then president. Long-standing Justice Department policy bars federal prosecutors from charging a sitting president with a crime. But after Trump left office, federal authorities still chose not to pursue him over the Daniels payment.

Concerns about Cohen's credibility have long dogged the investigations of the Daniels hush money payments, according to people familiar with the matter who spoke on the condition of anonymity to describe internal discussions.

Legal experts expressed varying degrees of confidence in the wisdom of indicting Trump in state court for the Daniels payments, particularly after the case seemed for so long to be going nowhere.

Election and civil rights lawyer Leo Glickman said such a charge against Trump "fits within the letter of the law," though he added that he can't think of a previous case "in which the law has been used in precisely this way."

"I'm very curious to see what he does, because it is novel, but that doesn't make it nonviable," said Glickman, a veteran election and civil rights lawyer based in Brooklyn.

Other analysts noted that there was also a risk of such charges being knocked down or reduced in pretrial motions, and that could have repercussions well beyond New York City.

"It is certainly a winnable case, but given the legal landscape, it would hardly be the first criminal case that I would bring against Donald Trump," said Robert Katzberg, a white collar defense attorney for Holland & Knight who has tried cases in New York courts for decades.

"Prosecutors follow the principle that you must win the first case," Katzberg said.

Katzberg said it appears authorities have stronger cases in other areas, including the probes into Trump's efforts to undo 2020 election results and whether he mishandled classified documents and obstructed government efforts to retrieve those materials. Prosecutors running those inquiries, Katzberg said, cannot be thrilled if Bragg brings an indictment first in the Daniels case, "unless there are some extraordinary facts lying below the public domain."

Bragg has said his office waited to take certain actions until after wrapping up a prosecution of Trump's business for tax violations. The company was convicted in December, and after it was sentenced in January, Bragg said in a telephone interview that the case's resolution allowed investigators to take other steps that, he suggested, might have been unfair during active litigation.

The tax trial's conclusion created a "moment when we are able to use some investigative steps that would have, in my judgment, been challenging before," Bragg said. While the tax case was pending, he said, serving subpoenas and interviewing witnesses would have drawn attention, which he wanted to avoid during that trial. Now, he said, "there are investigative steps which we can now more freely use" without impacting the tax case.

Randall Jackson, who worked with Bragg at the U.S. attorney's office in Manhattan and considers him a friend, called him "less politician and more prosecutor-slash-public-servant than probably a lot of people who become D.A.'s in major cities."

"While the public awaits understanding what the decisions are that are going to ultimately be made about this, someone with his background of service deserves the benefit of the doubt, in terms of the assumption of good faith and good intentions in terms of his approach," Jackson said.

Joan Illuzzi-Orbon, a former Manhattan trial prosecutor and executive in the district attorney's office, declined to discuss the Trump investigations specifically but cautioned against making judgments on a case before all the facts are laid out, saying prosecutors often have information not made public.

"You have to be super careful about just making assumptions about the strength of the case, the evidence or the skill of any party," said Illuzzi-Orbon, who won convictions in prominent cases, including of Harvey Weinstein. "You don't necessarily know everything that's going on, especially in high-profile matters."

People with knowledge of Bragg's administration dispute the idea that he lacked interest in evaluating the Trump matter — noting instead that there was pushback from Vance's team when attempts were made to get caught up on the issue before Bragg was formally sworn in. Even after, said the people, who spoke on the condition of anonymity to describe confidential events, higher-ups who asked the investigative team's leadership for information and documents felt like their requests were being dodged.

Bragg has rebuked the book, calling Pomerantz's criticism of his prosecutors "appalling." In remarks when the book came out, Bragg said he had not read it but said the case described by Pomerantz "simply was not ready."

Pomerantz also faced disapproval for the book from other attorneys, with an association of New York state prosecutors saying he violated ethical standards by writing and releasing the book during an ongoing case.

Bragg has generally declined to discuss the Trump cases in public, citing the ongoing investigation. Instead, he has pledged that people will find out more when the investigation wraps up — regardless of whether criminal charges ensue.

"We follow the facts," he told CBS New York during an interview this year. "We follow the facts and the law. And as I've said, when we conclude, we will speak either through an indictment or I will give a public statement explaining our thoughts."