# Exhibit X

## COMMITTEE ON GOVERNMENT REFORM AND OVERSIGHT

DAN BURTON, Indiana, *Chairman*

BENJAMIN A. GILMAN, New York
J. DENNIS HASTERT, Illinois
CONSTANCE A. MORELLA, Maryland
CHRISTOPHER SHAYS, Connecticut
CHRISTOPHER COX, California
ILEANA ROS-LEHTINEN, Florida
JOHN M. McHUGH, New York
STEPHEN HORN, California
JOHN L. MICA, Florida
THOMAS M. DAVIS, Virginia
DAVID M. McINTOSH, Indiana
MARK E. SOUDER, Indiana
JOE SCARBOROUGH, Florida
JOHN B. SHADEGG, Arizona
STEVEN C. LATOURETTE, Ohio
MARSHALL "MARK" SANFORD, South
  Carolina
JOHN E. SUNUNU, New Hampshire
PETE SESSIONS, Texas
MICHAEL PAPPAS, New Jersey
VINCE SNOWBARGER, Kansas
BOB BARR, Georgia
DAN MILLER, Florida

HENRY A. WAXMAN, California
TOM LANTOS, California
ROBERT E. WISE, JR., West Virginia
MAJOR R. OWENS, New York
EDOLPHUS TOWNS, New York
PAUL E. KANJORSKI, Pennsylvania
GARY A. CONDIT, California
CAROLYN B. MALONEY, New York
THOMAS M. BARRETT, Wisconsin
ELEANOR HOLMES NORTON, Washington,
  DC
CHAKA FATTAH, Pennsylvania
ELIJAH E. CUMMINGS, Maryland
DENNIS J. KUCINICH, Ohio
ROD R. BLAGOJEVICH, Illinois
DANNY K. DAVIS, Illinois
JOHN F. TIERNEY, Massachusetts
JIM TURNER, Texas
THOMAS H. ALLEN, Maine
HAROLD E. FORD, JR., Tennessee

BERNARD SANDERS, Vermont
  (Independent)

KEVIN BINGER, *Staff Director*
RICHARD BENNETT, *Chief Counsel*
WILLIAM MOSCHELLA, *Deputy Counsel and Parliamentarian*
JUDITH McCOY, *Chief Clerk*
PHIL SCHILIRO, *Minority Staff Director*

(II)



75

Mr. BURTON. We are always concerned about the safety of our witnesses.

We are now going to have Richard T. Preiss, is it?

Mr. PREISS. Preiss.

Mr. BURTON. Preiss, excuse me, and Joseph J. Dawson to testify for us.

Would you both stand and raise your right hands, please?

[Witnesses sworn.]

Mr. BURTON. Be seated.

I understand that you both have opening statements, is that correct?

Mr. PREISS. Yes, Mr. Chairman, Mr. Dawson's going to start, if that's all right with you?

Mr. BURTON. Mr. Dawson.

## STATEMENT OF JOSEPH J. DAWSON, ASSISTANT DISTRICT ATTORNEY, NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE

Mr. DAWSON. Thank you, Mr. Chairman.

Mr. Chairman and members of the committee, my name is Joseph J. Dawson. Thank you.

I am an Assistant District Attorney in the office of Robert M. Morgenthau, the District Attorney in the county of New York. I have been employed in the New York County District Attorney's Office since September 1987. My colleague, Assistant District Attorney Richard T. Preiss, and I are here pursuant to subpoenas that have been served upon us.

We have been asked to make brief statements outlining certain evidence of political corrup—I'm sorry—political contributions that we obtained in the course of a bank fraud investigation and our contacts with the U.S. Department of Justice with respect to that evidence. We have attempted to coordinate our statements to avoid repetition.

In May 1995, I was assigned to an investigation of certain Venezuelan banking groups that had conducted business through New York banks and had collapsed in December 1994. The investigation later focused on transactions conducted by Banco Progreso in Venezuela, Banco Progreso Internacional de Puerto Rico [BPIPR], and Banco Latinoamericano in the Dominican Republic. These three banks, our investigation showed, were owned by Orlando Castro Llanes, a Venezuelan citizen who moved to Miami, FL, after the collapse of his banks. Castro Llanes' son, Orlando Castro Castro, was the president of Banco Progreso in Venezuela. Jorge Castro, Castro Llanes' grandson and Castro Castro's nephew, was president of Banco Latinoamericano in the Dominican Republic. Until April 1994, he was also the president of BPIPR, which was closed by Puerto Rican banking regulators in January 1995.

In or about February—mid-February 1996, authorities in the Dominican Republic granted me, an analyst, and several investigators from our office, access to the premises and files of Banco Latinoamericano in Santo Domingo. The Dominican banking superintendent had closed the bank at the end of December 1994.

Among the items found in the office of Jorge Castro's secretary was copy of a fax dated September 16, 1992, from C. Intriago to Jorge Castro which appeared to contain instructions for payments

78

(e) Mr. Intriago subsequently told Jorge Castro that his $5,000 check would not be deposited, and he should issue a new $5,000 check to a different State Democratic organization; and,

(f) After the replacement check had been issued, Mr. Intriago called again, advising Jorge Castro that the replacement would not be deposited either, and asking him to issue yet a third check for $5,000 to a third State Democratic organization.

During his debriefing, we asked Jorge Castro why the contributions had been made. He told us that his grandfather wanted Mr. Intriago to be appointed as the United States Ambassador to the Republic of Venezuela.

Mr. Castro also told us that he and his grandfather had been invited to the inauguration in January 1993, and that the grandfather and Mr. Intriago had attended a reception at the White House in October 1993. Jorge Castro said he had not been invited to the reception, but, the day after the reception, he attended a meeting with his grandfather, Mr. Intriago and others at the State Department, during which a purported "smear campaign" against the grandfather had been discussed.

In May 1997, Mr. Castro met with Federal prosecutors. Mr. Preiss arranged that meeting and conducted most of the communications between our office and the Justice Department concerning this matter. Accordingly, Mr. Preiss will discuss these matters for you.

I have one final note. During the course of a civil forfeiture case that we brought, but which was eventually dismissed by operation of law, we obtained some additional corroboration for Jorge Castro's statements. Specifically, in an effort to show that the judge in the forfeiture case—I mean, I'm sorry—in an effort to show the judge in the forfeiture case that the Venezuelan Government had confiscated all of the grandfather's properties, one of Castro Llanes attorneys submitted a letter attaching a series of trust agreements between the Venezuelan equivalent of the FDIC and various companies. One of the trust agreements mentioned the entity, Inversiones Latinfin, and described it in terms showing that it was indeed an entity domiciled in Venezuela. These papers, therefore, were further evidence that Castro Llanes had controlled the company that, according to the bank records, apparently reimbursed Jorge and Maria Sire Castro for making the contributions in question.

I understand that the committee has a transcript of the sentencing of Jorge Castro, which details our reasons for our recommendation with respect to the sentence. I have little to add beyond my remarks at the sentencing of Mr. Castro, and beyond what I have already said here today. I'm at the committee's disposal, however, if there are any questions.

Mr. BURTON. Thank you, Mr. Dawson.

Mr. Preiss.

**STATEMENT OF RICHARD T. PREISS, ASSISTANT DISTRICT ATTORNEY, SENIOR INVESTIGATIVE COUNSEL, NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE**

Mr. PREISS. Preiss.

Mr. BURTON. Preiss?