UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALVIN L. BRAGG, JR., in his official capacity as District Attorney for New York County,<br><br>       *Plaintiff,*<br><br>      v.<br><br>JIM JORDAN, in his official capacity as Chairman of the Committee on the Judiciary; COMMITTEE ON THE JUDICIARY OF THE UNITED STATES HOUSE OF REPRESENTATIVES; and MARK F. POMERANTZ,<br><br>       *Defendants*. | Case No. 1:23-cv-03032 |

**BRIEF OF FORMER MEMBERS OF CONGRESS, PROSECUTORS AND OTHER INTERESTED PARTIES AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF ALVIN L. BRAGG, JR.'S MOTION FOR INTERIM INJUNCTIVE RELIEF**

E. Danya Perry
Joshua Stanton (*pro hac vice* forthcoming)
PERRY GUHA LLP
1740 Broadway, 15th Floor
New York, NY 10019
(212) 399-8330
dperry@perryguha.com
jstanton@perryguha.com

Fred Wertheimer (*pro hac vice* forthcoming)
DEMOCRACY 21 EDUCATION FUND
2000 Massachusetts Avenue NW
Washington, DC 20036
Tel: (202) 355-9600
fwertheimer@democracy21.org

*Counsel for Amici Curiae*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................... 1

INTEREST OF *AMICI* ......................................................................................................... 2

ARGUMENT ......................................................................................................................... 2

    I.       Congress Lacked the Authority to Issue the Instant Subpoena .............................. 2

            A.      The Subpoena Threatens Attorney Work Product Privilege ...................... 5

            B.      The Subpoena Threatens the Law Enforcement Privilege .......................... 6

            C.      The Subpoena Threatens Grand Jury Secrecy ............................................ 7

            D.      The Subpoena Threatens the Public Interest and
                     Deliberative Process Privileges .................................................................. 8

CONCLUSION ...................................................................................................................... 9

## TABLE OF AUTHORITIES

**Cases**

*Douglas Oil Co. of California v. Petrol Stops Nw.,*
  441 U.S. 211 (1979). ............................................................................................................. 8

*Gregory v. Ashcroft,*
  501 U.S. 452 (1991) .......................................................................................................... 3, 4

*Hopkins v. U.S. Dep't of Hous. & Urb. Dev.,*
  929 F.2d 81 (2d Cir. 1991)................................................................................................... 8

*Hickman v. Taylor*,
  329 U.S. 495 (1947). ........................................................................................................ 5, 6

*In re McRay, Richardson, Santana, Wise, & Salaam Litig.,*
  No. 03 CIV. 9685 DAB RLE, 2011 WL 5880994 (S.D.N.Y. Nov. 22, 2011) ...........................5

*In re The City of New York,*
  607 F.3d 923 (2d Cir. 2010)............................................................................................. 6, 7

*In re World Trade Ctr. Bombing Litig.,*
  709 N.E.2d 452 (N.Y. 1999) ................................................................................................ 8

*McCoy v. City of New York,*
  No. CV 07-4143 RJD (JO), 2008 WL 3286270 (E.D.N.Y. Aug. 7, 2008) ...............................8

*McGrain v. Daugherty,*
  273 U.S. 135 (1927) ............................................................................................................. 2

*Merrill v. City of New York,*
  2005 WL 2923520 (S.D.N.Y. Nov. 4, 2005) ....................................................................... 6

*Nixon v. Adm'r of Gen. Servs.,*
  433 U.S. 425 (1977) ............................................................................................................. 3

*Palmer v. Est. of Stuart,*
  No. 02 CIV. 4076 LTS GWG, 2004 WL 2429806, (S.D.N.Y. Nov. 1, 2004).............................8

*Socialist Workers Party v. Grubisic,*
  619 F.2d 641 (7th Cir. 1980)................................................................................................ 8

*Trump v. Mazars USA, LLP,*
  140 S. Ct. 2019, 2031 (2020) ...................................................................................... 2, 4, 5

*Watkins v. United States,*
  354 U.S. 178, 187 (1957) .................................................................................................... 2

*United States v. Nobles*,
   422 U.S. 225, 238 (1975) ................................................................................................ 5

*Younger v. Harris,*
   401 U.S. 37, 44 (1971) .................................................................................................... 3

**Rules & Statutes**

N.Y. Crim. Proc. Law § 190.25(4)(a) ............................................................................... 7

