N4jWbraO

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ALVIN L. BRAGG, JR., in his
    official capacity as District
4   Attorney for New York County,

5                    Plaintiff,

6            v.                                23 Civ. 3032 (MKV)

7   JIM JORDAN, in his official
    capacity as Chairman of the
8   Committee on the Judiciary;
    COMMITTEE ON THE JUDICIARY OF
9   THE UNITED STATES HOUSE OF
    REPRESENTATIVES; and MARK F.
10  POMERANTZ,

11                   Defendants.            Oral Argument

12  ------------------------------x
                                            New York, N.Y.
13                                          April 19, 2023
                                            2:00 p.m.
14  Before:

15                  HON. MARY KAY VYSKOCIL,

16

17                                          District Judge

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N4jWbraO

```
 1                            APPEARANCES

 2

 3   GIBSON, DUNN & CRUTCHER LLP
            Attorneys for Plaintiff
 4   BY:   THEODORE J. BOUTROUS, JR.
           LEE R. CRAIN
 5         MYLAN L. DENERSTEIN
           KATHERINE M. MEEKS
 6         -and-
     LESLIE B. DUBECK
 7   STEVEN WU
           Assistant District Attorneys
 8

 9

10   MATTHEW B. BERRY
     TODD B. TATELMAN
11         Attorneys for Defendants
           Jordan and Committee on the Judiciary
12         Office of General Counsel,
           U.S. House of Representatives
13

14

15   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
           Attorneys for Defendant Pomerantz
16   BY:   THEODORE V. WELLS, JR.
           JAKE G. ROSEN
17

18   Also Present:  Steve Castor

19

20

21

22

23

24

25
```

N4jWbraO

```
 1          (Case called; appearances noted)

 2          THE COURT:  Good afternoon.

 3          All right.  We're here for argument on plaintiff Alvin

 4   Bragg's application for an injunction with respect to the

 5   subpoena issued by the House Judiciary Committee.

 6          Will I be hearing from you first, Mr. Boutrous?

 7          MR. BOUTROUS:  Yes, your Honor.  Thank you.

 8          THE COURT:  All right.  Thank you.

 9          And by the way, I'm just going to remind people that I

10   am going to strictly enforce the time limits that we talked to

11   the parties about in advance.  Ms. Dempsey is going to keep

12   track of the time.  Obviously there are some time sensitivities

13   here, and we need to be efficient with the use of time, so

14   please bear that in mind.

15          MR. BOUTROUS:  Thank you very much, your Honor.

16          THE COURT:  Thank you.

17          MR. BOUTROUS:  Thank you.  And may it please the

18   Court, your Honor?

19          This Court should grant a temporary restraining order

20   and injunction precluding enforcement of this subpoena, which

21   raises serious federalism issues, separation of powers issues,

22   and would cause irreparable harm to the district attorney and

23   the state of New York if it is allowed to go forward.  We also

24   believe that the public interest and the equities strongly

25   favor this relief.
```

N4jWbraO

1    THE COURT:  All right.  Let me ask you at the outset,

2    Mr. Boutrous -- I know I received letters from two sets of

3    amici; everybody keeps throwing around separation of powers --

4    aren't we really talking before federalism, not separation of

5    powers here?

6    MR. BOUTROUS:  Your Honor, it's a really interesting

7    point because, here, I think separation of powers comes into

8    play in two senses.  Courts have, the D.C. Circuit and others,

9    talked about federalism raising what's a form of vertical

10   separation of powers.  It's a separation of the powers of

11   federal and state governments.

12   THE COURT:  Courts have said that or --

13   MR. BOUTROUS:  Yes.

14   THE COURT:  -- academics?

15   MR. BOUTROUS:  The D.C. Circuit has said it, and we

16   cited a D.C. Circuit case on this point, your Honor.

17   And then in terms of separation of powers, we have

18   Congress seeking to superintend the executive branch of New

19   York, the D.A. Bragg, and the judicial proceedings pending

20   before Judge Merchan.

21   THE COURT:  How?  How does the subpoena in any way

22   supersede the proceeding in the criminal case that's been

23   brought by the D.A.?

24   MR. BOUTROUS:  It doesn't supersede it, your Honor; it

25   superintends.  It oversees that proceeding.  That has been

N4jWbraO

1   the --

2              THE COURT:  Hold on a second.

3              MR. BOUTROUS:  Yes.

4              THE COURT:  I'm sorry.  Go ahead.

5              MR. BOUTROUS:  Thank you, your Honor.

6              Chairman Jordan has been very clear.  In his letter to

7   Mr. Pomerantz, he said nine times that the subpoena's purpose

8   was to conduct oversight over Attorney Bragg.

9              THE COURT:  He's talking generically about Congress

10  having oversight responsibility, and then he lays out three, as

11  I read the letter, different legislative purposes for the

12  subpoena.

13             MR. BOUTROUS:  Only after the fact, your Honor.

14  First, he doesn't talk about general oversight.  He says that

15  they want to investigate whether attorney general Bragg,

16  District Attorney Bragg is proceeding with political

17  motivation.

18             THE COURT:  He wants to investigate whether federal

19  funds are being used.  Why is that not a legitimate legislative

20  purpose for the subpoena?

21             MR. BOUTROUS:  That one, your Honor, we gave them, the

22  District Attorney's Office gave information to Chairman Jordan,

23  offered to meet and confer, offered to provide additional

24  information.  Mr. Pomerantz's declaration says he has no

25  knowledge whatsoever of federal funds.

N4jWbraO

<table>
<tr><td>1</td><td>THE COURT:  If he has no knowledge, it'll be a short</td></tr>
<tr><td>2</td><td>deposition.</td></tr>
</table>

1          THE COURT:  If he has no knowledge, it'll be a short

2    deposition.

3          MR. BOUTROUS:  **Well, it would be, your Honor, perhaps**

4    **if you were supervising it.  But Chairman Jordan will be, and**

5    **he rules on objections.  He's already said that he believes**

6    **there's been a waiver of all privileges that Mr. Pomerantz may**

7    **have possessed as a member of the District Attorney's Office.**

8          THE COURT:  Tell me, Mr. Boutrous, how does this book,

9    which is chock-full of what Mr. Pomerantz calls insider

10   account, how does it not disclose mental impressions,

11   deliberations of the office, the internal workings of the

12   D.A.'s office?  How is there not a waiver?

13         MR. BOUTROUS:  Your Honor, the District Attorney's

14   Office did not waive anything -- in fact, objected and asked

15   for pre-publication review.

16         THE COURT:  And he said no, right?

17         MR. BOUTROUS:  He said no.

18         THE COURT:  And what steps did the D.A.'s office take

19   to preserve its privilege?

20         MR. BOUTROUS:  I'll let Ms. Dubeck give the Court some

21   information.

22         THE COURT:  OK.  We can defer that if you want.

23         MR. BOUTROUS:  Yes.

24         THE COURT:  I don't want to interrupt.

25         MR. BOUTROUS:  I'll let Ms. Dubeck address it, because

N4jWbraO

1    a number of significant steps were taken.

2          But your Honor, here, in *Mazars*, the Supreme Court

3    said that the court did not have to blind itself to what

4    everyone can see.  Chairman Jordan, Chairman Comer of another

5    committee, the speaker of the house have all made clear that

6    this subpoena is part of a targeted effort to intrude on the

7    sovereignty of New York, to intimidate District Attorney Bragg.

8          THE COURT:  That's your interpretation of it.  I'm

9    quite certain Congress never used those terms -- quite certain.

10          MR. BOUTROUS:  Well, they didn't use "intimidate,"

11   your Honor.

12          THE COURT:  Correct.

13          MR. BOUTROUS:  But the speaker of the house said we

14   are going to hold the district attorney to account and hold him

15   accountable.  The speaker of the house unleashed investigations

16   specifically regarding the district attorney.  It's never been

17   clear -- and I hear your Honor.  We don't have to read their

18   minds.  They've been very, very explicit.

19          THE COURT:  In fact, doesn't the case law all say that

20   I shouldn't try to read the minds of either side here?

21          MR. BOUTROUS:  Exactly, your Honor.

22          THE COURT:  If there's a valid legislative purpose,

23   that's the end of the inquiry, right?

24          MR. BOUTROUS:  No, your Honor.  Here -- well, first

25   let me address that.

N4jWbraO

1          THE COURT:  Yes.

2          MR. BOUTROUS:  On the reading of the minds, the Court

3    does not have to do that here.  I don't think there's probably

4    been in history a more explicit, repeated expression of

5    improper legislative purposes.  For them to supervise, to

6    interrogate -- as you know, your Honor, they sought information

7    from the district attorney himself, wanted to take his

8    deposition.  They haven't given that up.