**Other Authorities**

Letter from Attorney General William French Smith to Rep. John D. Dingell (Nov. 30,
   1982) *reprinted in* EPA Withholding of Superfund Files: Hearing Before the House
   Comm. on Energy and Commerce, 97th Cong., 2d Sess. 220, 222 (1982) .................................. 3

Letter from Rep. Jim Jordan, H. Comm. on the Judiciary, to Mr. Mark F. Pomerantz,
   Former N.Y. Co. Special Assistant District Att'y (Apr. 6, 2023)
   https://judiciary.house.gov/sites/evo-subsites/republicans-
   judiciary.house.gov/files/evo-media-document/2023-04-06-jdj-to-pomerantz-
   subpoena.pdf .................................................................................................................... 7

Luke Broadwater and Jonathan Swan, *Republicans Vowed to Grill Bragg About Trump,
   but It's Not So Simple*, N.Y. Times (Apr. 5, 2023)
   https://www.nytimes.com/2023/04/05/us/politics/house- republicans-bragg-subpoena-
   trump.html. ...................................................................................................................... 9

## PRELIMINARY STATEMENT

Our federal system of government can, from time to time, create truly difficult questions about the balance of power between the states and the federal government. This case is not one. Congress has no authority to interfere with an ongoing criminal prosecution, particularly one brought by a state prosecutor. That calculus does not change just because the defendant whom a grand jury indicted happens to be a former President of the United States. Nor does it change when members of Congress attempt to characterize their unlawful interference as "oversight."

*Amici* are former members of Congress, former prosecutors, former government attorneys, and scholars who have an interest in ensuring an appropriate balance between an efficient and effective justice system, and the needs of legislators to engage in lawful oversight and legislation. Such a balance allows for wide congressional investigations. However, longstanding norms rooted in the Constitution have prevented Congress from intruding upon criminal investigations, and even more certainly from interference with active prosecutions. That has most commonly been seen in the case of federal prosecutions, based upon separation of powers principles. As to state prosecutions, that limitation on congressional action is equally strong—or stronger—given our system of federalism, the distribution of power between the federal government and the states.

In establishing the delicate equilibrium in our system of federalism, the Framers sought to avoid the very danger present in this case—that of politically motivated intrusion into a core element of state authority enshrined in the text, structure, and history of the Constitution as well as in the Tenth Amendment. Of course, *Amici* are not passing judgment on the merits of the underlying case. But they are united in expressing that this congressional incursion into the functioning of the Manhattan District Attorney's office is an egregious and unconstitutional overreach that should not be countenanced by this Court.

**INTEREST OF *AMICI***

*Amici* are former members of Congress, former prosecutors, former government attorneys, and scholars who have an interest in ensuring an appropriate balance between an efficient and effective justice system and the needs of legislators to engage in lawful oversight and legislation—and collectively have decades of experience in congressional oversight or prosecuting cases at the state and federal level. They seek leave of the Court to file this *amicus* brief. They have substantial experience with the structure and process of congressional and law enforcement investigations, including investigations involving public officials. Given their decades of public service, familiarity with the congressional, law enforcement, and constitutional matters at issue here, and commitment to the rule of law, *Amici* maintain an active interest in the proper resolution of the important questions raised by the Plaintiff's request for interim injunctive relief.

**ARGUMENT**

**I.    Congress Lacked the Authority to Issue the Instant Subpoena**

U.S. Supreme Court and other precedent makes clear that Congress lacks the power to issue the subpoena at issue in this case. That is not to say Congress does not have broad investigative authority. Indeed, such a power was "asserted and exerted" by the very first Congress, and has long been understood to be part of the legislative power granted by Article I. *See McGrain v. Daugherty*, 273 U.S. 135, 161 (1927). Nevertheless, that power is not specifically enumerated in the Constitution and has been carefully limited by the Supreme Court. "Most importantly, a congressional subpoena is valid only if it is 'related to, and in furtherance of, a legitimate task of the Congress.'" *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (quoting *Watkins v. United States*, 354 U.S. 178, 187 (1957)).