9          THE COURT:  That's not what we're here on today.

10         MR. BOUTROUS:  I totally understand, your Honor.

11         THE COURT:  Right?

12         MR. BOUTROUS:  But this is an ongoing criminal

13   prosecution, and they want information about it, about the

14   investigations.

15         Yes.  Let me go back to the book, your Honor.

16         THE COURT:  It's hard to avoid it.

17         MR. BOUTROUS:  I know.

18         THE COURT:  Isn't it, Mr. Boutrous?

19         MR. BOUTROUS:  I knew you were going to ask me about

20   it.

21         THE COURT:  Well?

22         MR. BOUTROUS:  And let me explain.

23         First of all, they've got the book.  So why do they

24   need Mr. Pomerantz?

25         THE COURT:  Look, you're a very experienced litigator,

N4jWbraO

| | |
|---|---|
| 1 | Mr. Boutrous.  You know full well that just because someone has |
| 2 | some information doesn't mean that they're not allowed to |
| 3 | inquire further in the manner in which they wish to inquire. |
| 4 | And in fact, with respect to congressional subpoenas, that's |
| 5 | what the cases say.  It's not for the courts to tell Congress, |
| 6 | if it's about a subpoena, how to conduct an inquiry. |
| 7 | MR. BOUTROUS:  Two things, your Honor. |
| 8 | First, the Supreme Court's *Mazars* decision really |
| 9 | changed the landscape.  It didn't get as much play when it came |
| 10 | out in terms of its significance.  It does say that the courts |
| 11 | can tell Congress the scope of their subpoena. |
| 12 | THE COURT:  Justice Roberts, at the very beginning of |
| 13 | his opinion in *Mazars*, talks about the fact that that subpoena |
| 14 | in that case set up a clash between Congress and the President, |
| 15 | two political branches.  We are talking separation of powers |
| 16 | there, and he says, "that distinctive aspect necessarily |
| 17 | informs our analysis of the question before us." |
| 18 | MR. BOUTROUS:  Yes, your Honor. |
| 19 | THE COURT:  Which is not what we have here. |
| 20 | MR. BOUTROUS:  I think we have at least as weighty |
| 21 | concerns.  The federalism concerns, you have the federal |
| 22 | Congress jumping in and haranguing the district attorney when |
| 23 | the prosecution is ongoing, and that is a blatant federalism |
| 24 | violation.  The other separation of powers, your Honor -- |
| 25 | THE COURT:  That's a different issue, though, of |

N4jWbraO

```
 1    whether the subpoena has a valid legislative purpose and

 2    whether I have any power to interfere with a congressional

 3    investigation.  There's politics going on on both sides here.

 4    Let's be honest about that.

 5            MR. BOUTROUS:  I don't concede that there's politics

 6    going on on the district attorney's side, your Honor, but let

 7    me address --

 8            THE COURT:  Mr. Boutrous, what did half of the

 9    pictures and allegations in your complaint have to do with the

10    subpoena?

11            MR. BOUTROUS:  Well, they were --

12            THE COURT:  That's rhetorical.

13            MR. BOUTROUS:  Yes.  I mean it was President Trump and

14    the chairman.

15            THE COURT:  Yes, which had nothing to do with the

16    subpoena before me or the issue I need to decide.

17            MR. BOUTROUS:  Let's put those aside, because you

18    asked about the separation of powers.

19            THE COURT:  Yes.

20            MR. BOUTROUS:  The *Kilbourn* case that we cited was a

21    subpoena from Congress.  It was filed against members -- the

22    action was filed, and the Supreme Court held that because,

23    there, the subpoena was regarding a pending bankruptcy

24    proceeding, that it was a judicial act.  It was inquiring about

25    an ongoing proceeding, and the court held that was --
```

N4jWbraO

1          THE COURT:  In federal court.  You had Congress and
2     the federal judiciary, so there you do have a
3     separation-of-powers question.

4          MR. BOUTROUS:  But the question was was it a
5     legislative or judicial act?  The Supreme Court said because it
6     was an invasion of an ongoing matter, it was a judicial act.

7          THE COURT:  With no validly stated legislative
8     purpose.

9          MR. BOUTROUS:  Well, here, your Honor, they have
10    stated their purpose.

11         THE COURT:  All right.

12         MR. BOUTROUS:  And they pin these other specious
13    purposes that they claim they're seeking.  The Alvin act, your
14    Honor, we cited in our reply which we submitted yesterday.

15         THE COURT:  They cited it too, I think.

16         MR. BOUTROUS:  They cited.

17         THE COURT:  Isn't that proof that they are, in fact,
18    considering legislation going to some of these issues?

19         MR. BOUTROUS:  No, your Honor.  And in fact, the Alvin
20    act --

21         THE COURT:  How is it not?

22         MR. BOUTROUS:  But let's take them at their word, that
23    they are going to consider the Alvin act, which I find to be a
24    rather disrespectful name, but let me give you the -- it's a
25    bill of attainder.  It's specifically directed solely at this

N4jWbraO

1    district attorney to punish him.

2         THE COURT:  Yes, but Mr. Boutrous, what you're doing

3    now is you're arguing about what would be the validity or maybe

4    even the constitutionality of the act should it be enacted into

5    law.  And I'm not permitted, under the long line of cases,

6    including *Mazars*, to look at what would be the ultimate

7    constitutionality of legislation that Congress may or may not

8    pass.

9         MR. BOUTROUS:  Totally agree, your Honor.  But *Mazars*

10   does give you much more leeway, and here's why.  It holds that

11   even if they do articulate an ostensible proper purpose, then

12   the Court applies the four-part test in *Mazars*.

13        THE COURT:  It says on the facts of *Mazars*, where you

14   have executive privilege implicated or where you have the

15   executive office implicated.  These are four considerations

16   that I might or a court might want to take into account, and it

17   goes on to say there may be others.

18        MR. BOUTROUS:  However, your Honor, by the time it

19   went back to the D.C. Circuit, it was former President Trump.

20        THE COURT:  I understand.

21        MR. BOUTROUS:  And here, we have former President

22   Trump's information.

23        THE COURT:  No.  Here, we have Mr. Pomerantz, for whom

24   I have tremendous respect, but Mr. Pomerantz is a lay citizen,

25   and the case law is abundantly clear that all citizens have a

N4jWbraO

1    duty to comply with subpoenas.

2              MR. BOUTROUS:  Not if they're not permissible, your

3    Honor.

4              THE COURT:  But now you're going back to the question

5    about whether there's a valid legislative purpose.

6              MR. BOUTROUS:  And if I may, your Honor?  Could I just

7    walk through the *Mazars* factors to give you a sense --

8              THE COURT:  Go ahead.  Sure.

9              MR. BOUTROUS:  Because I do think the Supreme Court

10   said the rationale of *Mazars* is that where you have a clash

11   between rival branches, which the state of New York is a branch

12   of government --

13             THE COURT:  It's not a branch of the federal

14   government, which is what *Mazars* is about.

15             MR. BOUTROUS:  It is in that specific instance, but

16   the underlying purposes, your Honor, I am confident if the

17   Supreme Court looked at this situation, it would say that

18   invading a state, the principles of federalism -- just like

19   separation of powers -- protect liberty, protect against

20   excessive abuse of power, protect it against the federal

21   Congress coming in and acting like a federal court -- under

22   their absolute immunity theory, they could subpoena the trial

23   judge.  They could subpoena you, and there's nothing you could

24   do.

25             THE COURT:  Well, now that you're talking about that

N4jWbraO

immunity theory, you didn't address in your opening brief the

speech or debate clause, which is front and center in most of

the jurisprudence on these types of debates.  How can you prove

a likelihood of success on the merits -- which is part of your

burden, right?

THE COURT:  Yes.

THE COURT:  How can you prove that when, under the

speech or debate clause, there is immunity?  You don't dispute

that there's immunity, do you?

MR. BOUTROUS:  Your Honor, we do dispute it, your

Honor, because there's not a proper legislative purpose.  And

under *Mazars* -- I'm going to stick with this, your Honor; I

think it's absolutely correct -- it requires a heightened

scrutiny because of this clash.

THE COURT:  I understand your position on *Mazars*, but

my question is on the speech or debate clause, which says

nothing about -- it says that members of the House shall not be

questioned in any place, and that has been broadly interpreted

to mean they're immune from suit -- not just from liability,

from suit.

MR. BOUTROUS:  Your Honor, I think that under the new

approach in *Mazars* in particular, that is called into question.