2

Intruding upon a state prosecution as the instant subpoena would do is not "related to, and in furtherance of, a legitimate task of Congress." Indeed, quite the opposite. The Supreme Court has explained that the system of federalism enshrined in the Constitution anticipates that "the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Younger v. Harris*, 401 U.S. 37, 44 (1971). According to the Court, that has resulted in a "fundamental policy against federal interference with state criminal prosecutions." *Id.* at 46. Allowing Congress to deploy its investigative powers to disrupt an ongoing state prosecution would "upset the usual constitutional balance of federal and state powers," a step that the Supreme Court ordinarily presumes is not Congress's intention. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Such interference could specifically compromise the integrity and effectiveness of state prosecutions in ways that echo the Justice Department's traditional reluctance to share files with Congress concerning open law enforcement investigations.[1]

It has been understood since the founding of our nation that the separation of powers among the several branches of federal government and federalism itself are "the two great structural principles of the American constitutional system," designed to prevent too great a consolidation of power in any one entity. *See Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 507 (1977) (Burger, C.J., dissenting) (citations omitted). "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any

---

[1] "[O]bjections to the disclosure of law enforcement files [to Congress] include the potential damage to proper law enforcement which would be caused by the revelation of sensitive techniques, methods or strategy, concern over the safety of confidential informants and the chilling effect on sources of information if the contents of files are widely disseminated, sensitivity to the rights of innocent individuals who may be identified in law enforcement files but who may not be guilty of any violation of law, and well-founded fears that the perception of the integrity, impartiality and fairness of the law enforcement process as a whole will be damaged if sensitive material is distributed beyond those persons necessarily involved in the investigation and prosecution process." Letter from Attorney General William French Smith to Rep. John D. Dingell (Nov. 30, 1982) *reprinted in* EPA Withholding of Superfund Files: Hearing Before the House Comm. on Energy and Commerce, 97th Cong., 2d Sess. 220, 222 (1982).

3

one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory v. Ashcroft*, 501 U.S. at 458.

The Supreme Court's reasoning as to the limits of Congress' power to intrude into the Executive Branch is therefore instructive in determining the limits of Congress' power to intrude into an otherwise generally protected state function. Applying the analogous *Mazars* factors to the subpoena at hand would impose a four-part test as to the subpoena's appropriateness: first, "the asserted legislative purpose" would have to "warrant[] the significant step of" interfering with a lawful state investigation and could not be a "'case study for general legislation," *see Mazars* at 2035; second, the interference sought would have to be "no broader than reasonably necessary to support Congress's legislative objective," *see id.* at 2036; third, the interference would have to be supported by "detailed and substantial" evidence of Congress's legislative purpose, *see id.*; and fourth, "the burdens imposed" by the interference must be justified by its legitimate aims, *see id.*

*Amici* agree with the arguments set forth in Plaintiff's Memorandum of Law in Support of The District Attorney's Motion for a Temporary Restraining Order and Preliminary Injunction (ECF No. 8) [hereinafter "Pl.'s Mem. of Law"] as to why the subpoena at issue here fails the first three parts of the test articulated in *Mazars*. See Pl.s Mem. of Law at 13–18. This *amicus* brief focuses on the fourth aspect of the test, specifically as to the "burdens imposed" by the subpoena, which *Amici* are uniquely suited to address given their backgrounds in this area. There are a number of burdens, and none of them are justified by any of the well-documented political aims of the subpoena. (*See* Compl. ¶ 7 (noting that "Chairman Jordan and his congressional allies have changed their story multiple times, creating as it suits them a scattershot hodgepodge of new purported legislative interests").) There may well be other cases in which the high *Mazars*' hurdle

is overcome by other congressional subpoenas relating to a state prosecution. But this one does not pass muster.

### A.       The Subpoena Threatens Attorney Work Product Privilege

The Supreme Court has recognized that that "[t]he interests of society and the accused in obtaining a fair and accurate resolution of the question of guilt or innocence demand that adequate safeguards assure the thorough preparation and presentation of *each side* of the case." *United States v. Nobles*, 422 U.S. 225, 238 (1975) (emphasis added). Consequently, this Court has previously held that "[p]rosecutors are entitled to the same 'zone of privacy' and qualified work product protection of their mental impressions, thoughts and opinions as other attorneys." *In re McRay, Richardson, Santana, Wise, & Salaam Litig.*, No. 03 CIV. 9685 DAB RLE, 2011 WL 5880994, at *3 (S.D.N.Y. Nov. 22, 2011).

Allowing this subpoena to stand threatens to allow for the pre-trial broadcast of the thoughts and opinions of not just the targeted former prosecutor, Mark Pomerantz, but also those who communicated freely with an expectation of confidentiality throughout the former prosecutor's tenure with the Manhattan District Attorney's office. This is not simply a matter of avoiding embarrassment. The Supreme Court long ago explained the justification for protecting attorney work product:

> [A] lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference.