THE COURT:  Where?  Where in *Mazars* is that called

into question?

MR. BOUTROUS:  Well, in that case, your Honor, they

N4jWbraO

1    originally sued -- President Trump sued the chairman of the

2    committee, and the Congress intervened as a defendant.

3              THE COURT:  They chose to waive their immunity.

4              MR. BOUTROUS:  They seemingly did.

5              THE COURT:  Well, they can do that, right, just like

6    you can waive the privilege?

7              MR. BOUTROUS:  Which we did not do, but the fact that

8    they came in as a defendant in a lawsuit, under their theory,

9    it would have meant they should have sought to dismiss it.

10   Instead, it went to the Supreme Court; it came back to the D.C.

11   Circuit.

12             And your Honor, if I may?

13             The reason we didn't address it at the beginning is

14   they have often not raised the issue.

15             THE COURT:  I understand.

16             MR. BOUTROUS:  And so now they have, but they rely

17   heavily on the *Eastland* case, and your Honor, the *Eastland* case

18   was exactly our circumstance.  A third party who was not

19   subpoenaed sued their bank and Senator Eastland and some other

20   senators.  The Supreme Court, in footnote 14, made clear that

21   the district court properly entertained the action to determine

22   whether there was a proper legislative purpose, which is

23   exactly what we're asking you to do and also to layer on the

24   *Mazars* standard.

25             THE COURT:  Do you win even if I reject your argument

N4jWbraO

1    on *Mazars*?

2          MR. BOUTROUS:  I think we still do, your Honor,

3    because I think this invading a judicial proceeding, whether in

4    state or federal court, is a judicial act.

5          The *Plaut* case that we cited, Justice Scalia, from the

6    court, even though a statute was passed, the court held that it

7    was more akin to a judicial act and violated the separation of

8    powers.  And I know the Court is pointing to the difference

9    between the federal and state schemes, but it's really a triple

10   whammy.  Congress is seeking to invade the executive branch of

11   New York, the D.A.

12         THE COURT:  How?  How?

13         MR. BOUTROUS:  By seeking to hold him to account in an

14   ongoing prosecution.

15         THE COURT:  He's seeking information in a deposition.

16         MR. BOUTROUS:  I'm quoting the speaker of the House,

17   your Honor.

18         THE COURT:  I'm talking about the subpoena.  That's

19   what's in front of me, not all the political rhetoric that's

20   been flying back and forth.

21         MR. BOUTROUS:  I understand.

22         THE COURT:  That's all color.  It's all theater, but

23   it's not what's in front of me.

24         MR. BOUTROUS:  Well, what's also in front of your

25   Honor is the letter from the chairman of the judiciary

N4jWbraO

1    committee that accompanied the subpoena --

2              THE COURT:  Yes.

3              MR. BOUTROUS:  -- where it said over and over it's not

4    just oversight of the general system, it's oversight of this

5    prosecution.  He wants to know about the internal deliberations

6    of the prosecutors.

7              THE COURT:  Because he says it's been waived in this

8    book.

9              MR. BOUTROUS:  Let me go back.

10             THE COURT:  You said Ms. Dubeck is going to address

11   that.

12             MR. BOUTROUS:  Yes.

13             THE COURT:  Are you going to do it now --

14             MR. BOUTROUS:  I could.

15             THE COURT:  -- or in the rebuttal?

16             MR. BOUTROUS:  How much time do I have left?

17             THE DEPUTY CLERK:  Five minutes.

18             MR. BOUTROUS:  Perfect.

19             Mr. Wells has also given us his five minutes.

20             THE COURT:  So you're not going to argue at all,

21   Mr. Wells?

22             MR. WELLS:  No, your Honor.

23             THE COURT:  OK.

24             MS. DUBECK:  Good afternoon.

25             THE COURT:  Hold on.

N4jWbraO

1          Are you doing that now?

2          MR. BOUTROUS:  Pardon me?

3          THE COURT:  In other words, you're doing 25?

4          MR. BOUTROUS:  Yes, please.

5          THE COURT:  OK.

6          MR. BOUTROUS:  Thank you.

7          THE COURT:  Thank you.

8          Ms. Dubeck.

9          MS. DUBECK:  The irreparable harm here is to the

10   independent prosecutors and the chilling of prosecutorial

11   decisions.  Due process depends on the independence of

12   prosecutors and is reflected in multiple doctrines -- grand

13   jury secrecy -- and absolute immunity is given to prosecutors.

14          THE COURT:  The question that I was asking you about

15   is how has that not been waived in this book?

16          MS. DUBECK:  Sure.

17          Those doctrines, those privileges and the confidences

18   belong to my office and not to Mr. Pomerantz as a former member

19   of the office.  We took steps upon learning of the book to be

20   published to alert Mr. Pomerantz to just remind him of his

21   obligations to keep our confidences.  He made a public

22   statement assuring the public that he -- that the book was

23   complying with his confidences.

24          THE COURT:  Let me ask you a question.  Have you read

25   this book?

N4jWbraO

1          MS. DUBECK:  Yes.

2          THE COURT:  Does it preserve your confidences?

3          MS. DUBECK:  No.  I think there are things contained

4     in there that should not have been published and that expose

5     Mr. Pomerantz to criminal liability under the city charter.

6          THE COURT:  And have you taken any actions to enjoin

7     distribution of the book?  Did you take any action to enjoin

8     its publication before it got published?  Did you do

9     anything --

10         MS. DUBECK:  Yes.

11         THE COURT:  -- with respect to your statement that you

12    just made -- that he has waived your privileges?

13         MS. DUBECK:  He has not waived our privileges because

14    they were unauthorized disclosures.  We have taken steps.  We

15    did not seek to -- we did not think that we could succeed in a

16    case of prior restraint because we did not have a copy of the

17    book to know what he was going to be saying, and he represented

18    that he was not violating any of the confidences.

19         THE COURT:  He represents that in the book, I will

20    say.

21         MS. DUBECK:  Moreover, at the time the book was

22    published, the proceeding that we were trying to protect was

23    confidential, and we had a legal obligation to maintain the

24    grand jury's secrecy.  We tried to navigate that as best we

25    could by sending the letter.  At the time we sent the letter,

N4jWbraO

1    which was within a week of the announcement that the book would

2    be published and a month before the book was published, we cc'd

3    the letter to the department of investigation, which is the

4    city department with civil and criminal jurisdiction to

5    investigate the breaches of confidentiality that we identified

6    as plausibly going to occur.  That's the most we could say

7    before we had read the book.

8         The city charter provisions I'm referring to

9    2604(d)(6) and 2606(c).  That latter provision makes it a

10   misdemeanor to violate 2604(d)(6), which says a former employee

11   may not disclose confidential information obtained as an

12   employee.

13        Mr. Pomerantz would be exposed to misdemeanor

14   liability if he answered questions about the work that he did

15   in the office that is not otherwise available to the public.

16        THE COURT:  Well, he's already exposed to that then,

17   you're saying, right?

18        MS. DUBECK:  I think he is, and I think if he says any

19   words that are different or in addition to what has been

20   written in the book, he is further exposing himself to criminal

21   liability.  And I think it's clear that the committee is not

22   planning to just ask him to authenticate the book but is, in

23   fact, asking for more information like what he has put in the

24   book, and that is why we think there is an irreparable harm

25   with going forward with the deposition, because the House rules

N4jWbraO

1    say that no government attorney can attend the deposition; that

2    the Chairman will make any rulings on the privilege; and that

3    the rules can't promise confidentiality; that the interview

4    would be available to the committee and if the committee

5    decides it would be available to the Congress and the public.

6            What they haven't done is identified any reason that

7    the deposition needs to happen tomorrow.  They haven't

8    identified any reason why they and I can't talk about the

9    ability -- whether there is information that we could provide

10   that would assist them without raising the concerns that we

11   have about prosecutorial independence and the feeling that what

12   they are trying to do is chill our actions rather than conduct

13   oversight of how our office spent $5,000 of federal forfeiture

14   funds.

15           THE COURT:  But you did admittedly do that, right?

16           MS. DUBECK:  Yes.

17           THE COURT:  Why is that not a valid legislative

18   purpose -- to look into that, to better understand how it was

19   spent and to explore whether there's legislation that might be

20   appropriate to address that?

21           MS. DUBECK:  My last letter to the committee --

22           THE COURT:  My question is is that a valid legislative

23   purpose, or why is it not?

24           MS. DUBECK:  I think there is a valid legislative

25   purpose to looking at how federal funds are spent.  I don't

N4jWbraO

1    think that this case can be a case study for them in

2    investigating that, and there is information that we have

3    offered to provide them, that we said we would provide on

4    request, but they never followed up to ask for it.