*Hickman v. Taylor*, 329 U.S. 495, 510–11 (1947). Accordingly, the Supreme Court held that "[n]ot even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney." *Id.* at 510. A violation of that privilege in this instance threatens

to air critical and private thoughts and impressions of the many lawyers in the Manhattan District Attorney's office. As the Supreme Court noted in *Hickman*, allowing such inquiry would have devastating consequences to the practice of lawyers: "The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served." *Id.* at 511.

Such a rule does not change as a result of the book Mr. Pomerantz published or his public statements about his tenure at the Manhattan District Attorney's office or about the underlying prosecution at issue here. That privilege is retained by the prosecuting office, rather than the individual attorney. *See Merrill v. City of New York*, 2005 WL 2923520, at *1 n.2 (S.D.N.Y. Nov. 4, 2005). A former prosecutor has neither the authority nor the power to unilaterally waive work product protections for a whole office. To find otherwise would subject every prosecutor's office and law firm in the country subject to have their files become broadly discoverable any time a former employee discussed their prior tenure or experience. Not surprisingly, that is not the law. It is therefore of no import whether the target of the subpoena in this case has already revealed any of his mental impressions about the prosecution at issue. Further revelations would still serve to hamper the fair administration of justice in this case. And, as Plaintiff astutely noted, re-airing of revelations already publicly distributed would be of no further assistance to Congress in its legislative functioning: it can already glean that information from the public record. *See* Pl.'s Mem. of Law at 22.

**B.     The Subpoena Threatens the Law Enforcement Privilege**

Under Second Circuit precedent, the law enforcement privilege protects "information pertaining to law enforcement techniques and procedures, information that would undermine the confidentiality of sources, information that would endanger witness and law enforcement

6

personnel or the privacy of individuals involved in an investigation, and information that would otherwise interfere with an investigation." *In re The City of New York*, 607 F.3d 923, 944 (2d Cir. 2010).

The subpoena at issue in this case threatens to undermine the protections established by the law enforcement privilege. The purported justification of the subpoena itself makes that abundantly clear. *See* Ltr. from Rep. Jim Jordan, H. Comm. on the Judiciary, to Mr. Mark F. Pomerantz, Former N.Y. Co. Special Assistant District Att'y (Apr. 6, 2023). As Judiciary Committee Chairman Jordan explained, the Judiciary Committee wishes to question Mr. Pomerantz as to the information and decision-making processes that went into the ultimate choice to seek an indictment against former President Trump. *See id.* Such questioning would inevitably provoke responses subject to the law enforcement privilege, further undermining the state prosecutorial function and unnecessarily endangering witnesses and law enforcement personnel. The risks to personal safety of those involved in the underlying case are more than theoretical. As the Complaint details, a number of individuals involved in the underlying prosecution have already been subjected to death threats. Compl. ¶¶ 50–55.

### C. The Subpoena Threatens Grand Jury Secrecy

Under New York law, "[g]rand jury proceedings are secret" and it is generally unlawful for any person to "disclose the nature or substance of any grand jury testimony, evidence, or any decision, result or other matter attending a grand jury proceeding." N.Y. Crim. Proc. Law § 190.25(4)(a). Given the nature of the subpoena in this case, there is a very real risk that the congressional inquiry will veer into the nature and substance of information before the grand jury. That would be deeply problematic for at least three reasons.

First, it would "disturb the proper functioning of our grand jury system [that] depends upon the secrecy of grand jury proceedings." *Douglas Oil Co. of California v. Petrol Stops Nw.*, 441 U.S. 211, 219 (1979). Second, it would violate the typical comity that is required between state and federal sovereigns, whereby the federal government is "require[d] . . . [to] first seek disclosure through the avenues available to them in the state court" before demanding grand jury material through other mechanisms. *Palmer v. Est. of Stuart*, No. 02 CIV. 4076 LTS GWG, 2004 WL 2429806, at *2 (S.D.N.Y. Nov. 1, 2004) (quoting *Socialist Workers Party v. Grubisic*, 619 F.2d 641, 644 (7th Cir. 1980)). Third, it stands to violate a recognized grand jury privilege under federal law. *McCoy v. City of New York*, No. CV 07-4143 RJD (JO), 2008 WL 3286270, at *1 (E.D.N.Y. Aug. 7, 2008).