5              THE COURT:  But the problem is you just conceded

6    there's a valid legislative purpose here, and once that's true,

7    it's not my role, under all the case law, to tell them what and

8    how they ought to conduct their inquiry.  Right?

9              MS. DUBECK:  If the Court were to limit the subpoena

10   to a discussion of federal funding --

11             THE COURT:  They've asserted other purposes too.

12             MS. DUBECK:  Well, I don't concede that those are

13   legislative or appropriate.

14             THE COURT:  You want to switch off again?

15             MR. BOUTROUS:  We're going to switch again, your

16   Honor.

17             THE COURT:  OK.

18             MR. BOUTROUS:  Your Honor, just back to the

19   legislative purpose, the first sentence of Chairman Jordan's

20   April 6 letter, which is part of exhibit 1 --

21             THE COURT:  Hold on one minute.  Let me pull it out --

22             MR. BOUTROUS:  Yes.

23             THE COURT:  -- because I flagged it myself.  So just

24   give me one moment.

25             All right.  Go ahead.

N4jWbraO

1          MR. BOUTROUS:  The first sentence is unequivocal.  It

2     says, the Committee on the Judiciary is conducting oversight of

3     the New York County district attorney's unprecedented

4     indictment of a former President of the United States.

5          THE COURT:  But that's not the subpoena.

6          MR. BOUTROUS:  The subpoena doesn't say anything, your

7     Honor.  It's an open-ended license.

8          THE COURT:  I have it.

9          MR. BOUTROUS:  I know, your Honor.

10         THE COURT:  It's not an open ended license.  It's a

11    subpoena specifically touching on matters of inquiry committed

12    to said committee or subcommittee.

13         MR. BOUTROUS:  That's meaningless, your Honor.

14         THE COURT:  It may be.

15         MR. BOUTROUS:  It's meaningless.

16         THE COURT:  But your cocounsel has just conceded that

17    the letter asserts a valid legislative purpose.

18         MR. BOUTROUS:  But your Honor, think about it this

19    way.  If someone came -- declared that their real, their

20    purpose is to conduct oversight of an ongoing criminal

21    prosecution -- and that's improper -- and then they toss in a

22    bunch of other things, that doesn't make the fundamental

23    purpose legitimate.

24         THE COURT:  You're saying that's the fundamental

25    purpose.  They have said in their briefing that there are three

N4jWbraO

| | |
|---|---|
| 1 | valid legislative purposes, one of which you've just conceded |
| 2 | is valid. |
| 3 | MR. BOUTROUS:  Those are the *post hoc* rationalizations |
| 4 | of lawyers. |
| 5 | THE COURT:  That's your characterization of it, and |
| 6 | the cases tell me if I find a valid legislative purpose, I am |
| 7 | not allowed to look at the motivations on either side. |
| 8 | MR. BOUTROUS:  Your Honor, I don't think that -- |
| 9 | again, back to *Mazars*, *Mazars* said that you look at the |
| 10 | evidence of -- even if they articulate purposes.  There's no |
| 11 | evidence. |
| 12 | THE COURT:  There is evidence.  You've sent a letter |
| 13 | conceding that you used $5,000 of federal forfeiture funds in |
| 14 | connection with the investigation. |
| 15 | MR. BOUTROUS:  Not in connection with the |
| 16 | investigation of President Trump that resulted in the |
| 17 | indictment.  And that's what they supposedly are investigating. |
| 18 | *Watkins*, your Honor, says that the purpose -- |
| 19 | THE COURT:  You're saying that's what they're |
| 20 | investigating.  They say they're investigating the use of |
| 21 | federal funds. |
| 22 | MR. BOUTROUS:  They say they are investigating -- they |
| 23 | are conducting oversight of the D.A.'s office, your Honor. |
| 24 | They can't get around that.  I'm not sort of speculating. |
| 25 | THE COURT:  But you can't get around that they also |

N4jWbraO

1    say they want to investigate the use of federal funds, and your

2    cocounsel has just conceded that would be a valid legislative

3    purpose.

4              MR. BOUTROUS:  But several cases, including one that

5    they cite **-- the** *McPhaul* case says that if the subpoena is

6    irrelevant to or has no connection to the supposed asserted

7    purpose, then it's not proper.  *Watkins* says it can't be a

8    flimsy relationship.  This is a -- your Honor, again, what the

9    Supreme Court said holds.  This Court does not have to blind

10   itself to what we can all see and what the Chairman said.

11             The last point I'll make before I sit down, leaving

12   some time for rebuttal, is, the Court asked about --

13             THE COURT:  I'm sorry.

14             MR. BOUTROUS:  If the Court were to conclude --

15             THE COURT:  The Court asked?

16             MR. BOUTROUS:  On the immunity point.

17             THE COURT:  Oh, yes.  Thank you.

18             MR. BOUTROUS:  So, if the Court right now is thinking

19   that we're not likely to succeed on the immunity issue, then we

20   still can proceed.  The Rule 19 indispensable party argument is

21   novel.  It's not supported by anything.

22             THE COURT:  It's supported by the federal rules, they

23   say.

24             MR. BOUTROUS:  It's not, because --

25             THE COURT:  So are you proposing we should let this

N4jWbraO

```
1    lawsuit go forward with your client, the D.A.'s office, as the

2    plaintiff and Mr. Pomerantz as the defendant?

3              MR. BOUTROUS:  Yes, your Honor.

4              THE COURT:  And Mr. Pomerantz has publicly stated he

5    will take his instructions from your office.

6              MR. BOUTROUS:  Yes.

7              THE COURT:  So we should have a lawsuit between two

8    parties, one of whom is following the instructions of the other

9    party?

10             MR. BOUTROUS:  Well, it's three parties -- four

11   parties now, or more.

12             THE COURT:  Right.

13             MR. BOUTROUS:  Well, two of them don't want to

14   participate.  They can make their arguments.

15             THE COURT:  Two of them are saying they have immunity,

16   and you have, therefore, a problem with likelihood of success

17   on the merits.  That's what they've said so far.

18             MR. BOUTROUS:  They've expressed their views on the

19   merits.  They've participated.  They could file an *amicus*

20   brief, like they did in the *Bannon* case.  They could file and

21   intervene back in, like they did in *Mazars*.

22             THE COURT:  How are they not a necessary party when

23   they're the ones that have served the subpoena that you're

24   seeking to enjoin?

25             MR. BOUTROUS:  We can get adequate relief without
```

N4jWbraO

```
1    them, and they could protect their interests.

2            In contempt actions, like Watkins, your Honor,

3    Congress isn't a party to that and their interests are well

4    represented and they're not an indispensable party.

5            THE COURT:  Right.

6            MR. BOUTROUS:  With that, I'll reserve.

7            THE COURT:  Thank you, Mr. Boutrous.

8            MR. BOUTROUS:  Thank you.

9            THE COURT:  I will hear, then, from counsel for the

10   committee.

11           Mr. Berry, right?

12           MR. BERRY:  Yes.

13           THE COURT:  Thank you.

14           MR. BERRY:  Thank you, your Honor.

15           May it please the Court?

16           Setting aside the hyperbole and the rhetoric, this

17   motion is about a single-deposition subpoena issued by the

18   House Judiciary Committee to Mr. Pomerantz.

19           THE COURT:  All right.  But Mr. Berry, what do you say

20   about Mr. Boutrous's accurate argument that the first line of

21   the cover letter accompanying the subpoena says that you're

22   asserting oversight over the district attorney's -- let me find

23   the exact wording -- conducting oversight of the New York

24   County district attorney's unprecedented indictment of a former

25   President of the United States and current declared candidate
```

N4jWbraO

1    for that office.

2            MR. BERRY:  Yes, it is true.

3            THE COURT:  How is that a valid legislative purpose?

4            MR. BERRY:  Because we are looking into whether or not

5    there is a problem with politically motivated prosecutions of

6    former Presidents and politically motivated prosecutions of

7    former Presidents using federal funds.  And the federal funds

8    legislative purpose, I think, is absolutely valid, as the

9    plaintiffs have now conceded.  What we have not discussed is

10   the federal interest in the former Presidents.

11           In the Former Presidents Act of 1958, Congress

12   recognized that the interest of the American people in the

13   President does not cease to exist when he leaves office.  He

14   gets lifetime Secret Service protection.  He gets federal

15   office space.  He gets money for staff.  He gets travel funds.

16   And the question is if you have politically motivated

17   prosecutions or investigations of former Presidents, can that

18   affect their conduct while in office?