### D. The Subpoena Threatens the Public Interest and Deliberative Process Privileges

Closely related to the law enforcement privilege in New York are the public interest and deliberative process privileges. Each privilege protects confidential information held by government officials in order to promote the effective administration of government. The public interest privilege protects "certain official confidential information in the care and custody of governmental entities" that would harm the public interest if the "extremely sensitive material were to lose this special shield of confidentiality." *In re World Trade Ctr. Bombing Litig.*, 709 N.E.2d 452, 455–56 (N.Y. 1999). Likewise, the deliberative process privilege "protects the decisionmaking processes of" government officials "in order to safeguard the quality and integrity of governmental decisions." *Hopkins v. U.S. Dep't of Hous. & Urb. Dev.*, 929 F.2d 81, 84 (2d Cir. 1991).

For all of the reasons stated above, the information sought by the Judiciary Committee would harm the public interest if it were released and would undermine the integrity of

governmental decisions. The subpoena at issue therefore presents a substantial risk to the public interest and deliberative process privileges.

## CONCLUSION

Even as an isolated incident, the attempted congressional interference in this case is an outrageous and unprecedented overreach that should be swiftly rejected. But it appears to be just the beginning of congressional intrusions into active criminal investigations and cases. House Oversight Committee Chairman James R. Comer indicated that additional members of the Manhattan District Attorney's office are soon to be subpoenaed, pledging that he "fully expect[s] to see Alvin Bragg answering questions in front of Congress as soon as we can make it happen." Luke Broadwater and Jonathan Swan, *Republicans Vowed to Grill Bragg About Trump, but It's Not So Simple*, N.Y. Times (Apr. 5, 2023), *available at* https://www.nytimes.com/2023/04/06/us/politics/house-republicans-bragg-subpoena-trump.html. Those subpoenas are not (yet) before the court. But they highlight the stakes here: a headlong plunge down a slippery slope where Congress may not lawfully set foot.

*Amici* strongly urge this Court to find in favor of Plaintiff's requested interim injunctive relief. To do otherwise would be to allow the unlawful and unprecedented to become the routine, disrupting the balance of power between the states and the federal government.

9

Dated: April 17, 2023
      New York, New York

Respectfully submitted,

PERRY GUHA LLP

_____
E. Danya Perry
Joshua Stanton (*pro hac vice* forthcoming)
1740 Broadway, 15th floor
New York, NY 10019
Telephone: (212) 399-8330
Facsimile: (212) 399-8331
dperry@perryguha.com
jstanton@perryguha.com

Fred Wertheimer (*pro hac vice* forthcoming)
DEMOCRACY 21 EDUCATION FUND
2000 Massachusetts Avenue NW
Washington, DC 20036
Tel: (202) 355-9600
fwertheimer@democracy21.org

*Counsel for Amici Curiae*

**APPENDIX: LIST OF *AMICI***

The *Amici* listed below join this brief as individuals and do not represent or advise any party in the matter; institutional affiliation is noted for informational purposes only and does not indicate endorsement by institutional employers of the positions advocated in this brief.

*Former Members of Congress*

**E. Thomas Coleman** served in the U.S. House of Representatives from 1976 to 1993 (R-Missouri). Prior to his congressional service he was an Assistant Attorney General of Missouri and twice elected to the Missouri House of Representatives.

**Mickey Edwards** served in the U.S. House of Representatives from 1997 to 1993 (R-Oklahoma). He was one of the three founding trustees of the Heritage Foundation and national chairman of both the American Conservative Union and Washington's annual Conservative Political Action Conference.

**Claudine Schneider** served in the U.S. House of Representatives from 1981 to 1991 (R-Rhode Island). Before her Congressional service, Ms. Schneider was a producer and host of an NBC affiliate's public affairs program, a Federal Coordinator for the Rhode Island Coastal Zone Management Program, and Executive Director of the Conservation Law Foundation.

**Christopher Shays** served 34 years in public office (R-Connecticut), 13 years as a state representative from Stamford and 21 years as congressman for the Fourth District of Connecticut. In Congress he served as vice chairman of the Budget and Government Reform Committees, and chairman of the Government Reform Committee's National Security Committee. After Congress, Shays became co-chairman of the Commission on Wartime Contracting focusing on Iraq and Afghanistan.

*Former Prosecutors and Other Experts*

**Karen Friedman Agnifilo** served as Chief Assistant District Attorney and as Executive ADA and Chief of the Trial Division in the Manhattan District Attorney's Office under Cyrus Vance, Jr. (2010-2021); General Counsel to the New York City Mayor's Criminal Justice Coordinator (2006-2010); and an Assistant District Attorney in Manhattan (1992-2006).