19           THE COURT:  Let me ask you a question.  Do you need

20   your adjectives of "politically motivated" then if you're

21   telling me that a valid legislative purpose is all of these

22   protections of a President or a former President and the need

23   to avoid interference with exercise of presidential powers

24   while in office?  Does the prosecution have to be politically

25   motivated to implicate those concerns?

N4jWbraO

1          MR. BERRY:  I don't think that it has to, but I

2      think --

3          THE COURT:  Then why are we having all this

4      conversation about what the D.A.'s motives are in bringing the

5      case that it brought?

6          MR. BERRY:  Because it makes the case for federal

7      action stronger, your Honor.  If you have a situation --

8          THE COURT:  Doesn't it politicize it on your side as

9      well?

10          MR. BERRY:  I don't think so, your Honor.  And if I

11      could explain?

12          If you have a situation where Presidents, while

13      they're in office, feared that because of the decisions they

14      make while in office, state and local prosecutors around the

15      country are going to make them target No. 1 for prosecutions,

16      that could impact the way they conduct themselves in office.

17      Let's say, for instance, they have something that they feel is

18      in the national interest but it would be very unpopular in New

19      York City.  If they fear a prosecution in New York City, will

20      they tailor their behavior in order to avoid prosecutions?

21          Similarly, if they fear that they're going to be

22      subject to a prosecution in a city, will they tailor their

23      agenda so that they will become more popular in a city, thus

24      warranting off prosecutions and investigations?

25          And this is not an issue about just one person, your

N4jWbraO

1    Honor.  There's already talk that there could be politically

2    motivated prosecutions or investigations of the current

3    President once he leaves office.  And the idea that there's no

4    federal interest in stopping that from happening or at least

5    developing legislation to try to ameliorate the effects of

6    that, I think, is something that the plaintiff has never

7    rebutted.  We've expressed this theory in letter after letter.

8    We put it in the brief, and they've never rebutted it.

9             THE COURT:  In all of the cases that I've looked at,

10   including *Mazars*, frankly, the court never did rule on the

11   validity of the subpoena in *Mazars* at the end of the day.  It

12   remanded it back, and the parties then talked to each other,

13   like civilized professionals, and presumably they worked

14   something out.  Why can't that happen here?

15            MR. BERRY:  So, we issued a subpoena to Mr. Pomerantz.

16            THE COURT:  Right.

17            MR. BERRY:  The next thing that happened was that we

18   were brought into this court.  We think we're immune from this

19   suit.  We were not contacted by Mr. Pomerantz, who said,

20   listen, I'm willing to discuss with you topics A, B and C.

21            THE COURT:  You were or you were not?

22            MR. BERRY:  We were not.

23            THE COURT:  You were not.

24            MR. BERRY:  We were not contacted by the District

25   Attorney's Office to say OK, do you want to talk to

N4jWbraO

1  Mr. Pomerantz about A, B, or C.  We were just brought into

2  court.  The plaintiff is asking the Court not only --

3          THE COURT:  But as I understand it, there were

4  attempts by the D.A.'s office to reach out to try to talk to

5  you about the scope of the subpoena.

6          MR. BERRY:  No.

7          THE COURT:  Am I wrong about that?

8          MR. BERRY:  No, the D.A.'s office has not reached out

9  to us once to discuss the scope of the subpoena.

10          THE COURT:  There were no letters sent to you about

11  the timing and about the scope?

12          (Indiscernible overlap)

13          MR. BERRY:  Not after the subpoena was issued, no.

14          THE COURT:  Well, you issued the subpoena, after you

15  tried, which may be the more appropriate way to do things; I

16  don't know.  You tried to informally get information.

17  Certainly there were letters back and forth then.

18          MR. BERRY:  There were letters back and forth, and we

19  did receive the valuable piece of information that they spent

20  $5,000 of federal forfeiture money on this investigation.  But

21  it's up to Congress to determine how it's going to structure

22  its investigation.  We were not getting much cooperation.  We

23  issued a subpoena, and not only did they haul us into court to

24  try to enjoin the subpoena, which I think that this Court has

25  no power to do, they have also asked --

N4jWbraO

1          THE COURT:  Why do I have no power to do it?

2          MR. BERRY:  I think that it is precluded by the speech

3    or debate clause to the U.S. Constitution, and I think that

4    because there's a valid legislative purpose for the subpoena --

5          THE COURT:  OK.  But I do first have to determine is

6    there or is there not a valid legislative purpose, correct?

7          MR. BERRY:  You do have to determine whether or not

8    the subpoena, the investigation relates to topics on which

9    legislation could be had.

10         THE COURT:  Right.

11         MR. BERRY:  Absolutely.

12         THE COURT:  OK.

13         MR. BERRY:  But we issued the subpoena.  If

14   Mr. Pomerantz or the D.A.'s office wanted to have a

15   conversation about that subpoena to try to narrow it, we could

16   have done it.  Instead, we were hauled into court not only to

17   enjoin the subpoena, but in the complaint the plaintiff's asked

18   me to say that preemptively we cannot issue any subpoenas to

19   any current or former D.A.'s office employees.

20         THE COURT:  Yes, I do know that, and we didn't have a

21   chance to talk about that, Mr. Boutrous and I or Ms. Dubeck and

22   I.  So perhaps on rebuttal we can talk about that, because that

23   is certainly part of the relief sought in this lawsuit.

24         MR. BERRY:  So I think there's a valid legislative

25   purpose in terms of the interest of former Presidents and

N4jWbraO

1    federal government's interest in that.  There's a federal

2    removal bill that we cite in our brief that deals with that

3    issue that's under consideration.

4           THE COURT:  Is that what has been, I have to say,

5    pejoratively referred to as the Alvin bill?

6           MR. BERRY:  That is not the Alvin bill, your Honor.

7    We do not cite that in our brief.

8           THE COURT:  No, you don't.

9           MR. BERRY:  This is a bill that was introduced by

10   Congress that says if you have an indictment of a former

11   President, it can be removed to federal court, where you could

12   have federal judges of life tenure overseeing such prosecution.

13          THE COURT:  So that bill has been introduced.

14          MR. BERRY:  It is.  It's cited in our brief, your

15   Honor.

16          There's also a bill that would restrict the use of

17   federal forfeiture funds in investigations of current or former

18   Presidents or vice presidents.

19          THE COURT:  If you've already introduced the bills,

20   why do you need testimony then at this point?

21          MR. BERRY:  Because for Congress to introduce them,

22   there has to be consideration given as to whether they're

23   necessary.

24          THE COURT:  Don't you normally do that before you

25   introduce something?

1           MR. BERRY:  Congressmen introduce bills all the time.

2      Then committees hold hearings and give deliberation in terms of

3      whether or not this is a bill that's worthy of moving forward.

4      There are thousands of bills that are introduced each Congress.

5      Not all of them, and the small minority of them, make it

6      through.  So you have hearings after you've introduced bills to

7      see whether or not they're necessary.

8           Your Honor, if I could also move to the *Mazars* case

9      given how much emphasis the plaintiffs put on it, I have two

10     points to make here.

11          First of all, *Mazars* does not implicate the speech or

12     debate clause protection that the committee has.  And in

13     particular, I want to point your Honor to *Meadows v. Pelosi*.

14     So, you had a case about a subpoena directed to the former

15     chief of staff of the White House, a clear executive

16     branch-legislative branch clash.  The D.C. federal district

17     court said that *Mazars* had no bearing on whether or not that

18     subpoena was protected by the speech or debate clause.  So if a

19     subpoena that was issued to the former chief of staff of the

20     White House, and it implicates executive branch and legislative

21     branch prerogatives, is protected by the speech or debate

22     clause, then I think that the answer here in terms of whether

23     or not the subpoena is protected by the speech or debate clause

24     is the same.

25          THE COURT:  What is your argument with respect to

N4jWbraO

1   speech or debate clause?  Is it that they can't show likelihood

2   of success on the merits, and therefore, I should deny the

3   relief they're requesting?

4           MR. BERRY:  Absolutely.  I think because of the speech

5   or debate clause they cannot show likelihood of success on the

6   merits.

7           The second issue I wanted to raise with respect to

8   *Mazars* -- and I agree with much of what your Honor said

9   before -- is that that case depended upon the unique nature of

10  the presidency.

11          THE COURT:  So  it your position that *Mazars* is

12  limited to that factual context?

13          MR. BERRY:  It is.  To the extent the Supreme Court

14  wishes to extend it, it could extend it, but I don't think the

15  lower courts can.

16          The court said there the President is the only person

17  who alone composes a branch of government.  They also said the

18  President's unique constitutional status means that Congress

19  may not look to him as a case study for general legislation.