**Marc Agnifilo** served as an Assistant U.S. Attorney and as an Assistant District Attorney in the Manhattan District Attorney's Office. He is currently Senior Trial Counsel at a private practice law firm where he focuses on complex criminal cases.

**Donald B. Ayer** served as Deputy Attorney General at the U.S. Department of Justice from 1989 to 1990; Principal Deputy Solicitor General of the United States from 1986 to 1989; and U.S. Attorney for the Eastern District of California from 1981 to 1986. He has argued nineteen cases in the U.S. Supreme Court.

**Benjamin Brafman** is a seasoned criminal defense attorney with one of the highest acquittal records in New York City. Before entering private practice in 1980, he served as an Assistant District Attorney in the Rackets Bureau of the New York District Attorney's Office.

**Erwin Chemerinsky** is a renowned professor of constitutional law, and the author of eight books and more than 200 articles in leading law reviews. He is the founding Dean and Distinguished Professor of Law, and Raymond Pryke Professor of First Amendment Law, at the University of California, Irvine School of Law. He was formerly a professor of law at the University of Southern California for more than twenty-one years.

**Norman L. Eisen** served as President Barack Obama's special counsel and special assistant for ethics and government reform from 2009-11. He was U.S. Ambassador to the Czech Republic from 2011–14. He served as Special Counsel to the U.S. House of Representatives Committee on the Judiciary for the first impeachment and trial of Donald Trump.

**John J. Farmer Jr.** served as an Assistant U.S. Attorney, New Jersey Attorney General, Senior Counsel to the 9/11 Commission, and Dean of Rutgers Law School, and is currently Director of the Eagleton Institute of Politics. He also served on New Jersey's Executive Commission on Ethical Standards, Advisory Committee on Judicial Conduct, and the State Commission of Investigations.

**Stuart Gerson** served as Acting Attorney General of the United States during the early Clinton Administration, as President George H.W. Bush's Assistant Attorney General for the Civil Division of the Justice Department, as an advisor to several Presidents, and as an Assistant U.S. Attorney for the District of Columbia (1972-1975).

**Renato Mariotti** served for nine years as a federal prosecutor at the at the U.S. Attorney's Office for the Northern District of Illinois. He is currently a partner at a private practice law firm where he focuses on many types of complex high-stakes litigation, including private equity and hedge fund litigation, derivative-related claims and cyber theft.

**Michael Miller** served as an Assistant District Attorney in the New York County District Attorney's Office, including three years in the Trial Division and five years in what was known then as the Frauds Bureau (1985-1993). He is currently a partner at a private practice law firm with a focus on white collar criminal defense and commercial litigation.

**Alan Charles Raul** served as Associate Counsel to the President (1986-1988); General Counsel of the Office of Management and Budget (1988-1989); General Counsel of the U.S. Department of Agriculture (1989-1993); and Vice Chairman of the White House (and, later, independent) Privacy and Civil Liberties Oversight Board (2006-2007, 2007-2008).

**Sarah R. Saldaña** served as the U.S. Attorney for the Northern District of Texas (Dallas) from 2011 to 2014 and was appointed to the Attorney General's Advisory Committee during her tenure. Since 2004, she had served as an Assistant U.S. Attorney in the same office, both as a line prosecutor, including service as the District's Election Officer, and as Deputy Criminal Chief of

the Major Fraud and Public Corruption unit. Most recently, she served as Director of U.S. Immigration and Customs Enforcement from 2014 to 2017.

**Peter Shane** is the Jacob E. Davis and Jacob E. Davis II Chair in Law at The Ohio State University's Moritz College of Law. He previously served as Attorney-Adviser in the Office of Legal Counsel (1979-1981).

**Stanley A. Twardy, Jr.** served as a United States Attorney for the District of Connecticut and Chief of Staff to Connecticut Governor Lowell P. Weicker, Jr. He is currently of counsel at a private practice law firm with a focus on criminal, civil and regulatory investigations conducted by federal and state agencies.

**Cyrus Vance, Jr.** served three consecutive terms as the Manhattan District Attorney (2010-2021). He is currently a partner at a private practice law firm with a focus on white collar criminal defense, global investigations, complex civil and criminal litigation, compliance and cybersecurity.

**William F. Weld** served as the U.S. Attorney for Massachusetts from 1981 to 1986; as the Assistant U.S. Attorney General in charge of the Criminal Division from 1986 to 1988; and as Governor of Massachusetts from 1991 until 1997.

**Shan Wu** served as counsel to Attorney General Janet Reno and was an Assistant United States Attorney in Washington, D.C.