20          The uniqueness of the presidency was key to *Mazars* and

21  that four-part test.  It's not even clear that it would apply

22  to the vice president of the United States, the secretary of

23  transportation, the secretary of health and human services.  I

24  think that there is no way you can read *Mazars* then to say that

25  that four-part test and heightened scrutiny applies to a

N4jWbraO

```
1    subpoena for information from a former special assistant

2    district attorney in New York County.

3          THE COURT:  Before you get there, do you agree that

4    the test articulated in Mazars is a, quote, heightened

5    scrutiny?

6          MR. BERRY:  I do agree that it is more scrutiny than

7    is given to a standard congressional subpoena.  If you get past

8    immunity problem, it is heightened scrutiny.

9          THE COURT:  Well, what is the standard that you say

10   should apply here?

11         MR. BERRY:  The standard is does this investigation

12   and this subpoena relate to a subject upon which legislation

13   could be had?  Is there a valid legislative purpose?  And here,

14   the plaintiff has already conceded one valid legislative

15   purpose, which is the use of federal funds, is this the type of

16   investigation where federal funds should be used, and they've

17   really not made any serious attempt to rebut our second federal

18   purpose about the protection and treatment of former Presidents

19   in terms of politically motivated prosecutions and

20   investigations, how that could impact the exercise of the

21   office of -- the exercise of the powers of the office of the

22   President of the United States.

23         And this is an exceptional deferential test that

24   courts use, as the court said in Brewster, in Johnson.  The

25   Supreme Court said don't look at motives in terms of
```

N4jWbraO

1    determining legislative purpose.  So I think that in terms of

2    the legislative purpose, we have two very strong legislative

3    purposes that have not been rebutted.

4            I'd also like to talk briefly, if I may, about the

5    privilege issues, your Honor.

6            THE COURT:  Yes.  Give me one second.

7            Is it your position that there are just two purposes

8    that they re invoking?

9            MR. BERRY:  So, with respect to the subpoena of

10   Mr. Pomerantz, we are primarily focused on the interest in the

11   former President and the use of federal funds.  There is an

12   issue in terms of the protection of the President while he's in

13   the criminal justice system.

14           THE COURT:  Is that your removal point?

15           MR. BERRY:  No.  That deals with the treatment in the

16   criminal justice system and issues about protection, and the

17   like.  I do not believe that those are of substantial relevance

18   to this particular subpoena or this particular deposition.

19           THE COURT:  OK.

20           All right.  I would like to talk to you about the

21   privilege point, so go ahead.

22           MR. BERRY:  With respect to the privilege issues, as

23   you pointed out, Mr. Pomerantz has written a book about the

24   investigation of the former President.  That's not all, though.

25   He has answered questions about that work in numerous

N4jWbraO

1    high-profile television interviews.  He's talked to 60 Minutes.

2    He's answered questions to Rachel Maddow, Good Morning,

3    America, etc.  Once the book came out, we're unaware of any

4    action that the plaintiff took to try to get him to stop

5    answering questions about this material.  The only time where

6    the plaintiff has gone to court and taken any substantive

7    action to try to get him to stop talking is when a duly issued

8    congressional subpoena was issued and the House Judiciary

9    Committee wants to ask him questions about that issue.

10         So as I understand it, their position basically is if

11   he wants to go on to Rachel Maddow, if he wants to star on 60

12   Minutes, we're going to sit on our hands and not actually do

13   anything, but when the House Judiciary Committee wants to ask

14   him questions about that very same topic, then we need

15   emergency relief from the federal court.

16         I don't think that this is reasonable behavior if you

17   think this is privileged material.  I don't think that this is

18   the type of behavior that this Court should countenance -- that

19   somehow the House Judiciary Committee ranks below 60 Minutes in

20   terms of the protection of privilege or in terms of the public

21   interest in having the material in his book discussed.

22         THE COURT:  All right.

23         Mr. Berry, the court, in *Mazars*, said the following:

24   "Recipients" of a subpoena "have long been understood to retain

25   common law and constitutional privileges with respect to

N4jWbraO

1    certain materials, such as attorney-client communications and

2    governmental communications protected by executive privilege."

3              MR. BERRY:  Yes.

4              THE COURT:  Do you intend to respect the invocation of

5    privilege if this deposition were to go forward?

6              MR. BERRY:  So, if this deposition were to go forward,

7    this is the way it would work.  Mr. Pomerantz would be asked a

8    question.  If he feels, if he would like, if he feels that a

9    privilege should be invoked or he's been instructed to invoke

10   the privilege, then the committee chair will make a decision on

11   a case-by-case basis of whether to sustain that privilege.  If

12   Mr. Pomerantz is unsure whether or not a question involves a

13   privilege -- he's not being held hostage in the room -- he's

14   free to go outside the room if he wants to consult with an

15   attorney from the D.A.'s office about whether the question

16   implicates privilege; he can do so.  Decisions are made on

17   privilege in congressional depositions on a

18   question-by-question basis.

19              Then, if it's overruled and he still refuses to answer

20   on the basis of privilege, generally those questions are then

21   saved for the end.  At that point, Mr. Pomerantz would be free

22   to go.  The way this works then is the committee gives

23   Mr. Pomerantz another chance.  They would write him a letter

24   exploring the questions that they would still like answered

25   that Mr. Pomerantz refused to answer on the basis of privilege.

N4jWbraO

He would then be able to come back and either answer the

questions or make additional -- explain more why he thinks it's

covered by privilege.

If he still refuses to answer, then the committee

would have a decision to make.  Would they try to do civil

enforcement of the subpoena and require him to ask by going to

court itself, where we don't have speech or debate clause

relief, or would they seek to hold him in contempt, in which

case there has to be a committee vote.  There has to be a vote

of the full House, and then that would have to be referred to

the Justice Department to see if they want to go forward.

But the key question is Mr. Pomerantz, if he shows up

tomorrow and invokes privilege, he's not going to be held in

contempt tomorrow.  He's free to present whatever privilege

arguments he wants, on a question-by-question basis, and then

the committee will make a decision.  And I would point your

Honor to the Harriet Miers case from the federal district court

in 2008.

There, the former counsel to the President of the

United States, not a former special assistant district

attorney, said I don't want to come, I'm absolutely immune

because of executive privilege, I should not be required to

show up at all.  And what did the federal district court there

say?  The federal district court said no, you do not have

absolute immunity.  You do not just get to say I'm not showing

N4jWbraO

1    up.  You have to show up, but if you want to assert executive

2    privilege in response to questions, you can do that.  And

3    Mr. Pomerantz is free to assert privileges if he shows up

4    tomorrow with respect to particular questions.  Then the

5    committee can ask questions to elicit the basis of the

6    privilege claims and they adjudicate them on a

7    question-by-question basis.

8         What there's no precedent for, your Honor, is a court

9    saying you do not have to show up for a congressional

10   deposition because you intend to make some privilege claims.

11        THE COURT:  Isn't Mr. Pomerantz, who now,

12   unfortunately, said he doesn't wish to be heard and is being

13   heard really by just saying I agree with what the D.A.'s office

14   says, but in any event, isn't he being put in a little bit of a

15   difficult position here, where either he answers your questions

16   and potentially violates his ethical duties to the office of

17   the district attorney, or he refuses to answer and then he

18   faces potential contempt?

19        MR. BERRY:  I guess I would have two answers to that,

20   your Honor.

21        First, people that are being deposed by Congress, it

22   is standard that they do not get judicial review up front of

23   their privilege claims, or the like.  So if they wish to assert

24   privilege claims and they are going to refuse to answer even if

25   all those privilege claims are overruled, they have to rely on

N4jWbraO

judicial review at the back end, and that is not in any way
unique to Mr. Pomerantz.  That is anybody who shows up for a
congressional deposition.

        But secondly, your Honor, this is a case where there
is diversity between Mr. Bragg and Mr. Pomerantz, on one side,
and the committee, on the other.  Mr. Pomerantz is objecting to
the subpoena.  He says he agrees with Mr. Bragg's arguments,
and so even though they've tried to set up this formality,
where Mr. Bragg is suing Mr. Pomerantz and us --

        THE COURT:  Yes, but under all the line of cases, he
is appropriately a nominal defendant; no?

        MR. BERRY:  He is a nominal defendant, but he's joined
in the request for relief and says he opposes the subpoena.

        THE COURT:  Yes, he did.  Yes, he did.

        MR. BERRY:  So he is not a neutral third party that
was referred to in the *Eastland* case.  He is someone that has
come in and is opposing the subpoena and objecting to it.  So I
think that even if one were to say that there's a special
exception for neutral third parties, that doesn't apply to him
anymore.

        Also, with respect to Rule 19 joinder, and this is one
point I wanted to make, your Honor, the Second Circuit has been
clear, both in cases involving state sovereign immunity,
invoked by the state of New York, and by Indian tribes in terms
of their immunity, that when you look at the Rule 19(b)

N4jWbraO

1    factors, that if we are an indispensable party -- and I would

2    strongly argue that we are an indispensable party -- and if we

3    are immune, then the No. 1 factor in determining whether the

4    other claims should be dismissed as well, the other defendants,

5    is the immunity.  And I would submit, your Honor, that if the

6    state of New York thinks that it is an indispensable party and

7    because of its sovereign immunity, claims brought by the Seneca

8    Nation in that case that we cited in our brief, that that

9    warranted dismissing the claims so that Seneca Nation could not

10   get relief on anything or, your Honor, if the Second Circuit

11   says with respect to Indian tribes and their immunity, the

12   overwhelming importance of that immunity overrides the other

13   Rule 19 factors, I would submit, your Honor, that the speech or

14   debate clause in congressional immunity is no less deserving of

15   the judiciary's respect than the state of New York's sovereign

16   immunity when they have made this Rule 19 argument or the

17   Indian tribes when they have made this argument.  And so your

18   Honor, I think we don't even have to get to that point because

19   in terms of likelihood of success on the merits, this is

20   covered by the speech or debate clause; there's really more

21   than one valid legislative purpose, and also with respect to

22   irreparable harm, your Honor, plaintiff --

23            THE COURT:  How can they?

24            MR. BOUTROUS:  With respect to irreparable harm,

25   Mr. Pomerantz has already written the book.  He's already given

N4jWbraO

1    all these television interviews in public.  It's a best-selling
2    book, by the way; it made the top ten of the New York Times
3    bestseller list.  He's given interviews on 60 Minutes, which is
4    the most watched news magazine in the country.  He's shared all
5    this information in public, tens of millions of people.  Then
6    the District Attorney's Office is saying if he talks about
7    those topics in a room in the Capitol, where there will not be
8    any reporters, and answers questions about those same topics
9    they will somehow be irreparably harmed --
10             THE COURT:  Is it your position there's been a waiver
11   with respect to what has been said in the book, or are you
12   arguing a subject matter waiver?
13             MR. BERRY:  I think that, at a minimum, there is
14   waiver in terms of what has been said in the book.  In terms of
15   whether or not there's been complete subject matter waiver, I
16   think that if Mr. Pomerantz or Mr. Bragg wants to make that
17   argument that there's not been subject matter waiver, if
18   Mr. Pomerantz shows up at the deposition and there's a question
19   that implicates that, that argument can be advanced and the
20   committee would have to consider it.
21             I'm not authorized here to state that because that has
22   not been brought to our attention yet.
23             THE COURT:  OK.
24             MR. BOUTROUS:  But where is the irreparable harm, your
25   Honor?  Mr. Pomerantz is not working to prepare for the trial

N4jWbraO

| | |
|---|---|
| 1 | of former President Trump.  All of this information is already |
| 2 | out there, and he did not express any theory in terms of how |
| 3 | this is imminent harm to the state of New York. |
| 4 | THE COURT:  So you have to admit that it is somewhat |
| 5 | unusual to, as you say in your cover letter, for Congress to |
| 6 | exercise oversight of a local district attorney's prosecution. |
| 7 | Is it not? |
| 8 | MR. BERRY:  I would say that it's not the ordinary |
| 9 | course of events.  It's also not the ordinary course of events |
| 10 | for Congress to go after the -- you know, to do many types of |
| 11 | investigations.  But what I would say is that we have shown |
| 12 | that this is related to valid legislative purposes.  And in |
| 13 | particular, if we are concerned about, and that you think that |
| 14 | there's a substantial federal concern in dealing with |
| 15 | politically motivated prosecutions of former Presidents, part |
| 16 | of an investigation into whether or not we need to take |
| 17 | legislative steps to address that problem is looking into |
| 18 | what's going on in terms of the investigations of former |
| 19 | Presidents. |
| 20 | THE COURT:  How far can you go with that without |
| 21 | stepping on what clearly is immunity of this office to conduct |
| 22 | its own prosecutions and investigations? |
| 23 | MR. BERRY:  What I would say, your Honor, is that we |
| 24 | are proceeding in a very measured, modest way.  You will notice |
| 25 | we have issued one subpoena, and that is to Mr. Pomerantz. |

N4jWbraO

Hopefully, he will cooperate and we can get information from

him.  I'm not authorized to nor has the committee made any

decision about what it's going to do in terms of any future

subpoenas.  If we do issue such subpoenas and they were

challenged, we would litigate about those.

But the main point I would like to make is that

plaintiff wants this case and this motion to be about things

other than the subpoena to Mr. Pomerantz, because I think they

realize how weak their case is with respect to the subpoena of

Mr. Pomerantz.  That's why you have the implication of other

things that are going on.  You have the rhetoric and the

hyperbole.  I would urge your Honor to focus just on the

subpoena of Mr. Pomerantz.  Ask is there a subject upon which

legislation could be had?  Is there a valid legislative

purpose?  Have they shown that there will be irreparable harm

for the Court to take the extraordinary step, for the first

time we're aware of, of enjoining a subpoena for a

congressional deposition?  And I think, your Honor, if you ask

yourself those questions, the Court will come to the conclusion

that there is no substantial likelihood of success on the

merits in this case.  There is no showing of actual and

imminent irreparable harm and that consistent with case after

case where people have gone to court and tried to get

congressional subpoenas enjoined -- whether it be *Meadows v.*

*Pelosi*, whether it be the *Ward* case, **whether it be the** *Freiss*

N4jWbraO

1  case -- that this Court should decline to issue a preliminary

2  injunction, to respect the speech or debate clause, respect

3  legislative prerogatives, and leave other matters for other

4  days if the committee chooses to take those steps.

5          And with that, I will let my learned colleague come

6  in.

7          THE COURT:  OK.  Thank you.

8          MR. BOUTROUS:  Thank you.

9          Your Honor, first, we are not seeking relief on this

10  motion for anything other than this subpoena.

11         THE COURT:  Right.  That was one question I did have

12  for you, Mr. Boutrous, because you do have a second count in

13  your complaint in which you seek injunctive relief with respect

14  to anything that might be issued in the future.  You're not

15  asking me --

16         MR. BOUTROUS:  Not today.  If they come after us

17  similarly again in the office and continue this pattern, then

18  we need to come back before you.

19         THE COURT:  OK.

20         MR. BOUTROUS:  Your Honor, it is totally unprecedented

21  for Congress to ever go after local prosecutors in any context

22  and conduct oversight, totally.

23         THE COURT:  I understand that, but it's also

24  unprecedented for a local district attorney to bring a criminal

25  indictment against a former President.  Correct?

N4jWbraO

1          MR. BOUTROUS:  That's correct, your Honor.

2          THE COURT:  So in connection with that, Mr. Berry has

3   said Congress is exploring whether there is legislation that is

4   appropriate in order to protect people who serve in the office

5   of President, both while they're in office and after they

6   leave.

7          MR. BOUTROUS:  Your Honor, two points on that.

8          First of all, let's say that they really do want to

9   look at that, they just came up with this, like this is isn't

10  something they've been wrestling with.

11         THE COURT:  But you just brought the indictment.

12         MR. BOUTROUS:  Exactly.  They're doing it to punish

13  and deter and --

14         THE COURT:  No, but --

15         MR. BOUTROUS:  Go ahead.

16         THE COURT:  You're asking me to assume that.  They're

17  telling me they're doing it because the indictment raises, in

18  their mind, legitimate concerns, which Congress has a right to

19  investigate to see whether there's legislation that's

20  appropriate.

21         MR. BOUTROUS:  Let me accept that premise, your Honor.

22         THE COURT:  Yes.

23         MR. BOUTROUS:  Why now?  Why can't they do --

24         THE COURT:  But if you accept that premise, isn't that

25  the end of the inquiry?

N4jWbraO

1      MR. BOUTROUS:  No, your Honor.  I go back to *Mazars*.

2  The Court asked about what happened in *Mazars*, and you were

3  right.  Chief Justice Roberts thought that there should be a

4  hashing out --

5      THE COURT:  Yes.

6      MR. BOUTROUS:  In *Mazars*, the case went back to the

7  D.C. Circuit, and far from immunity, the chairman of the

8  committee at that point issued a 58-page explanation of the

9  subpoena instead of press releases and tweets, and the D.C.

10 went assiduously down.  It didn't enjoin the subpoena, but it

11 substantially narrowed it, and I think the chief justice and

12 the court would be shocked if they thought they went through

13 all that work in *Mazars* to create this test, which is -- I

14 think Mr. Berry is understating its impact.  It's a dramatic

15 change in the scrutiny for subpoenas from Congress, that

16 Congress could avoid it by simply seeking to just get out of

17 the case or not intervening.  That, I don't think, is what the

18 Supreme Court intended.  Why wouldn't they have had immunity in

19 the *Mazars* case?

20     THE COURT:  Why didn't you wait, then, for Congress to

21 bring a case to enforce the subpoena?  Wouldn't that take care

22 of this problem?

23     MR. BOUTROUS:  Well, they might have gone straight to

24 contempt, your Honor, which it sounds like they're

25 contemplating, and the Supreme Court --

N4jWbraO

1          THE COURT:  But what's your interest in that?

2          MR. BOUTROUS:  Well, our information --

3          THE COURT:  You're not going to be held in contempt.

4          MR. BOUTROUS:  That's true.

5          THE COURT:  The subpoena's not addressed to you.  It's

6     addressed to Mr. Pomerantz.

7          MR. BOUTROUS:  That's true, your Honor, but as you

8     pointed out, Mr. Pomerantz is in -- New York authorities

9     enforcing New York law.

10          THE COURT:  Are you representing Mr. Pomerantz?

11          MR. BOUTROUS:  No.  I'm going to point out why it's in

12     our interest, because he's in a space for contempt, and he

13     might decide, under those circumstances, to disclose

14     confidential information, deliberations information that

15     they're seeking, grand jury information.

16          THE COURT:  Does this book not reveal deliberation

17     information?  You can't credibly say that it doesn't.

18          MR. BOUTROUS:  We sought to stop it from happening.

19     And that point I wanted to make, your Honor, this court has

20     found that it would have been a First Amendment prior

21     restraint.  So that's why we didn't go running into court to

22     try to enjoin it.

23          THE COURT:  No, but you also didn't, after

24     publication, take any steps -- in litigation anyway -- to try

25     to enjoin further distribution of the book.

N4jWbraO

1          MR. BOUTROUS:  But the district attorney did and I

2   believe is taking action to inquire into those matters, and

3   so --

4          THE COURT:  You didn't say any of that in your papers

5   to me.

6          MR. BOUTROUS:  I believe it's correct, your Honor, and

7   I think I have one minute left.

8          (Indiscernible overlap)

9          MR. BOUTROUS:  I want to stick to the time.

10         Two cases the Court asked me about -- vertical

11   federalism and --

12         THE COURT:  No, I didn't ask about vertical

13   federalism.  I asked isn't this federalism and not separation

14   of powers.

15         MR. BOUTROUS:  Excuse me.  Vertical separation of

16   powers.  This is from the *LaRoque* case that we cited in our

17   reply brief which talks about it.

18         And then, your Honor, on the federal funding, I just

19   want to be very clear that the record is clear here in this

20   case that the $5,000 was used for the righteous prosecution

21   that resulted in the conviction of the Trump Organization.  It

22   was not used in connection with the indictment and prosecution

23   of President Trump that we're here talking about today.

24         THE COURT:  That's not really before me, is it?

25         MR. BOUTROUS:  I think it is, because *Watkins* and

N4jWbraO

1    other cases say where there's a flimsy connection between the

2    subpoena and supposed legislative purpose, that's a ground for

3    not enforcing it.

4              THE COURT:  Right.

5              MR. BOUTROUS:  And again, I think the *Mazars* case

6    makes very clear the Court can scrutinize, it can limit the

7    subpoena, and therefore, we would ask you to do that.  I know

8    these are really thorny issues.  I do think that the Supreme

9    Court did not intend for Congress to avoid separation of powers

10   issues, and the like, by invoking immunity.  And *Eastland* says

11   you can't do that.

12             THE COURT:  All right.  Thank you.

13             MR. BOUTROUS:  Can I make one procedural point, your

14   Honor?

15             In the event the Court doesn't agree with us, we would

16   like time to seek a stay and go to the Second Circuit.

17             THE COURT:  Look, I don't know what you want me to do

18   about time.  That's why I'm holding you strictly to the time

19   limits for oral argument here.  It's 3 o'clock.  You brought

20   your application on when you did, which, by the way, you

21   brought on improperly, without even serving the other side with

22   the complaint, never mind with your motion.  You did it *ex*

23   *parte*.  You didn't include the affidavit that our local rules

24   require you to file.  Then you filed the reply brief yesterday,

25   which was not authorized by the scheduling order that I put in

N4jWbraO

| | |
|---|---|
| 1 | place, which I concede was truncated, but that's because of the |
| 2 | urgency here.  So I can't do anything about the time.  It is |
| 3 | what it is. |
| 4 | MR. BOUTROUS:  No, your Honor. |
| 5 | THE COURT:  My intent is to wrap up the hearing |
| 6 | momentarily and, as promptly as I can, get a decision |
| 7 | published.  And then you can seek whatever relief you want to |
| 8 | seek, if you need it, or if the other side needs it. |
| 9 | MR. BOUTROUS:  We do appreciate it.  I just wanted, |
| 10 | I'm hereby giving notice.  We did not intend to come in without |
| 11 | giving notice when we came.  We were in the process of |
| 12 | notifying them. |
| 13 | THE COURT:  But you did. |
| 14 | MR. BOUTROUS:  We were in the process, but here we |
| 15 | are, your Honor. |
| 16 | THE COURT:  But you filed it, Mr. Boutrous.  I mean, |
| 17 | look, I don't want to waste a lot of time on this, but you're a |
| 18 | very experienced litigator.  Going into court *ex parte* seeking |
| 19 | a TRO pursuant to a proposed order to show cause without |
| 20 | providing notice is somewhat unusual, and our rules require an |
| 21 | affidavit from you about the steps you took and why notice |
| 22 | could not be given.  And you didn't do that.  So I don't want |
| 23 | to belabor it, but that is how we got here. |
| 24 | MR. BOUTROUS:  Understood, your Honor.  And we will |
| 25 | then just await your ruling and move promptly if we think we |

N4jWbraO

1    need more relief.

2            THE COURT:  Mr. Berry, I think you have three minutes.

3            MR. BERRY:  Yes.  I will not take more time than

4    necessary, your Honor.

5            I just wanted to point out that in the letter that was

6    sent to Chairman Jordan, the District Attorney's Office said --

7            THE COURT:  Where is this?  Is it in the record?

8            MR. BERRY:  Yes.  This is document 12-20, ECF document

9    12-20, on page 5 of that document.

10           THE COURT:  All right.  Thank you.

11           MR. BERRY:  It says, our review of the office's

12   records reflect that of the federal forfeiture money that the

13   office helped collect, approximately $5,000 was spent on

14   expenses incurred relating to the investigation of Donald J.

15   Trump or the Trump Organization.  It talks about when they were

16   incurred, and then it says most of the costs were related to

17   the *Trump v. Vance* case.

18           So I just want to point out that it is not accurate to

19   say that this money was spent, all this money was spent on the

20   prosecution of Mr. Weisselberg.  As well, there's no dispute

21   here that this has been an ongoing investigation for years, and

22   if they spent $5, if they spent $5 million, Congress has the

23   power of the purse.  Congress has the right to investigate

24   whether or not expenditures are appropriate, and in particular,

25   here Congress has the right to try to investigate, given

N4jWbraO

1   everything that's going on with respect to investigations, is

2   it appropriate going forward for federal funds to be used on

3   the investigations and prosecutions of current and former

4   Presidents and that this -- the nature of this investigation is

5   relevant to that inquiry.

6           THE COURT:  But the testimony that you seek has to

7   relate to that --

8           MR. BERRY:  Yes.

9           THE COURT:  -- let's assume it is a valid legislative

10  purpose, does it not?

11          MR. BERRY:  Absolutely.

12          THE COURT:  How does Mr. Pomerantz's testimony relate

13  in any way to these stated legislative purposes?

14          MR. BERRY:  As someone who was intimately involved in

15  this investigation, he can give us information in terms of

16  whether or not this is the type of investigation upon which

17  federal funds should be spent.  And it doesn't matter how much

18  money we're talking about; Congress has the power of the purse.

19          And with that, your Honor, that's all I have here to

20  submit.

21          THE COURT:  All right.  Then I thank everybody very

22  much for spirited oral arguments and really excellent briefing.

23  I will get a decision published as promptly as I can.

24          We'll stand adjourned then, everyone.  Thank you.

25          (Adjourned)